No. 08-99027

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Richard Kenneth Djerf, Petitioner-Appellant,

vs.

Charles L. Ryan, et al., Respondents-Appellees.

On Appeal from the United States District Court
for the District of Arizona,
No. 2:02-cv-00358-JAT

## REPLACEMENT OPENING BRIEF OF PETITIONER-APPELLANT

JON M. SANDS
Federal Public Defender
District of Arizona

Therese Michelle Day (GA No. 213810)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816 (telephone)
(602) 889-3960 (facsimile)
therese_day@fd.org
Attorney for Petitioner-Appellant

## TABLE OF CONTENTS

Jurisdictional Statement ........................................................................1

Standard of Review ...............................................................................1

Statement of the Issues Presented for Review ........................................2

Statement of the Case.............................................................................3

Statement of the Facts ...........................................................................4

Introduction ..........................................................................................4

Indictment and Self-Representation........................................................6

The Uncounseled Plea..........................................................................13

The Withdrawal of the Waiver of Counsel ...........................................18

Sentencing ...........................................................................................21

Direct Appeal, Post-Conviction, and Federal Habeas Corpus................25

Summary of argument...........................................................................28

Argument..............................................................................................31

Certified Issues.....................................................................................31

I.    Djerf did not make a knowing, intelligent, and voluntary waiver of
      counsel, pursuant to *Faretta v. California* and *Von Moltke v. Gillies*,
      because the trial court failed adequately to inquire into the reason he
      wanted to proceed *pro se*, and because it forced him to choose between
      being represented by incompetent counsel or no counsel at all. ..................31

A.    The trial court failed to conduct an inquiry constitutionally sufficient to protect Djerf's right to counsel and to ensure that his waiver of counsel was valid. ...............................................33

B.    The trial court improperly forced Djerf to choose between proceeding with incompetent counsel or no counsel at all, making his waiver of counsel constitutionally impermissible. ..........39

    1.    In the fifteen months before their removal as Djerf's attorneys, Vaughn and Simpson deprived him of his constitutional right to the effective assistance of counsel. ....................................................40

    2.    Djerf's waiver of counsel was invalid because he was forced to choose between proceeding with Vaughn and Simpson, who were incompetently investigating and preparing his case for trial, or representing himself. .............................................53

II.    The District Court erred in rejecting on the merits, without conducting an evidentiary hearing, Djerf's claim that his trial attorneys provided constitutionally ineffective assistance of counsel at sentencing by failing to investigate, develop, and present adequate and appropriate mitigation. ......................................................................63

III.    The District Court erred in rejecting Djerf's claim that his guilty pleas were not knowing, voluntary, and intelligent and were thus constitutionally infirm. ...................................................72

IV.    The District Court Erred in Denying Relief Pursuant to *Martinez v. Ryan* on Remand on Djerf's Claim That His Trial Counsel Provided Constitutionally Ineffective Assistance of Counsel During the Approximately Fifteen Months They Represented Him During the Merits Phase of His Trial. ..................................................78

A.    Introduction ............................................78

B.    Relevant Legal Standards...................................80

    1.    *Martinez* and Cause and Prejudice.............................80

    2.    *Strickland* and Ineffective Assistance .......................87

C.    Deficient Performance of Post-Conviction Counsel...........................88

        1.      Professional Standards ............................................................89

        2.      McAlister's Lack of Qualification ............................................91

        3.      McAlister's "Psychotic Break" During Her Representation of Djerf........................................................93

        4.      McAlister's gross ineffectiveness in Djerf's case ...................97

    D.    The district court erred in rejecting Djerf's allegations of ineffectiveness of post-conviction counsel ......................................102

    E.    Prejudice ..........................................................................105

V.    The District Court erred in rejecting Djerf's claim that the state court failed properly to consider the mitigating evidence he presented. ..............108

    A.    The State Courts' Treatment of Djerf's Mitigation Evidence ...........109

    B.    The Arizona Courts' Exclusion of Relevant Mitigating Evidence from the Sentencing Calculus Violated Mr. Djerf's Eighth and Fourteenth Amendment Rights and was Contrary to Clearly Established Federal Law. ................................................110

    C.    Djerf was Prejudiced when the Arizona Supreme Court Excluded Relevant Mitigating Evidence from its Sentencing Decision Because it Found it Lacked a Causal Connection to the Crime........115

Conclusion ..........................................................................118

Certificate of Compliance .......................................**Error! Bookmark not defined.**

Statement of Related Case ...........................................................120

Certificate of Service ................................................................121

iii

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. Woodford*, 366 F.3d 823 (9th Cir. 2004) .................................................. 2

*Arrendondo v. Neven*, 763 F.3d 1122 (9th Cir. 2014) .......................................... 77

*Banks v. Dretke*, 540 U.S. 668 (2004) .................................................................. 87

*Bell v. Cone*, 535 U.S. 685 (2002) ....................................................................... 99

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ..................................................... 44, 53, 92

*Brady v. Maryland*, 373 U.S. 83 (1963) .............................................................. 87

*Brecht v. Abrahamson*, 507 U.S. 619 (1993).......................................................120

*Brown v. Craven*, 424 F.2d 1166 (9th Cir. 1970) ................................................ 55

*Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994)................................................. 1-2

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999) ............................................... 70

*Clabourne v. Lewis*, 64 F.3d 1373 (9th Cir. 1995) .............................................. 69

*Clabourne v. Ryan*, 745 F.3d 362 (9th Cir. 2014) ......................................... 87, 89

*Clark v. Murphy*, 331 F.3d 1062 (9th Cir. 2003) ................................................. 1

*Coleman v. Thompson*, 501 U.S. 722 (1991) ....................................................... 83

*Correll v. Stewart*, 137 F.3d 1404 (9th Cir. 1998) .............................................. 75

*Crandell v. Bunnell*, 25 F.3d 754 (9th Cir. 1994) ............................... 46, 56, 57, 70

*Crandell v. Bunnell*, 144 F.3d 1213 (9th Cir. 1998),..................................... *passim*

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) .............................................................. 91

*Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) ...................................... 85, 87, 90

*Djerf v. Arizona*, 525 U.S. 1024 (1998) .............................................................. 26

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ............................. 114, 115, 119, 122

*Faretta v. California*, 422 U.S. 806 (1975) ............................................. 35, 35, 39

*Gregg v. Georgia*, 428 U.S. 153 (1976) .............................................................. 65

*Hill v. Lockhart*, 474 U.S. 52 (1985) ................................................................. 112

*Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006) ............................................... 69, 69

*Iowa v. Tovar*, 541 U.S. 77 (2004) ..................................................................... 79

iv

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ............................................... 35, 66, 79, 91

*Jones v. Wood*, 114 F.3d 1002 (9th Cir. 1997) ...................................................... 75

*Libberton v. Ryan*, 583 F.3d 1148 (9th Cir. 2009) ............................................... 75

*Lockett v. Ohio*, 438 U.S. 586 (1978) ........................................ 114-115, 119, 122

*Lopez v. Ryan*, 630 F.3d 1198 (9th Cir. 2011) ..................................................... 115

*Lopez v. Schriro*, 491 F.3d 1029 (9th Cir. 2007) ..................................................... 1

*Martinez v. Ryan*, 566 U.S. 1 (2012) ...................................................... *passim*

*Maynard v. Meachum*, 545 F.2d 273 (1st Cir. 1976) ...................................... 41-42

*McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015)........................................... *passim*

*McMann v. Richardson* 397 U.S. 759 (1970).........................................76, 91

*Ortiz v. Stewart*, 149 F.3d 923 (9th Cir. 1998) ...................................................... 83

*Patterson v. Illinois*, 487 U.S. 285 (1988) ............................................................. 79

*Pazden v. Maurer*, 424 F.3d 303 (3d Cir. 2005) ........................................... *passim*

*Pennsylvania v. Finley*, 481 U.S. 551 (1987) ....................................................... 82

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ..................................... 115, 115, 119, 122

*Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002) ................................................. 68

*Powell v. Alabama*, 287 U.S. 45 (1932) ........................................................ *passim*

*Reece v. Georgia*, 350 U.S. 85 (1955) ................................................................... 91

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................... 47, 73, 119

*Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000)...................................................... 41

*Sechrest v. Ignacio*, 549 F.3d 789 (9th Cir. 2008) ............................................... 66

*Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002) ................................................... 2

*Smith v. Murray*, 477 U.S. 527 (1986) .................................................................. 86

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................... *passim*

*Strickler v. Greene*, 527 U.S. 263 (1999) ............................................................. 87

*Tennard v. Dretke*, 542 U.S. 274 (2004) ............................................................ 116

*Trevino v. Thaler*, 133 S. Ct. 1911 (2013) ........................................................... 84

*United States v. Johnson*, 196 F. Supp. 2d 795 (N.D. Iowa 2002) ......................... 5

*United States v. Mendez-Sanchez*, 563 F.3d 935 (9th Cir. 2009) ................... 42, 56

v

*United States v. Padilla*, 819 F.2d 952 (10th Cir. 1987) ............................ 41-42, 56

*United States v. Silkwood*, 893 F.2d 245 (10th Cir. 1989) ........................... *passim*

*United States v. Taylor*, 183 F.3d 1199 (10th Cir. 1999) ...................................... 38

*Von Moltke v. Gillies*, 332 U.S. 708 (1948).................................................... *passim*

*Walker v. Martin*, 562 U.S. 307 (2011) ................................................................. 86

*Wiggins v. Smith*, 539 U.S. 510 (2003) ..................................................... 47, 72, 119

*Williams v. Taylor*, 529 U.S. 362 (2000) ........................................... 47, 70, 72, 119

## FEDERAL STATUTES

28 U.S.C. § 2254(d) ........................................................................................ 30, 81

28 U.S.C. § 2254(d)(1) ................................................................................. 61, 119

28 U.S.C. § 2254(d)(2) .................................................................................. 30,78

28 U.S.C. § 2254(i) ............................................................................................. 82

28 U.S.C. § 1291 .................................................................................................. 1

28 U.S.C. § 1651 .................................................................................................. 1

28 U.S.C. § 2241 .................................................................................................. 1

## STATE CASES

*State v. Hoskins,* 14 P.3d 997 (Ariz. 2000) ................................................. 112, 113

*State v. Apelt*, 861 P.2d 654 (Ariz. 1993) ............................................................ 84

*State v. Djerf*, 959 P.2d 1274 (Ariz. 1998) ................................................... *passim*

*State v. Sansing*, 26 P.3d 1118 (Ariz. 2001) ....................................................... 118

## JURISDICTIONAL STATEMENT

Richard Kenneth Djerf, Jr. ("Djerf"), is an indigent death row prisoner in the custody of the Arizona Department of Corrections. On September 30, 2008, the United States District Court for the District of Arizona entered a final order denying Djerf's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ER 015.) The district court had jurisdiction over his habeas petition pursuant to 28 U.S.C. §§ 2241 and 2254.

Following the district court's denial of his motion to alter or amend the judgment, Djerf filed a timely notice of appeal on November 4, 2008. (ER 007, 009.) This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291, 1651, and 2253.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of habeas relief. *Lopez v. Schriro*, 491 F.3d 1029, 1036 (9th Cir. 2007); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003). A claim challenging the knowing, voluntary, and intelligent nature of a waiver of a constitutional right, such as the rights to counsel and to a jury trial, is a mixed question of law and fact that this Court reviews *de novo*. *See Campbell v. Wood*, 18 F.3d 662, 672 (9th Cir. 1994) (en banc) ("The finding of a knowing and voluntary waiver is a mixed question of law and fact which we review *de novo*.").

1

A claim alleging ineffective assistance of counsel is likewise a mixed question of law and fact, which this Court reviews *de novo*. *Allen v. Woodford*, 366 F.3d 823, 836 (9th Cir. 2004), *amended by* 395 F.3d 979 (9th Cir. 2005); *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

### *Certified Issues*

I.   Did the District Court err in rejecting on the merits Djerf's claim that the state court violated his constitutional rights when, by failing adequately to inquire into the reason he filed a *pro se* motion to dismiss his court-appointed counsel and to represent himself, the state court forced him to choose between incompetent counsel and no counsel at all?  As a result of the state court's error, was Djerf's waiver of his Sixth Amendment right to counsel not knowing, intelligent, or voluntary?

II.  Did the District Court err in rejecting on the merits, without conducting an evidentiary hearing, Djerf's claim that his trial attorneys provided constitutionally ineffective assistance of counsel at sentencing by failing to investigate, develop, and present adequate and appropriate mitigation?

III. Did the District Court err in rejecting on the merits on remand Djerf's claim that his guilty pleas to four counts of first-degree murder were not made knowingly, voluntarily, and intelligently and were thus constitutionally infirm?

IV.  Did the District Court err in rejecting on remand Djerf's claim that trial counsel were ineffective during the approximately fifteen months they represented him during the merits phase of his trial, and that pursuant to *Martinez v. Ryan* post-conviction

2

counsel's ineffectiveness for failing to raise this claim excused the default of this claim?

*Uncertified Issue*

V.    Did the District Court err in rejecting Djerf's claim that the state court failed properly to consider the mitigating evidence he presented?

### STATEMENT OF THE CASE

This appeal arises from the district court's denial of a petition for a writ of habeas corpus in a capital case. Following Djerf's uncounseled guilty pleas to four counts of first-degree murder, a judge of the Superior Court for Maricopa County, Arizona, imposed four death sentences on him. The Arizona Supreme Court affirmed his convictions and sentences on direct review. *State v. Djerf*, 959 P.2d 1274 (Ariz. 1998). (ER 097.) Pursuant to Arizona procedure, the state supreme court then filed a notice of post-conviction relief on Djerf's behalf in the trial court. (ER 285.) The trial court subsequently denied Djerf's post-conviction petition, and the Arizona Supreme Court denied his petition for review of this ruling. (ER 090, 091.)

On February 27, 2002, Djerf filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dist. Ct. Dkt. 1.) The district court ultimately dismissed that petition with prejudice on September 30, 2008. (ER 063.) Following motions for

3

relief from judgment and for reconsideration of the denial of certificates of appealability, Djerf timely appealed the district court's ruling. This Court subsequently granted remand for the district court to consider the application of *Martinez v. Ryan*, 566 U.S. 1 (2012) to Djerf's unexhausted claims. (9th Cir. ECF No. 62.) The district court denied relief on all the claims. (Dist. Ct. ECF No. 128 at 24.) Djerf now files this Replacement Opening Brief pursuant to the Court's order. (9th Cir. ECF No. 68.)

### STATEMENT OF THE FACTS

### INTRODUCTION

> *It is precisely when the lowest or most despised members of society are subjected to the investigatory and penal power of the State, when the charged crimes are most heinous . . . or the defendant's guilt supposedly most obvious, that courts must be most vigilant to protect defendants' constitutional rights for the sake of all members of society, the favored as well as the despised. History shows that tables can turn with shocking rapidity, such that everyone has a vested interest in protection of constitutional rights from erosion, even if the erosion seems justified in a particular case by "legitimate reasons."[1]*

---

[1] *United States v. Johnson*, 196 F. Supp. 2d 795, 885 (N.D. Iowa 2002), *rev'd on other grounds*, 338 F.3d 918 (8th Cir. 2003).

4

This case arises from the murders of four members of the Luna family in Phoenix, Arizona, on September 14, 1993. As will become evident in the pages that follow, the parties to this proceeding have significant disagreements about the constitutionality of the subsequent conviction and sentencing of Richard Djerf, the man charged with the homicides. There is no disagreement, however, that the deaths of Albert, Patricia, Rochelle, and Damien Luna were profoundly tragic.

This brief will necessarily focus on the constitutional infirmities in Djerf's prosecution and sentencing. It will discuss the gross indifference of his court-appointed attorneys, the trial court's blatant disregard of his Sixth Amendment rights, the state courts' misapplication of clearly established federal law, and the farce that was his state post-conviction proceeding. It will also discuss Djerf himself: his difficult and unusual family history, and the specter of mental illness in his life. In short, this appeal necessarily is about the inequities caused by the flawed legal process in Djerf's case. The brief does not detail the facts of the crime, rather it limits the facts to those relevant to the issues in this appeal. Silence about the details of the crimes, however, does not ignore the magnitude of the tragedy that underlies this case. Instead, the issues in this appeal concern the constitutional errors that have plagued this case from its inception. The latter cannot be undone; the

former, however, are well within this Court's power – and, in fact, are its obligation – to correct.[2]

## INDICTMENT AND SELF-REPRESENTATION

A grand jury indicted Djerf on eighteen criminal counts, including four counts of first-degree murder, arising from the homicides of Albert Luna, Sr., his wife Patricia, and their children, eighteen-year-old Rochelle and five-year-old Damien, in their Phoenix home. (ER 211.) The trial court appointed the Maricopa County Public Defender to represent Djerf, but the public defender immediately moved to withdraw from the case because his office had previously represented the Lunas' surviving son, Albert, Jr., in two criminal proceedings. (ER 519.) The court permitted the public defender's office to withdraw and subsequently appointed Phoenix attorneys Michael Vaughn and Alan Simpson in its stead.

---

[2] As this Court recently observed:

> There is no doubt that the facts of this case are repulsive. But that is true for every case where the death penalty is imposed. If the resolution of this case rested on the relative heinousness of the offense, we would have no quarrel with our colleague in dissent. However, our charge is to look at the merits of the legal issues raised rather than to focus on the degree to which we are repulsed by the inevitably grisly details of the case. Indeed, our precedent leaves no doubt that the heinous nature of the underlying offense should not be the determining factor.

6

The enormity of the task facing Vaughn and Simpson upon their appointment was daunting. Standing alone, the gravity of the charges against Djerf and the prosecution's intent to seek the death penalty against him would have required Vaughn and Simpson to devote hundreds of hours to Djerf's defense in the months immediately following his indictment. Counsel's obligations were heightened in this case, however, by Djerf's emotional fragility. For example, Djerf's already tenuous mental health degenerated so significantly following his arrest that he was transferred to the jail's psychiatric unit in October 1993 after attempting suicide by slitting his wrists with a piece of metal removed from the mechanics of a musical Halloween card he had received from his sister. (ER 245, 323, 460.) As will be described *infra*, however, Vaughn and Simpson performed so little work on Djerf's case in the critical months following his indictment, and had such minimal communication with their emotionally troubled client, that by early 1995, Djerf sought to have them removed from his case.

In a February 1995 letter to the trial judge, Djerf wrote of his dissatisfaction with his attorneys. (ER 464.) Specifically, he stated that he had barely spoken to counsel since July 1994, and that, although his trial was scheduled to commence in only two weeks, he had absolutely no idea what his attorneys' trial strategy would be. (ER 464.) Perhaps most troubling, Djerf informed the trial court that, in the

7

more than fifteen months they had been assigned to his case, Vaughn and Simpson

had failed to ask him anything about the crimes for which he was charged. (ER 464.)

Djerf's letter to the court read:

> The reason that I am writing this letter is because I want it on the record that I don't believe that I am being properly represented by my defense councel [sic] of Michael Vaughn and co-councel [sic] Alan Simpson.

> Since July the only time Vaughn and I have talked is, briefly, over the phone and at court. The last few times I've been to court, he's been more interested in talking with the prosecuter [sic], than with myself.

> I've made my feelings known to Vaughn and Simpson, in letters (copies attached) mailed from the jail, on January 20, 1995, and still I wait!

> My trial is scheduled to start March 1st, 14 days untill [sic] my life goes on trial. 14 days and I haven't the faintest idea what route Vaughn and Simpson plan, for my defense. Apparently anything I may have of help with my defense, isn't important or just doesn't matter. They haven't asked me anything, concerning the case, so, apparently, everything they've learned from interviewing the witness' [sic], must have satisfied them, [illegible] is not acceptable!

> This is a capitol [sic] case, which directly involves me and the DEATH PENALTY, therefore, I believe, I should be completely involved, in all aspects, of this matter.

> I will no longer sit back and allow anybody to do as they please with my life, and that includes my defense councel [sic]!

8

Thank you, for taking the time, to listen, to my problem.

Sincerely,

Richard K. Djerf

The day after writing this letter, Djerf filed a *pro se* "Motion for Change of Counsel." (ER 471.) The pre-printed motion required Djerf to write in the name or names of the counsel he wished withdrawn and the name of the "attorney" he wished to have substituted as his counsel. (ER 471.) Given that the public defender's office was conflicted off of his case, (ER 519), and because he presumably was unfamiliar with any other attorneys whom the court could appoint, Djerf wrote his own name in as substitute counsel.[3] (ER 471.)

At the hearing on Djerf's motion to remove Vaughn and Simpson, the trial court immediately launched into the colloquy necessary to accept Djerf's waiver of counsel. (ER 190.) Only upon completion of the colloquy did the court state, "Why don't you briefly tell me why you want to do this." (ER 199.) The trial court, however, was in receipt of Djerf's letter and knew that his request to proceed *pro se*

---

[3] Richard later explained his request to proceed *pro se* in a letter to Vaughn, stating, "I didn't want to proceed pro-per but I felt I had no choice." (ER 409.) Richard's letter makes clear that he felt that he had "no choice" but to have Vaughn and Simpson removed because their failure to communicate with him about his case had become so intolerable that he "couldn't take it any longer." (ER 409.)

9

was prompted solely by his concerns about the competency of his court-appointed counsel. (ER 464.) In response to the court's request for a "brief" explanation for the request to proceed *pro se*, Djerf again informed the court that Vaughn and Simpson had not been communicating with him and had not been advising him of developments in the case. (ER 199.) Djerf concluded, "So I just assume I can do this myself."

Seemingly unfazed that lawyers whose client was facing four death sentences would fail to speak to that client at all about the crimes with which he was charged, and would fail to visit their suicidal client for months on end, the trial court chided Djerf for his concerns, telling him that his attorneys were "doing a lot of work" on the case, and that to have his attorneys "run down to the county jail every night and tell [him] what they have done [was] not a very good use of their time." (ER 199-200.) When Djerf responded that Vaughn had not been to the jail to see him in seven months, the trial court cut him off: "Well, you may not be happy with the number of times they come down and see you, but I want to tell you that I have been monitoring this case. They have been advising me of what they have been doing, and they have been doing a lot of work on your behalf." (ER 200.)

Based on this cursory inquiry, the trial court found that Djerf had "knowingly, intelligently and voluntarily" waived his right to counsel, and that the waiver was

10

"not the result of any force, threats, promises or coercion." (ER 206-207.) Then, despite being aware of the complete breakdown of the attorney-client relationship between Djerf and his attorneys, the court appointed Vaughn and Simpson as advisory counsel. (ER 207.)

Although the trial court unquestioningly accepted Djerf's waiver of his constitutional right to counsel in a complex capital case, the prosecution, to its credit, recognized that his decision to proceed *pro se*, coupled with his previous suicide attempt, suggested that Djerf might not be competent to make such a serious – and potentially disastrous – decision. The prosecution asked that Djerf's competency be evaluated, noting that his "decision to represent himself in the face of highly technical, complex evidence which will be elicited from expert witnesses does not appear to be logical or well founded." (ER 459.)

In response to the prosecution's request, the trial court ordered only that a "prescreening" report be prepared to determine whether a complete competency determination was warranted. (ER 458.) The court further ordered counsel to provide the psychiatrist assigned to prepare the report with copies of police reports, previous mental health reports, and any other appropriate material for the prescreening examination, and it scheduled a hearing to consider the prescreening report and determine whether a more thorough mental health evaluation was

11

warranted.  (ER 458.)  Four days before the scheduled hearing, however, Dr. Jack Potts, the psychiatrist assigned to conduct the prescreening evaluation, informed the court that, despite his requests and the court's previous order, Vaughn and Simpson had failed to provide him with any information concerning Djerf.  (ER 457.)  Potts requested additional time to complete the prescreening report, stating in his letter, "I ask defense counsel to provide me with all mental health evaluations that were conducted on Mr. Djerf.  This is an important case and the more information I have, the better prepared I will be to form an accurate opinion."  (ER 457.)

In his subsequent report, Potts informed the court that he had "briefly discussed the case" with Simpson and from that discussion understood that Vaughn and Simpson "do not have any doubts regarding the defendant's present competency to continue with the legal proceedings against him or to enter a plea of guilty if he should wish to do so."  (ER 454, 455.)  Potts concluded that "*[t]here is no evidence provided* that would preclude [Djerf] from exercising his constitutional right" to represent himself.  (ER 456 (emphasis added).)  He repeated, "No information that I have reviewed or that has been provided to me would, I believe, rise to a level of precluding the defendant's Pro Per status."  (ER 456.)  Potts noted, however, that due to Djerf's "past proclivity towards depressive reactions," the court and counsel would need to monitor him to determine whether he was "effectively continuing

12

with his Pro Per status." (ER 456.) Potts concluded, "This does not mean that I believe that what Mr. Djerf is doing is a wise or intelligent choice. It is a competent one." (ER 456.)

Relying on Potts's prescreening report, and making no note of the doctor's evident concern about the limits of the information provided to him, the trial court promptly found no reasonable grounds to order a full mental health or competency evaluation. (ER 449, 452-453.)

### THE UNCOUNSELED PLEA

In the months following the trial court's decision to permit him to proceed without counsel, Djerf "on more than one occasion" expressed to his then-advisory counsel, Vaughn and Simpson, his desire to negotiate a plea agreement for a life sentence. (ER 410, 430.) Djerf explained that he wanted to negotiate a plea because he "was afraid of going to trial." (ER 410.) At one point, he telephoned both Vaughn and Simpson to schedule a meeting to discuss the possibility of a plea agreement. (ER 430.) As Djerf later recounted, "I was informed that [Simpson and Vaughn] would be down, to the jail, by the end of the week so that we could discuss this matter." (ER 430.) Despite these assurances, however, neither attorney contacted him. (ER 430.)

13

In July 1995, Djerf wrote to Simpson, with a copy to the court, expressing frustration over the two attorneys' failure to provide him any assistance or advice. (ER 419.) He complained that, with regard to "several issues," he had been required to seek the assistance of a fellow inmate because "repeated messages" left at Simpson's office had gone unanswered. (ER 419.) Djerf wrote a letter to Vaughn, again copying the court, expressing similar concerns. The letter read in part:

> Since you obviously ignore all the requests that I've made for assistance, either you don't know what "advisory councel [sic]" means, or you don't care one way or the other what happens in relation to this case.
>
> Since August 27th, when you were down here, at the jail, for the Deposition of Emily Boswell, you have only been down here 3 times. On February 16th you came down with Alan Simpson so we could discuss my decision to represent myself, and then twice on March 1st to talk me out of a news conference.
>
> Several times I've made requests for you to make a jail visit so we could discuss certain issues but apparently you have better things to do since you never show up.
>
> I am tired of hearing you say that you'll be up to see me, only so I can wait for you not to show up.
>
> If you have a problem with assisting me in an advisory capacity then you need to address your problem with the court, so that I can be appointed advisory councel [sic] that is willing to assist me when I need assistance and not blow me off.

14

> You need to make your decision now, because I will not
> put up with getting jerked around any longer.

(ER 417.)

Neither Vaughn nor Simpson responded to Djerf's letters, nor did they meet

with him to discuss the possibility of negotiating a plea agreement. (ER 410-411.)

Eventually, Djerf wrote the following letter to the lead prosecutor without first

conferring with his advisory counsel:

> I am writing you this letter in a weak attempt at negotiating
> a plea agreement allowing me to avoid the death penalty.
>
> I have nothing at all to offer the state, other than my
> willingness to accept the maximum sentences on all
> counts; consecutive of course!
>
> I agree that this isn't much of an offer, but it allows the
> families of the victims to move on with their lives, without
> having all the terrible details of this incident brought out,
> and the State of Arizona will save the many millions of
> taxpayer dollars it will cost for the trial and the many
> appeals.
>
> Take some time and consider this opportunity to do justice
> to the victims and their families, and let me know your
> answer as soon as possible, so that I may prepare
> accordingly.
>
> Sincerely,
>
> Richard K. Djerf, Jr.

(ER 421.)

15

The prosecutor responded to Djerf's letter, informing him that "[t]he State refuses to relinquish its request for the death penalty." (ER 423.) The prosecution, however, did offer to drop the non-murder charges against Djerf if he agreed to plead guilty to the four murder counts, with the understanding "that the State will present an aggravation hearing in an attempt to obtain the death penalty." (ER 423.)

Djerf immediately contacted Vaughn, asking him to meet with him to discuss the prosecution's proposal and informing him that he was considering accepting the plea. (ER 411.) Only then did Vaughn meet with Djerf—for approximately fifteen minutes. (ER 411-412.) Remarkably, however, he apparently expressed no trepidation over Djerf's consideration of the prosecution's offer. (ER 412.) Several days later, Vaughn returned to the jail, bringing the plea agreement for Djerf's signature, but again expressed no reservations about Djerf's decision to enter into the plea. (ER 412.) Immediately prior to his change of plea hearing, Djerf again met with Vaughn in a holding room adjacent to the courtroom. (ER 401-402.) During this third meeting, Vaughn again expressed no concerns or reservations to Djerf regarding his decision to plead guilty. (ER 402.)

At the hearing, the trial court conducted the colloquy required by Rule 17.2 of the Arizona Rules of Criminal Procedure and *Boykin v. Alabama*, 395 U.S. 238 (1969). One of the requirements of the colloquy is that the court inform the

16

defendant about, and that the defendant understand, "[t]he constitutional rights which the defendant foregoes by pleading guilty or no contest, including his or her right to counsel if he or she is not represented by counsel." *See* Ariz. R. Crim. P. 17.2(c) (1995). Fully aware of the breakdown of Djerf's relationship with Vaughn and Simpson, the court nevertheless informed Djerf during the colloquy: "You also have the right to go to trial, a jury trial, and you can either represent yourself or have Mr. Vaughn and Mr. Simpson represent you[.]" (ER 174.) In other words, the court informed Djerf that his choices were to proceed to trial *pro se* or with incompetent counsel. The court failed to explain to Djerf that he had a Sixth Amendment right to proceed to trial with competent attorneys representing him.

At no time during the change of plea hearing did the trial court address either Djerf or his advisory counsel regarding the concerns Djerf had repeatedly raised about counsel. And only *after* Djerf admitted his guilt to the four murders did the trial court ask Vaughn if he had "any concerns." (ER 186.) For the first time, Vaughn responded that he had "concerns about the propriety" and "wisdom" of what Djerf was doing, but did not elaborate on those concerns. (ER 186-187.) When asked if he had any concerns about Djerf's mental state, Vaughn responded, "I have no questions about his mental state at all." (ER 186.) Although Vaughn had seen no reason to advise Djerf against pleading guilty to four death-eligible charges,

17

following the hearing he was quick to inform a reporter that the plea was "not a good idea," and that he had "tried to dissuade Djerf from entering the plea deal." (ER 426.) Vaughn, however, gave another reporter a conflicting (and legally inaccurate) account of his role in Djerf's guilty pleas, stating, "It was never my recommendation to do this, . . . [b]ut by law, I can't give him advice without his asking for my advice." (ER 425.)

## THE WITHDRAWAL OF THE WAIVER OF COUNSEL

The week following his guilty plea, Djerf wrote to Simpson, informing him that he was considering withdrawing his waiver of counsel so that his sentencing hearing could be "conducted properly," but expressed his reluctance to do so because of counsel's wholly inadequate representation of him. (ER 431.) He began the letter:

> On February 23rd, Judge Ryan permitted me to represent myself. *I made the decision to represent myself not because I wanted to, but because you and Mike (Vaughn) repeatedly ignored my requests for any information as to the current status of my case, so I felt that my only option was to represent myself[.]*

(ER 428 (emphasis added).) Djerf then filed a motion seeking to have Vaughn and Simpson removed as his advisory counsel because he "no longer trust[ed] them." (ER 396.) In the motion, Djerf again explained that he asked the court to permit him

18

to represent himself because that was the "only way" he believed he could rid himself of his incompetent attorneys, and detailed at length the disintegration of his relationship with Vaughn and Simpson. (ER 397-403.) The motion left no doubt that Djerf could not, under any circumstances, continue to work with Vaughn or Simpson:

> Since the Defendant is facing a possible sentence of death, the Defendant, upon withdrawal of his waiver of council [sic], should be entitled to effective representation by councel [sic] willing to work with the Defendant. The Defendant's advisory councel [sic] has had ample opportunity to resolve these problems, but they have chosen to ignore them. The actions of Mr. Vaughn and Mr. Simpson are clearly not those of persons who are willing to help another person avoid a possible death sentence.

> The Defendant has submitted complaints to the State Bar of Arizona, and from this date forward the Defendant will no longer accept legal visits from Mr. Vaughn or Mr. Simpson. The Defendant has nothing to say to these so-called lawyers.

> Therefore the Defendant requests that Michael Vaughn and Alan Simpson be removed as Defendant's councel [sic] and that other councel [sic] be appointed to represent the Defendant upon withdrawal of his waiver of councel [sic].

(ER 403-404.)

19

At the subsequent hearing on his motion, Djerf informed the court that he wanted to be represented by counsel at his sentencing hearing, but that he had "lost trust in Mr. Vaughn and Mr. Simpson." (ER 390-391.) As it had when Djerf sought to proceed *pro se*, however, the trial court once again responded that counsel had "done a lot of work on his case," and were not ineffective "simply because they don't come down and see you as often as you believe is appropriate." (ER 391.) The court further noted that, in any event, Djerf did not have a constitutional right to have advisory counsel. (ER 391.) Noting that appointing new counsel for sentencing "would not be in the interest of justice because [the] case would then have to be further delayed," the trial court denied Djerf's motion. (ER 391-392.)

When the court asked Djerf if he wanted to have Vaughn and Simpson represent him during sentencing, Djerf first responded that he would continue to proceed *pro se*, but then agreed to discuss the matter further with Vaughn and Simpson before deciding. (ER 392-393.) A month later, Djerf withdrew his waiver of counsel. (ER 380, 383.) The court briefly questioned him regarding his decision before finding that he "knowingly, intelligently and voluntarily waived [his] right to represent himself." (ER 380, 383-384.)

20

**SENTENCING**

The aggravation/mitigation hearing in Djerf's case was scheduled to occur in October 1995, more than two years after his indictment. Despite having been assigned to Djerf's case virtually from its inception, Simpson informed the court that, although the prosecution was prepared to present its aggravation case in October, "Mr. Vaughn and I would request the Court to allow us to set our mitigation several months off from that date." (ER 385.) The trial court deferred ruling on Simpson's request for extra time until after the prosecution's presentation of its aggravation case. (ER 387.)

Over the course of five days in October 1995, the prosecution presented evidence of the aggravating factors it maintained warranted death sentences for each of the four homicides to which Djerf pleaded guilty. Counsel ultimately obtained a four-month continuance to present Djerf's mitigation case, which commenced on February 9, 1996. Djerf's lead counsel, Vaughn, was not present that day, however, because he "had to attend to matters in another court." (ER 313.) Simpson presented the testimony of a jail guard, Rick Bailey, who testified about Djerf's conduct while an inmate at the county jail. (ER 314.) Bailey described Djerf's housing arrangements, then proceeded to explain that Djerf had received several disciplinary action reports during his time at the jail. (ER 316-318.) Djerf was first written up

21

for his attempted suicide on October 29, 1993. (ER 323.) He was next written up and disciplined for possession of a razor blade in December 1993. (ER 319.) The razor blade was found as part of a routine search of Djerf's cell and had not been used against himself or anyone else. (ER 319-320.) According to Bailey, other disciplinary actions resulted from Djerf's participation with other inmates in posting a fake notice informing inmates that they would be charged for hot meals; his possession of a braided, rope-like sheet; and his ordering of numerous "bill-me-later" publications in violation of jail policy. (ER 325, 326-327, 329-330.) Although Simpson presumably presented Bailey's testimony to highlight Djerf's good conduct while incarcerated, on cross-examination, Bailey admitted that Djerf's disciplinary infractions were not reflective of model inmate behavior. (ER 333-337.)

Simpson next called defense investigator Art Hanratty. (ER 338.) Hanratty had been appointed to the case in September 1993, immediately after Djerf was indicted. (ER 340.) In the two years and four months he had been assigned to Djerf's case, however, Hanratty, a former police officer with no training or experience in mitigation investigation, had interviewed only Djerf's mother, father, and sister in his efforts to obtain Djerf's "life history." (ER 340.) Hanratty testified that he did not contact Djerf's family until April or May of 1995, and then again in January 1996, shortly before his testimony. (ER 340.) His interviews consisted, in total, of

22

no more than eleven hours of investigation – six of which had been conducted in the month preceding his testimony. (ER 340-341.) He made no notes or recordings of these interviews. (ER 371.)

Hanratty offered only brief and general testimony about Djerf's background, including the fact that he had a difficult birth; that when his parents divorced, his mother gave sole custody of the children to his father even though he was an alcoholic; that Djerf had very little contact with his mother because she remarried and lived out of state with a man who did not like children; that his stepfather once slammed Djerf against a wall; and that Djerf had a head injury when he was a toddler for which he received no medical treatment. (ER 341-356.) He described Djerf's life with his father as lonely and isolated because of his father's minimal interaction with his children and nightly drinking. (ER 357-360.)

The paucity of Hanratty's investigation is plainly revealed by his own testimony. For example, he could not recall whether Djerf was the third or fourth child born to his mother, nor could he provide an accurate description of significant injuries Djerf sustained at birth, stating vaguely that Djerf "received a fracture or dislocation of the left arm or possibly left shoulder." (ER 341, 342.) The record does not reflect that Hanratty attempted to interview other members of Djerf's extended family, or that he attempted to interview neighbors, friends, teachers, or

23

coworkers.[4]   He apparently made no attempt to obtain relevant birth, marriage, divorce, military, or health records pertaining to Djerf or members of his family.   On cross-examination, Hanratty admitted that he never read Djerf's probation officer's reports from a prior offense.  (ER 366.)  When asked by the prosecutor if he had checked Djerf's school records, Hanratty stated that he had recently looked at some school documents, but could not provide any details.  (ER 369.)  Hanratty was equally vague about Djerf's work history.  (ER 370.)

Following this minimal presentation of mitigation, counsel received four additional continuances to investigate Djerf's mental health.  (ER 299-302, 305-308, 310-311, 372-375.)  Ultimately, however, they presented no mental health evidence in mitigation.  Rather, the only other witness on Djerf's behalf was another jail guard whose brief testimony concerned Djerf's responsibilities as a jail "trustee" and his respectful behavior toward officers and other inmates.  (ER 289-291.)

Simpson eventually submitted a six-page sentencing memorandum on Djerf's behalf, only two pages of which addressed mitigating circumstances.[5]  (ER 292.)  In

---

[4] Hanratty did speak with Richard's father's friend, Ellen Dickson, but the scope of this interview appears to have been very limited.  (ER 361, 364.)

[5] The record does not reflect that Vaughn participated in any manner in Richard's case in mitigation.

24

contrast, the prosecution submitted a fifty-six-page memorandum addressing aggravating factors and a supplemental eleven-page memorandum refuting the minimal mitigating evidence presented on Djerf's behalf. (Trial Court Docket "Td." 266, 268.)

The trial court returned its special sentencing verdict on May 22, 1996. (ER 141.) Although the court found that the prosecution had proven four statutory aggravating factors, it found that Djerf had proven no mitigating circumstances whatsoever. (ER 155-160.) Of particular note, the court rejected evidence of Djerf's "alleged difficult family background" as mitigating evidence because there was no proof that it "had any effect on the defendant's behavior during these killings that was beyond the defendant's control." (ER 140, 157.) The court then imposed four death sentences.

### DIRECT APPEAL, POST-CONVICTION, AND FEDERAL HABEAS CORPUS

The Arizona Supreme Court subsequently affirmed Djerf's convictions and sentences, and the United States Supreme Court denied his petition for writ of certiorari. *State v. Djerf*, 959 P.2d 1274 (1998); *Djerf v. Arizona*, 525 U.S. 1024 (1998). The state supreme court then appointed Jamie McAlister to represent Djerf in his state post-conviction proceedings. (ER 287.) The state courts, however,

ultimately denied Djerf post-conviction relief without the benefit of an evidentiary hearing.  (ER 090, 091.)

In his subsequent federal habeas corpus proceeding, Djerf attempted to demonstrate that at the critical post-conviction stage of his state case—the first stage at which he could first challenge the constitutional effectiveness of counsel—the Arizona Supreme Court provided him with an attorney who, in addition to being unqualified under the Arizona Rules of Criminal Procedure to represent capital defendants in post-conviction proceedings, was so seriously mentally ill that she was incapable of acting as an attorney in any meaningful capacity.  Among the evidence that Djerf sought to present to the district court was proof that McAlister, who had previously been diagnosed with bipolar disorder, suffered a psychotic break during her representation of Djerf, and that she retained as the psychological expert in his case the very psychologist who, during the same period of time, she retained to evaluate *herself* in connection with a series of ethical complaints filed against her with the Arizona State Bar.  The district court rejected Djerf's attempts to present this evidence because it concluded that he did not have the constitutional right to the effective assistance of post-conviction counsel and that his challenges to McAlister's representation were therefore not cognizable.  (ER 072-074.)

26

Djerf raised nineteen other claims in his amended habeas petition. Those claims included arguments that (1) the state court violated his constitutional rights when it forced him to choose between representing himself or being represented by grossly ineffective attorneys the court had previously appointed; (2) his guilty pleas were not knowing, intelligent, and voluntary; (3) his appointed counsel rendered ineffective assistance of counsel by failing to investigate and present adequate and appropriate mitigating evidence; and (4) the state courts applied an unconstitutional screening test to the consideration of mitigating evidence by refusing to consider evidence that did not bear a "causal nexus" to the crimes for which he was convicted.

In a preliminary ruling in September 2005, the district court denied Djerf's motions for an evidentiary hearing and to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts. (ER 065.) In that ruling, the court dismissed four of Djerf's claims as either procedurally barred or non-cognizable in federal habeas proceedings. (ER 089.)

Three years later, the district court issued its memorandum of decision and order denying Djerf relief on his remaining claims. (ER 015.) The court initially granted Djerf a certificate of appealability on only one claim (ineffective assistance of counsel at penalty phase), but in response to Djerf's motion to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the court

27

granted an additional certificate of appealability on his claim that the trial court impermissibly forced him to choose between incompetent counsel and no counsel at all. (ER 012-013, 063-064.) Djerf timely appealed.

While Djerf's appeal was pending before this Court, the Supreme Court of the United States issued its ruling in *Martinez*, 566 U.S. 1. In light of *Martinez*, on April 19, 2012, Djerf filed a motion seeking a partial remand of his appeal to permit him to return to district court to litigate whether inadequate representation by his state post-conviction attorney excused his failure to exhaust certain of his claims. (9th Cir. ECF No. 54.) This Court granted Djerf's motion for partial remand on August 19, 2014. (9th Cir. ECF No. 62.) Djerf filed his supplemental brief in the district court on April 17, 2015. (Dist. Ct. ECF No. 124.) The district court denied relief on all the claims. (Dist. Ct. ECF No. 128 at 24.) On return to this Court, the Court expanded the certificate of appealability to include the claims denied by the district court on remand. (9th Cir. ECF No. 68.) The Court also ordered that the prior briefs filed by the parties be struck and that replacement briefs be filed in their place. (9th Cir. ECF No. 68.)

## SUMMARY OF ARGUMENT

Djerf raises four certified issues and one uncertified issue in this brief. Issue I, a certified claim, concerns the trial court's violation of his Sixth Amendment right

28

to counsel when it required him to choose between being represented by incompetent counsel or representing himself. The record in this case plainly demonstrates that Djerf sought to remove Vaughn and Simpson as his attorneys because of their ongoing failure to communicate with him and their lack of preparation in his case. He desired adequate representation, not self-representation. The state courts' refusal to acknowledge that Djerf's waiver of his right to counsel was obtained in violation of Sixth Amendment rights was contrary to clearly established federal law.

Issue II, a certified claim, concerns the district court's merits denial of Djerf's argument that his attorneys rendered constitutionally ineffective assistance of counsel in the penalty phase of his trial. Djerf identifies critical errors both in the district court's interpretation of the state court's ruling and in its application of the deference provisions of 28 U.S.C. § 2254(d). He then demonstrates that counsel rendered deficient performance in investigating, preparing, and presenting mitigating evidence in his case. He further demonstrates that both the state court and the district court erroneously denied him an evidentiary hearing on this claim, and requests that the Court remand the matter to the district court for an evidentiary hearing on the question of prejudice.

Issue III, a certified claim, concerns the district court's merits denial of Djerf's claim that his guilty pleas were not knowing, intelligent, and voluntary because the

29

trial court failed properly to advise him that, by pleading guilty, he was waiving his right to proceed to trial represented by competent counsel. The district court found that the trial court's statement to Djerf at the change of plea hearing was not improper because there was no Supreme Court authority requiring a court "to apprise defendants in any particular form of the risks of proceeding to trial pro se." (Dist. Ct. ECF No. 128 at 31 (citation omitted).) The district court also found that Djerf exaggerated the state of his relationship with counsel at the time he pleaded guilty and that counsel were not "grossly deficient." (Dist. Ct. ECF No. 128 at 32.) The district court erred when it found that the Arizona Supreme Court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law or did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(1) and (2).

Issue IV, a certified claim, concerns Djerf's claim that trial counsel was ineffective during the approximately fifteen months they represented him during the pretrial stage of proceedings. Djerf presents extensive details of the failures of counsel prior to trial and argues that pursuant to *Martinez v. Ryan*, post-conviction counsel's failure to raise this claim constituted cause excusing the default of this claim in state court.

Issue V, an uncertified claim, concerns the state court's application of an unconstitutional "causal nexus" test on its consideration of mitigating evidence concerning Djerf's difficult childhood. The trial court found that Djerf's family background was "*not a mitigating circumstance*" because there was "no evidence that any alleged difficult family background had any effect on [Djerf's] behavior during [the] killings." (ER 140 (emphasis added).) The Arizona Supreme Court expressly affirmed the trial court's ruling. The state courts' imposition of this causal nexus requirement violated clearly established federal law, and mandates relief in this case. *See McKinney v. Ryan*, 813 F.3d 798, 803 (9th Cir. 2015) (en banc), *cert. denied*, 137 S. Ct. 39 (2016) (mem.).

**ARGUMENT**

*Certified Issues*

**I.**   **DJERF DID NOT MAKE A KNOWING, INTELLIGENT, AND VOLUNTARY WAIVER OF COUNSEL, PURSUANT TO *FARETTA V. CALIFORNIA* AND *VON MOLTKE V. GILLIES*, BECAUSE THE TRIAL COURT FAILED ADEQUATELY TO INQUIRE INTO THE REASON HE WANTED TO PROCEED *PRO SE*, AND BECAUSE IT FORCED HIM TO CHOOSE BETWEEN BEING REPRESENTED BY INCOMPETENT COUNSEL OR NO COUNSEL AT ALL.**

In the fifteen months that Vaughn and Simpson represented Djerf prior to his waiver of counsel, they did little for him that bore resemblance to adequate legal representation. From December 1993 through February 1995, they requested

31

fourteen continuances because they had not begun investigation or preparation of the case for trial, were in trial in other courtrooms for other clients, were unable to work at all due to serious health issues or illness, or were on vacation. (ER 470-471, 474, 478, 483, 487, 489, 492-493, 497, 502, 505, 508-509, 511-512, 514, 516.) Between July 1994 and February 1995, a period of approximately seven months, lead counsel Vaughn failed to visit Djerf at the jail or otherwise inform him of the progress of his case.[6] (ER 405.) Both attorneys failed to return Djerf's telephone calls or answer his letters inquiring about the status of his case. Djerf had no information about any aspect of his case: he was unaware of the state of investigation, the prosecution's evidence against him, what defense theories would be put forth at trial, or whether counsel had developed any mitigation themes for sentencing. (ER 396.) Essentially, he was held incommunicado by his own attorneys.

It was in this context that Djerf sought to replace Vaughn and Simpson as his counsel. Without considering the possibility of appointing other counsel, or even meaningfully inquiring into Djerf's difficulties with Vaughn and Simpson, the court instead forced Djerf to choose between two equally unacceptable alternatives:

---

[6] The record reflects that Simpson had not visited his client for three months preceding Richard's February 1995 motion for change of counsel. (ER 405.)

proceed with counsel who were incompetently preparing his case for trial, or represent himself. With no legal background and little understanding of his rights, Djerf found himself facing a Homeric dilemma, forced to choose between the Scylla of proceeding with ineffective counsel or the Charybdis of representing himself.[7] He chose the latter and was sucked into the perilous whirlpool of self-representation, which led to his self-negotiated and uncounseled guilty pleas, and ultimately to his four death sentences. As Djerf demonstrates in this brief, however, the trial court violated his constitutional rights when it failed to inquire adequately into the reason he wanted his counsel replaced and then forced him to either proceed with incompetent counsel or represent himself.

**A. THE TRIAL COURT FAILED TO CONDUCT AN INQUIRY CONSTITUTIONALLY SUFFICIENT TO PROTECT DJERF'S RIGHT TO COUNSEL AND TO ENSURE THAT HIS WAIVER OF COUNSEL WAS VALID.**

The trial court's inquiry into Djerf's motion to remove Vaughn and Simpson was inadequate to ensure that he was knowingly, intelligently, and voluntarily waiving his right to counsel. *See Faretta v. California*, 422 U.S. 806, 835 (1975); *see also Von Moltke v. Gillies*, 332 U.S. 708, 723-24 (1948) (plurality opinion); *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938). In *Faretta*, the Supreme Court

---

[7] Homer, *The Odyssey*, Book XII, lines 60-110 (Richmond Lattimore, transl.) (1999 ed.).

33

extended the right to represent oneself, already recognized in federal courts, to state court defendants who voluntarily and intelligently elect to do so. *Faretta*, 422 U.S. at 807. The Court relied on well-established standards for the waiver of the right to counsel enunciated in *Zerbst* and *Von Moltke* to provide guidance to state courts deciding whether a defendant has "knowingly and intelligently" waived his right to counsel. *Id.* at 835 (citing *Zerbst*, 304 U.S. at 464-65; *Von Moltke*, 332 U.S. at 723-24). Recognizing that a defendant who elects to proceed *pro se* gives up "many of the traditional benefits associated with the right to counsel[,]" the Court reasoned that he or she "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)); *see also Zerbst*, 304 U.S. at 464 ("'[C]ourts [must] indulge every reasonable presumption against waiver' of fundamental constitutional rights . . . .'" (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)).

In *Von Moltke*, the Court held that the trial court had violated the defendant's constitutional right to be represented by counsel when it failed to inquire adequately into the facts and circumstances that led the defendant to waive her right to counsel. 332 U.S. at 726. The Court emphasized the special role of the trial court in ensuring

that a defendant's right to counsel is protected and that any waiver of this right is valid: "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused–whose life or liberty is at stake–is without counsel.  This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused."[8]  *Id.* at 723 (quoting *Zerbst*, 304 U.S. at 465). The Court in *Von Moltke* offered guidance concerning the nature of the inquiry that must occur when a defendant is waiving his right to counsel:

> [A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand.  The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the  judge's responsibility. . . . A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.

*Von Moltke*, 332 U.S. at 723-24.  The trial judge's inquiry "cannot be discharged as though it were a mere procedural formality." *Id.* at 722.  "[A] mere routine inquiry–

---

[8] Because Von Moltke's invalid waiver of counsel was made within the context of a guilty plea, the Court emphasized that "[a] waiver of the constitutional right to the assistance of counsel is of no less moment to an accused who must decide whether to plead guilty than to an accused who stands trial."  332 U.S. at 721 (citing *Williams v. Kaiser*, 323 U.S. 471, 475 (1945)).

35

the asking of several standard questions followed by the signing of a standard written waiver of counsel–may leave a judge entirely unaware of the facts essential to an informed decision that an accused has executed a valid waiver of his right to counsel." *Id.* at 724.

*Von Moltke* and *Zerbst* are part of the jurisprudential foundation upon which the Court relied when it extended a defendant's right of self-representation to the States in *Faretta*. These cases, along with *Faretta,* provide guidance to state courts and ensure that a court's inquiry into a defendant's waiver of his constitutional right to counsel is not reduced to "a mere procedural formality," *Von Moltke*, 332 U.S. at 722, but instead meaningfully addresses "all . . . facts essential to a broad understanding of the whole matter." *Id.* at 724.

Federal circuit courts of appeal have relied upon the analysis in *Von Molkte* in determining whether a defendant has adequately waived his or her constitutional right to counsel. *See, e.g.*, *United States v. Silkwood*, 893 F.2d 245, 248 (10th Cir. 1989) (finding that for waiver to be knowing and intelligent, trial court must conduct "'penetrating and comprehensive examination'" into defendant's dissatisfaction with counsel to ensure "broad understanding of the whole matter") (citing *United States v. Padilla*, 819 F.2d 952, 956-58 (10th Cir. 1987)); *see also United States v. Taylor*, 183 F.3d 1199, 1203 (10th Cir. 1999) (finding that trial court can "make

36

certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered") (citing *United States v. Taylor*, 113 F.3d 1136, 1140-41 (10th Cir. 1997)); *Pazden v. Maurer*, 424 F.3d 303, 314 (3d Cir. 2005) (same).

In Djerf's case, the trial court failed to conduct an inquiry adequate to ensure that he was knowingly, voluntarily, and intelligently waiving his right to counsel. The court ignored Djerf's concerns that counsel were not properly representing him and that they failed to keep him apprised of his case and had not visited him for months. (ER 199.) It also turned a blind eye to apparent deficiencies in counsel's trial preparation, as reported to it at monthly status conferences. For example, after fifteen months on the case, counsel had not yet interviewed key witnesses, had only recently requested expert assistance, and had yet to review the physical evidence in the case. (ER 207, 442, 484, 486, 489.) The record demonstrates that they were occupied with trials in numerous other cases during those months and had otherwise been unavailable due to illness or vacations. (ER 473, 484, 486, 490, 497, 511.) Notably, the trial court itself had acknowledged counsel's lack of preparation the previous summer and had observed that if it forced counsel to proceed to trial in

37

September 1994, "any conviction, if there is one . . . would [not] survive an appeal." (ER 495.)

A trial court must consider "all . . . facts essential to a broad understanding of the whole matter" when assessing the validity of a defendant's waiver of counsel. *Von Moltke*, 332 U.S. at 724; *see Faretta*, 422 U.S. at 835. Just as in *Von Moltke*, Djerf's case "bristled with factors that made it all the more essential that, before accepting a waiver of [his] constitutional right to counsel, the court be satisfied that [he] fully comprehended [his] perilous position." *Von Moltke*, 332 U.S. at 720. In Djerf's case, again as in *Von Moltke*, the court's "mere routine inquiry–the asking of several standard questions followed by the signing of a standard written waiver of counsel– [left the] judge entirely unaware of the facts essential to an informed decision that [Djerf] . . . executed a valid waiver of his right to counsel." *Id.* at 724.

Djerf, who was uncounseled in the intricacies of capital murder litigation, brought the issue of his trial counsel's incompetence to the court's attention in the only way in which he knew how. It was incumbent upon the court to "investigate as long and as thoroughly as the circumstances of the case before him demand[ed]" to ensure that Djerf, in fact, wanted to represent himself and did so knowingly, intelligently, and voluntarily. *Von Moltke*, 332 U.S. at 723-24; *see Faretta*, 422 U.S. at 835. Instead, the trial court did very little to ensure that Djerf's rights were

38

protected, effectively eliminating the adversarial process the United States Supreme Court has found so essential in capital cases to ensure that a defendant receives a fair trial process before the State imposes the death penalty. *See Powell v. Alabama*, 287 U.S. 45, 68-73 (1932).

**B.** **THE TRIAL COURT IMPROPERLY FORCED DJERF TO CHOOSE BETWEEN PROCEEDING WITH INCOMPETENT COUNSEL OR NO COUNSEL AT ALL, MAKING HIS WAIVER OF COUNSEL CONSTITUTIONALLY IMPERMISSIBLE.**

Although *Faretta* recognizes the right of state court defendants to represent themselves, a defendant's decision to waive counsel must be made voluntarily and cannot result from the desire to avoid substandard performance on the part of his appointed counsel. *See Crandell v. Bunnell*[9], 144 F.3d 1213, 1216 (9th Cir. 1998) (hereinafter *Crandell II*), *overruled on other grounds by Schell v. Witek*, 218 F.3d

---

[9] This Court subsequently overruled *Crandell II* "to the extent that [it] conflict[s] with" its decision in *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000) (en banc). A careful reading of *Schell*, however, reveals that the Court actually *distinguished Crandell II*, and that the decision still stands for the proposition for which Djerf invokes it:

> *Crandell* is distinguishable. In *Crandell*, the defendant was improperly forced to choose between incompetent counsel and no counsel at all. He chose the latter and to represent himself. Under those unique circumstances, we concluded that no showing of prejudice was required because Crandell was improperly left with no counsel at all. The inherent prejudice in *Crandell* was therefore the denial altogether of the right to counsel, not the denial of a motion for substitute counsel. 218 F.3d at 1026 (citations omitted).

1017 (9th Cir. 2000) (en banc); *see also Pazden*, 424 F.3d at 313; *Silkwood*, 893 F.2d at 248. "A defendant forced to choose between incompetent or unprepared counsel and appearing *pro se* faces 'a dilemma of constitutional magnitude.'" *Padilla*, 819 F.2d at 955 (quoting *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976)). Placing a defendant in such an untenable situation is constitutionally offensive, "implicat[ing] the fundamental fairness and accuracy of the criminal proceeding and a showing of prejudice is therefore not required." *Crandell II*, 144 F.3d at 1216. Moreover, a defendant's waiver must be unequivocal. *See United States v. Mendez-Sanchez*, 563 F.3d 935, 939 (9th Cir. 2009). A defendant's request to represent himself "made while at the same time stating a preference for representation by a different lawyer . . . is insufficient to invoke *Faretta*." *Id.*

### 1. IN THE FIFTEEN MONTHS BEFORE THEIR REMOVAL AS DJERF'S ATTORNEYS, VAUGHN AND SIMPSON DEPRIVED HIM OF HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

Emphasizing the necessity of effective representation not only during trial but also during the pretrial stage of a capital murder case, the Supreme Court has reasoned that "a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go

40

forward with the haste of the mob." *Powell*, 287 U.S. at 59. The pre-trial efforts of counsel in Djerf's case were especially important if he were to have any hope of challenging the prosecution's case at trial or avoiding the death penalty. Yet, in the fifteen months that Vaughn and Simpson represented Djerf prior to his waiver of counsel, "when consultation, thorough-going investigation and preparation were vitally important, [Djerf] did not have the aid of counsel in any real sense, although [he was] as much entitled to such aid during that period as at the trial itself." *Id.* at 57.

Throughout their representation of Djerf, Vaughn and Simpson were occupied with matters unrelated to his case. Vaughn was in trial in other courtrooms for other clients consistently during his representation of Djerf. (ER 445-446, 473, 484, 490.) He was also unable to work for significant periods of time during the course of his representation of Djerf, due to a variety of medical problems. (ER 394-395, 497, 511-512.) Simpson was likewise occupied with trials in other cases or unavailable because of vacation or illness. (ER 388, 445, 484, 511.) The letter that Djerf wrote the trial court in February 1995 indicated that, in addition to failing to visit him for months, Vaughn and Simpson provided him with no information whatsoever about their investigation or preparation of the case, did not apprise him of what the prosecution's evidence was against him, and did not inform him of what their

41

defense theories were for trial or what their mitigation themes were for sentencing. (ER 464.)

"'[T]he right to counsel is the right to the effective assistance of counsel.'" *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). In *Strickland*, the Court recognized certain basic duties of counsel representing a criminal defendant: the duty of loyalty, the duty to avoid conflicts of interest, and the duty "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Id.* at 688. Although the Court found that more specific guidelines were not appropriate and that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms," *id.* (explaining that prevailing norms of practice as reflected in the American Bar Association standards and the like are guides to determining what is reasonable), the Court also explained that counsel has a duty to make reasonable investigations and that strategic choices made after less than complete investigation are only reasonable to the extent that professional judgment would support such limits to investigation. *Id.* at 690-91. The Court reiterated these principles in *Bobby v. Van Hook*, 558 U.S. 4 (2009), where it acknowledged that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails . . . [where] they describe the professional

42

norms prevailing when the representation took place." *Id.* at 7 (citing *Strickland*, 466 U.S. at 688).

Vaughn and Simpson performed ineffectively because they were overextended in their law practices and did not have adequate time to devote to Djerf's case. The *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* that were in effect at the time Vaughn and Simpson represented Djerf provide, "Capital counsel should not accept workloads which, by reason of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations." American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (1989) (hereinafter "1989 ABA Guidelines"), No. 6.1, "Workload." The 1989 ABA Guidelines also provide that counsel in death penalty cases should be "zealously committed to the capital case, [and have] adequate time and resources for preparation." 1989 ABA Guideline 11.2, "Minimum Standards Not Sufficient." Further, pursuant to the *Model Rules of Professional Conduct*, "A lawyer shall act with reasonable diligence and promptness in representing a client." American Bar Association, *Model Rules of Professional Conduct*, R. 1.3, "Diligence." *See* American Legal Ethics Library, ABA Model Rules of Professional Conduct (pre-2002), http://www.law.cornell.edu/ethics/aba/2001/ABA_CODE. HTM#Rule_1.3

43

(last visited Oct. 20, 2017). The *Model Code of Professional Responsibility* also provides that a lawyer's "obligation to his client requires him to prepare adequately for and give appropriate attention to his legal work." American Bar Association, *Model Code of Professional Responsibility*, Canon 6, Ethical Consideration 6-4 (1983).

Counsel also acted unreasonably when they failed to meet with Djerf for a period of several months. *See Strickland*, 466 U.S. at 685; *see also Crandell v. Bunnell* (hereinafter *Crandell I*), 25 F.3d 754, 755 (9th Cir. 1994) (finding that the failure of counsel to meet with his client for two months "is unusual enough within our experience to raise doubts about the lawyer's competence"). Counsel's failure to meet with Djerf violated one of the basic duties of counsel, which is "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688; *see also* Commentary, 1989 ABA Guideline 11.4.2, "Client Contact" ("Counsel always has a duty to interview the client, to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters."). Not only did Vaughn and Simpson fail in their ethical duty to keep Djerf apprised of their investigation and preparation, they apparently failed to consult with Djerf about *any* aspect of the case. *See Strickland*, 466 U.S. at 691; *see also* 1989

44

ABA Guideline 11.4.2, "Client Contact" ("Trial counsel should maintain close contact with the client throughout the preparation of the case, discussing (*inter alia*) the investigation, potential legal issues that exist or develop, and the development of a defense theory."); Commentary, 1989 ABA Guideline 11.4.1, "Investigation" ("Client interviews are vital for establishing the trust between attorney and client necessary to allow the attorney to learn the facts. Counsel cannot frame an adequate defense without knowing what is likely to develop at trial, including information that is or that appears to be incriminating."). These duties and requirements were even more crucial in Djerf's case because he was facing the death penalty. *See* Commentary, 1989 ABA Guideline 11.4.2, "Client Contact." ("Counsel's general duty to maintain client contact is compounded in a capital case. The complexity and unique nature of the legal proceedings, stemming from their potentially lethal outcome, mandate careful consultation with the person who may be killed."). Consultation with Djerf was also integral to counsel's mitigation investigation. *See Williams v. Taylor*, 529 U.S. 362 (2000); *see also Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005). Vaughn's and Simpson's failure to devote adequate time and effort to Djerf's cause violated the basic premise behind the right to counsel: that the appointment of *effective* counsel is essential to receiving

45

a fair trial in a capital case. *See Powell*, 287 U.S. at 71; *see also Strickland*, 466 U.S. at 686.

The record also indicates that Vaughn and Simpson failed to conduct a prompt and thorough investigation of guilt phase issues in Djerf's case. They did not begin interviewing witnesses until June 1994, nine months following their appointment to the case and six months following Vaughn's statement to the court that the defense would commence interviews. (ER 505, 509, 512, 514, 518.) At no time did they offer the court an explanation for the delay in commencing witness interviews, nor did the court question them about it. Although counsel finally commenced witness interviews in June 1994, (ER 502), they did not make any attempt to interview certain crucial witnesses until more than a year later. At the status conference on July 12, 1995, the prosecution informed the court that defense counsel still had not interviewed three witnesses in the case: Travis Webb, and Steve and Diane Post. (ER 442.) The prosecution recognized the importance of these witnesses and informed the court, "Mr. Webb is a very important witness, and the Posts are people that I believe the defense should have the opportunity to interview before trial." (ER 443.) Travis Webb was a long-time friend of Djerf's and allegedly was with him shortly after the incident. (ER 443.) The prosecution believed that Djerf made statements to Webb regarding his involvement in the murder of the Luna family.

46

(ER 443.) Despite the importance of these witnesses, counsel made no attempt during their direct representation of Djerf, or subsequently in their advisory capacity, to interview these witnesses in person.

Counsel were also remiss in their review of discovery, which they received shortly after their appointment in 1993. (ER 518.) Although it was necessary for counsel to review discovery before being able to direct their investigation of the case, counsel informed the court on numerous occasions that they had yet to complete their review of it. In January 1994, Vaughn informed the court that he needed a continuance because "[t]here is much discovery still to be dissected." (ER 516.) Two months later, Simpson informed the court that the defense would need another continuance as Vaughn was unable to work because he was recuperating from neck surgery and because Simpson had not yet reviewed most of the discovery, stating "I have gotten my feet a little more wet in the reports that have been submitted to us." (ER 511.) The following month, Vaughn again failed to appear in court and Simpson requested another continuance "due to the fact that discovery needs to be completed, [and] interviews need to be completed . . . ." (ER 509.) In May 1994, *eight months* following the return of Djerf's indictment and five months after Vaughn told the court the defense would begin witness interviews, Vaughn announced that he was going to start interviewing witnesses. The court granted yet

47

another continuance acknowledging the "need to interview witnesses and complete discovery." (ER 506.)

Counsel's lack of investigation and preparation became more apparent during subsequent status hearings. In June 1994, the prosecution informed the court that defense counsel still had not filed a notice of defenses and a list of witnesses. (ER 503.) The court granted another continuance acknowledging that it was necessary "due to the extensive investigation and interviews that need to be conducted in this case . . . ." (ER 503.) Although Vaughn promised the prosecution that the defense would file its notice of defenses and list of witnesses within a week of this status hearing, the prosecutor informed the court at the next status hearing in July that he still had not received this notice from the defense. (ER 498.) Simpson notified the court that Vaughn was unable to work because he became ill with pneumonia and that the defense would not be ready to go to trial in September. (ER 497.) Although counsel had been appointed to the case more than eight months earlier, Simpson informed the court that they were unable to meet the August 1 motions deadline and requested a continuance to file motions. (ER 500.)

In August 1994, although defense counsel had been appointed to the case for close to one year, all parties acknowledged during a status conference that the defense was not ready for trial. Vaughn told the court that a trial date in September

48

1994 was "not realistic." (ER 492.) He explained that he needed a continuance because "there are several witnesses, not the least of which are several experts, that still need to be interviewed . . . ." (ER 493.) The prosecution informed the court that "essential witnesses have not been interviewed" and "essential materials have not been gathered at this point by the defense." (ER 494.) The prosecutor also noted that there was "a tremendous amount of evidence [still] to be reviewed [by the defense]." (ER 494.) Recognizing that the defense was unprepared for trial, the trial judge observed that if he forced counsel to proceed to trial in September, "any conviction, if there is one . . . would [not] survive an appeal." (ER 495.)

The following month, Vaughn informed the court that the defense needed yet another continuance due to the "need for further investigation and discovery[.]" (ER 489.) In November 1994, the prosecution informed the court that several witness interviews had to be cancelled because Vaughn was in trial and Simpson was ill. (ER 484.) Two months later, the prosecution informed the court that defense counsel still had not reviewed the physical evidence in the property room and that they needed to make arrangements for defense counsel to do this before trial. (ER 473.) Vaughn gave no explanation to the court for breaching this basic aspect of pretrial

49

investigation and requested yet another continuance of the case because he was, again, in trial in another case. (ER 473.)[10]

The record leaves no doubt that Vaughn and Simpson failed to investigate and prepare diligently for the guilt phase of Djerf's trial, and that their performance was unreasonable under Supreme Court precedent. *See Strickland*, 466 U.S. at 688; *see also Powell*, 287 U.S. at 71-73; *Van Hook*, 558 U.S. at 6-7. Defense counsel are required to begin investigation into the merits phase of the trial "immediately upon [their] entry into the case" and investigation "should be pursued expeditiously." 1989 ABA Guideline 11.4.1(A), "Investigation"; *see also* 1989 ABA Guideline

---

[10] Counsel also represented Djerf's interest in related litigation challenging the prosecution's methods for testing DNA evidence. This litigation was consolidated with the cases of ten other defendants in order to combine legal and financial resources. (ER 481.) The DNA litigation, however, did not commence until November 1994, more than a year after counsel's appointment in Djerf's case, and only four months before Djerf waived his right to counsel. Counsel's participation in the DNA litigation was minor, involving only preparatory matters such as seeking experts and funding, and attending a handful of status conferences. Vaughn also represented another client in the DNA litigation and made appearances on behalf of both clients. (ER 476.) Djerf began representing himself at the DNA hearings following his waiver of counsel. The same month, all parties to the consolidated DNA litigation agreed to allow two attorneys, Michael Reeves and Stacey Gottlieb, to take the lead in representing the interests of all defendants in the matter. (ER 462-463.) Vaughn and Simpson thus played no meaningful role in the DNA litigation, and this tangential proceeding in no way explains or justifies their inaction in Djerf's capital case. In fact, at a DNA status conference in April 1995, the trial court asked Djerf if Vaughn would be attending the conference. Djerf responded, "I haven't seen him in weeks." (ER 448.)

11.4.1.5, "Physical Evidence" (Counsel should make "a prompt request to the police or investigative agency for any physical evidence or expert reports relevant to the offense or sentencing.") Defense counsel's investigation into guilt phase issues "should be conducted regardless of any admission or statement by the client concerning facts constituting guilt." 1989 ABA Guideline 11.4.1(B), "Investigation." Counsel's investigation should include interviewing potential witnesses and pursuing "other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute . . . ." 1989 ABA Guideline 11.4.1.2(B), "The Accused"; *see also* 1989 ABA Guideline 11.4.1.3, "Potential Witnesses."

It is only after defense counsel have adequately investigated the case that they "should formulate a defense theory[,] [taking into consideration] both the guilt/innocence phase and the penalty phase, and seek a theory that will be effective through both phases." 1989 ABA Guideline 11.7.1(A), "General Trial Preparation." Moreover, "Counsel has a duty to investigate the case before recommending that a guilty plea be taken (or sought) or proceeding to trial. This duty is intensified . . . by the unique nature of the death penalty and is broadened by the bifurcation of

51

capital trials into two phases." Commentary, 1989 ABA Guideline 11.4.1, "Investigation."

Counsel performed unreasonably at every turn in Djerf's case, beginning with their failure promptly to review discovery and to view the evidence. Although counsel received discovery shortly after their appointment in 1993, they requested six continuances over the course of six months because they had not yet completed their review of it. Similarly, although a review of the physical evidence was a basic aspect of preparing the case for trial and was necessary to direct further investigation and requests for experts, counsel had still not viewed the evidence by January 1995, more than a year following their appointment. Counsel did not commence witness interviews until nine months after their appointment and had still not interviewed key witnesses by July 1995, which was after Djerf had been forced to proceed *pro se.*,

Counsel's failure to devote the time necessary to developing a relationship with Djerf and to investigating and preparing his case for trial resulted in mistrust that irreparably damaged the attorney-client relationship and directly led to Djerf proceeding without the assistance of counsel. Vaughn's and Simpson's actions "fell below [the] objective standard of reasonableness" required of competent counsel. *See Strickland*, 466 U.S. at 688.

### 2. DJERF'S WAIVER OF COUNSEL WAS INVALID BECAUSE HE WAS FORCED TO CHOOSE BETWEEN PROCEEDING WITH VAUGHN AND SIMPSON, WHO WERE INCOMPETENTLY INVESTIGATING AND PREPARING HIS CASE FOR TRIAL, OR REPRESENTING HIMSELF.

Djerf did not knowingly, intelligently, and voluntarily waive counsel because he was forced to choose between being represented by incompetent counsel or no counsel at all. *See Crandell II*, 144 F.3d at 1216; *see also Brown v. Craven*, 424 F.2d 1166, 1169-70 (9th Cir. 1970); *Pazden*, 424 F.3d at 313; *Silkwood*, 893 F.2d at 248. Although Djerf informed the court that he did not believe that he was being properly represented by his attorneys, and although the record is replete with examples of counsel's failures, the trial court nonetheless refused to consider appointing different counsel, requiring Djerf either to continue with the ineffective assistance he was receiving or proceed *pro se*. In so doing, the court created "'a dilemma of constitutional magnitude.'" *Padilla*, 819 F.2d at 955 (quoting *Maynard*, 545 F.2d at 278). Djerf's request to represent himself "made while at the same time stating a preference for representation by a different lawyer . . . [wa]s insufficient to invoke *Faretta*." *Mendez-Sanchez*, 563 F.3d at 939. The trial court's actions "implicate[d] the fundamental fairness and accuracy of [Djerf's] criminal proceeding and a showing of prejudice is therefore not required." *Crandell II*, 144 F.3d at 1216.

53

This Court's decisions in *Crandell I* and *II* compel relief for Djerf in this case. In *Crandell II*, the state court appointed a deputy public defender to represent Crandell in his capital murder case. 144 F.3d at 1215. Despite being represented by counsel, Crandell subsequently appeared in court to argue a number of *pro se* motions. *Id.* When asked why he was representing himself, Crandell responded that it was because he had not heard from his attorney in almost two months and he believed his attorney was "completely ineffective." *Id.* The court nevertheless denied Crandell's repeated motions to have alternative counsel appointed. *Id.* Crandell represented himself at trial and was convicted and sentenced to death.[11]

In Crandell's appeal from the denial of his subsequent federal habeas corpus petition, this Court observed that "'[a] criminal defendant may be asked to choose between waiver and another course of action so long as the choice presented to him is not constitutionally offensive.'" *Crandell I*, 25 F.3d at 755 (*quoting United States v. Robinson*, 913 F.2d 712, 715 (9th Cir. 1990)). The Court acknowledged that when a defendant demonstrates that his counsel is incompetent, "his decision to go *pro se* [is] involuntary." *Id.* The Court noted that "the two-month delay [in client contact]

---

[11] The California Supreme Court later reversed the penalty phase judgment and the State declined to further prosecute; Crandell was thus sentenced to life in prison without the possibility of parole. *See Crandell I*, 25 F.3d at 754 n.1.

is unusual enough within our experience to raise doubts about the lawyer's competence." *Id.* The Court then remanded the case to the district court for an evidentiary hearing on whether Crandell's lawyer was incompetent at the time Crandall chose to proceed *pro se*. *Id.*

Following the evidentiary hearing, the district court granted Crandell habeas relief and the government appealed. *Crandell II*, 144 F.3d at 1214. In *Crandell II*, this Court noted the additional facts developed at the evidentiary hearing, including the fact that in the sixty-three days that Crandell did not meet with his attorney, his attorney also refused to return Crandell's letters and phone calls. *Id.* at 1217. Counsel's "discovery efforts were limited to relying on an 'open file' policy with the prosecutor" that produced only thirty pages of documents. *Id.* While acting *pro se*, however, Crandell filed motions for discovery which "resulted in the production of 191 pages of responsive documents." *Id.* While representing Crandell, counsel had not initiated investigation into either guilt or penalty phase issues and made no attempt to interview witnesses or hire investigators. *Id.* Crandell also presented the testimony of a legal expert at the evidentiary hearing who characterized counsel's behavior as "absolutely outrageous." *Id.* This Court concluded that its "fears were realized in the evidentiary hearing, and Crandell's claims were substantiated." The Court held that "[a]t the point when Crandell requested alternative counsel, [his

55

existing counsel's] representation, viewed in its totality, was incompetent and the state trial court should have appointed substitute counsel." *Id.* The Court concluded, "The magnitude of [counsel's] inadequacies are multiplied by the fact that it was a capital case." *Id.* at 1218. The Court affirmed the district court's grant of the petition. *Id.*

The facts and circumstances of Djerf's case are even more compelling than those in *Crandell*. Whereas in *Crandell* counsel had delayed investigation and preparation of the case for two months, Vaughn and Simpson delayed preparation and investigation *for more than fifteen months* following their appointment. In *Crandell*, counsel refused to acknowledge his client's letters and telephones calls for two months; in Djerf's case, Vaughn failed to meet with Djerf for *seven months*, during which time he also refused to respond to his letters and telephone calls.[12] As in *Crandell*, Vaughn and Simpson delayed review of discovery, failed to interview witnesses, and delayed requests for experts. Certainly, as in *Crandell*, Vaughn's and Simpson's representation of Djerf was "absolutely outrageous." *Crandell II*, 144 F.3d at 1217.

---

[12] Simpson had not met with Djerf for at least three months. (ER 405.)

56

This Court's rulings in *Crandell I* and *II* find support in the decisions of other circuits as well. For example, in *Pazden v. Maurer*, a Third Circuit case that bears many similarities to Djerf's case, the trial court appointed replacement counsel for Pazden, a defendant facing a complex 131-count indictment, shortly before trial. 424 F.3d at 307. The new attorney sought to continue the trial because she was not prepared, but the trial court refused a postponement. *Id.* at 307-08. In light of the court's ruling, and because he believed that he was more familiar with his case than his recently-appointed attorney, Pazden informed the court that he wanted to represent himself. *Id.* at 308. He explained, "I feel I have no choice in this matter. . . . I'm selecting the lesser of two evils." *Id.* at 308, 309. The court admonished Pazden, stating, "[I]t is unwise for you to represent yourself and . . . you would be better served if [counsel] served as [your] attorney." *Id.* at 309. The court also emphasized that Pazden was not familiar with the rules of evidence and that, although he was intelligent, he was incapable of adequately representing himself. *Id.* When Pazden informed the court that his new counsel was unprepared to go to trial, the court responded:

> I have personally witnessed that [counsel] has put in countless hours during the week and on weekends. She has a background in financial matters, and I frankly think you would be hard pressed to find another attorney who

57

> would devote themselves to this case the way she has and
> pour over this discovery the way she has.

*Id.* The court ultimately allowed Pazden to proceed *pro se*. He was convicted on all counts and sentenced to sixteen years in prison. *Id.*

In his subsequent federal habeas corpus proceeding, Pazden argued that he opted to represent himself only after being confronted with "the unconstitutional dilemma of either representing himself or proceeding to trial with assigned counsel who admitted being unprepared and unfamiliar with the record" and, therefore, his waiver of counsel was involuntary. *Pazden*, 424 F.3d at 314. In granting Pazden habeas relief, the Third Circuit recognized that "Pazden was not exercising his free will, but was instead compelled to proceed *pro se* only because his attorney had not been given enough time to familiarize herself with the relevant background of his case." *Id.* at 316. The court explained that the record supported "Pazden's contention that his decision to proceed *pro se* was not an exercise of free will, rather it was the result of him 'bowing to the inevitable.'" *Id.* The court held that the state court's conclusion that Pazden had knowingly, voluntarily, and intelligently waived his right to defense counsel was "contrary to" the Supreme Court's decision in *Zerbst*, and it therefore granted Pazden the writ. *Id.* at 318, 319; *see* 28 U.S.C. § 2254(d)(1).

58

Similarly, in *United States v. Silkwood*, a Tenth Circuit decision, the defendant's attorney moved to withdraw from the case five days before Silkwood's federal trial for unlawful possession of a firearm by a convicted felon because he had previously represented one of the government's witnesses. 893 F.2d at 247. The court appointed new counsel who represented Silkwood at trial. *Id.* Following trial, Silkwood moved to appear *pro se* for sentencing and the court granted his request. *Id.* After the government announced it would seek a sentence enhancement, the court asked Silkwood if he wanted counsel appointed given the gravity of the motion for enhancement. *Id.* Silkwood "refused the offer because he believed that his trial counsel had been incompetent." *Id.* At a subsequent hearing, the court again asked Silkwood if he wanted counsel appointed. *Id.* Silkwood again rejected the court's offer "because he believed that trial counsel had spent insufficient time preparing his case" and he felt "he could represent himself more effectively than appointed counsel." *Id.* The court allowed Silkwood to proceed *pro se* and, after hearing argument from the government regarding the enhancement, the court sentenced Silkwood to twenty-five years in prison without the possibility of parole. *Id.*

On appeal, the Tenth Circuit held that the trial court's inquiry was insufficient and that Silkwood did not voluntarily or knowingly waive his Sixth Amendment

59

right to counsel. 893 F.2d at 248. The court explained that it had previously addressed the type of inquiry that is necessary to ensure that a defendant's waiver meets these standards, *id.* (citing *United States v. Gipson*, 693 F.2d 109 (10th Cir. 1982); *Padilla*, 819 F.2d 952; *and Sanchez v. Mondragon*, 858 F.2d 1462 (10th Cir. 1988)), and explained that "[f]or the waiver to be voluntary, the trial court must inquire into the reasons for the defendant's dissatisfaction with his counsel to ensure that the defendant is not exercising a choice between incompetent or unprepared counsel and appearing *pro se*." *Id.* (citing *Sanchez*, 858 F.2d at 1465). The court stated that, for a waiver to be knowing and intelligent, "the trial court must conduct a "'penetrating and comprehensive examination'" into the defendant's "'apprehension of the nature of the charges . . . the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'" *Id.* (citing *Padilla*, 819 F.2d at 956-57.)

The court noted that Silkwood had twice rejected the appointment of counsel "because he believed that his trial counsel had been incompetent" and "because he believed that trial counsel had spent insufficient time preparing his case and that he could represent himself more effectively than appointed counsel." 893 F.2d at 248-49. The court reasoned, "Rather than inquiring thoroughly into Mr. Silkwood's

60

allegations of incompetence, the trial court merely attempted to persuade him that trial counsel had done an excellent job in light of the circumstances." *Id.* at 249. The court found that the trial court "failed to ensure that Mr. Silkwood was not forced to make the Hobson's choice against which *Sanchez* warns, a choice between incompetent or unprepared counsel and appearing *pro se*." *Id.* The court concluded that Silkwood's "choice did not reach the level of voluntariness which *Faretta* and our cases require." *Id.*

As in *Silkwood*, Djerf chose to represent himself "because he believed that trial counsel had spent insufficient time preparing his case" and he felt "he could represent himself more effectively than appointed counsel." *Silkwood*, 893 F.2d at 247. While the attorney in *Silkwood* was unprepared because he had just been appointed to the case, Djerf's attorneys were unprepared because they had not diligently investigated or prepared his case for trial. In both cases, the trial court was aware of counsel's failures, yet nevertheless refused to consider constitutionally permissible alternatives, instead forcing the defendant to choose between representing himself or proceeding to trial with counsel who were inadequately prepared.

In *Silkwood*, the trial court refused to consider Silkwood's allegations that his attorney was incompetent and, instead, "attempted to persuade him that trial counsel

61

had done an excellent job in light of the circumstances." *Id.* at 249. Likewise, in Djerf's case, the trial court ignored Djerf's allegations of his attorneys' incompetence, as well as the facts revealed to the court during monthly status conferences, and instead emphasized the good work counsel had done for him: "[Counsel has been] doing a lot of work on [your] case[,]" (ER 199), and although "you may not be happy with the number of times they come down and see you, . . . I want to tell you that I have been monitoring this case. They have been advising me of what they have been doing, and they have been doing a lot of work on your behalf." (ER 200.) Just as in *Silkwood*, the court in Djerf's case impermissibly forced him to choose between representing himself or proceeding to trial with incompetent counsel.

This Court's decisions in *Crandell I* and *II*, and the decisions of other circuit courts of appeal, compel this Court to grant Djerf habeas relief. The trial court erred when it forced Djerf to choose between being represented by Vaughn and Simpson, who were incompetently representing him, or proceeding *pro se*. Although a showing of prejudice is not required when a court fails to replace incompetent counsel and instead forces a defendant to proceed *pro se*, *see Crandell II*, 144 F.3d at 1216, there is no question that Djerf was prejudiced by counsel's failure to investigate and prepare his case for trial. Because of counsel's failures, Djerf was

62

forced to represent himself, which led to his uncounseled guilty pleas with no agreement as to sentence, and ultimately to his sentences of death.  By forcing Djerf to choose between being represented by incompetent counsel or no counsel at all, the trial court violated Djerf's right to counsel and a fair trial process pursuant to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  *See Strickland*, 466 U.S. 668; *see also Powell*, 287 U.S. at 50, 66; *Gregg*, 428 U.S. 153. By upholding the trial court's error, the state supreme court rendered an adjudication that was contrary to and/or an unreasonable application of clearly established law. *See Zerbst*, 304 U.S. 458; *Von Moltke*, 332 U.S. at 723-24; *see also Pazden*, 424 F.3d at 318.

**II.  THE DISTRICT COURT ERRED IN REJECTING ON THE MERITS, WITHOUT CONDUCTING AN EVIDENTIARY HEARING, DJERF'S CLAIM THAT HIS TRIAL ATTORNEYS PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING BY FAILING TO INVESTIGATE, DEVELOP, AND PRESENT ADEQUATE AND APPROPRIATE MITIGATION.**

Djerf alleged in Claim Four of his Amended Habeas Petition that counsel rendered constitutionally ineffective assistance by failing to investigate, develop, and present adequate and appropriate mitigation.  The district court found this claim fully exhausted, but it denied Djerf an evidentiary hearing or expansion of the record in federal court because it concluded that he failed to develop the factual basis of the claim in state post-conviction proceedings.  (ER 078, 084-088.)  It subsequently

denied Djerf merits relief on the claim, concluding that the state court's holding that counsel's performance was not deficient was neither contrary to nor an unreasonable application of clearly established federal law. (ER 034-040.) This Court reviews *de novo* the district court's denial of relief on this claim. *Sechrest v. Ignacio*, 549 F.3d 789, 815 (9th Cir. 2008).

The district court's ruling contains at least two critical, factual errors that invalidate its reasoning. First, the district court erroneously suggests that the PCR court concluded "that trial counsel did not perform deficiently in their investigation of Petitioner's mental health at sentencing," and it finds that this conclusion was "not contrary to or an unreasonable application of Supreme Court precedent." (ER 040.) In truth, the PCR court never reached the question of deficient performance, choosing instead to reject the claim on the prejudice prong. Specifically, the PCR court held: "Defendant has failed to present any evidence to support this claim; instead, he simply speculates that *if* his childhood was [sic] investigated, some mitigating evidence might have been discovered." (ER 094-095 (emphasis in original).) The PCR court thus clearly disposed of the claim by finding no evidence of prejudice. The PCR court's analysis is devoid of any examination of deficient performance.

64

Because the district court's ruling – that the state court did not contravene or unreasonably apply Supreme Court precedent in finding no deficient performance – is premised on a factual inaccuracy, it is plainly wrong. Any question of deficient performance must be reviewed *de novo* by the federal courts because that question was never addressed by the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).

The second critical, factual error in the district court's analysis is its allegation that Dr. McMahon, the psychologist retained by Vaughn and Simpson, concluded that Djerf "suffered from an antisocial personality disorder," and "rejected a diagnosis of schizophrenia." (ER 040, 087.) Both of these statements are incorrect. In truth, Dr. McMahon found that "there [was] some question as to whether [Djerf] would qualify for a diagnosis of Antisocial Personality by the DSM-IV criteria." (ER 261.) For example, Dr. McMahon noted that Djerf "does not have a long history of criminal behavior prior to the current offense, and we do not have sufficient information to accurately use Hare's Psychopathy Checklist- Revised." (ER 261.)

Moreover, McMahon did not reject a diagnosis of schizophrenia. Rather, he concluded only that, although Djerf had "some paranoid tendencies," those tendencies were not sufficiently severe to warrant a diagnosis of *paranoid* schizophrenia. (ER 260.) There are, of course, many subtypes of schizophrenia

65

other than paranoid. These include disorganized, catatonic, undifferentiated, and residual schizophrenia. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 286-290 (4th ed. 1994).

The district court thus misconstrued the facts necessary to conduct an accurate assessment of the merits of Djerf's claim. The court erroneously concluded that "[t]he record shows that trial counsel, based on the conclusions of the defense experts, considered but rejected the possibility that [Djerf] suffered from schizophrenia." (ER 040.) Not only does this finding misinterpret the evidence actually before the district court, it fails to address the core of Djerf's argument: that his attorneys were ineffective in failing to timely and thoroughly *investigate* potential mitigating evidence. Counsel's ultimate reliance on their defense experts would have been reasonable only to the extent that they provided those experts information from which they could make accurate assessments or diagnoses. "A defense attorney in the sentencing phase of a capital trial has 'a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[] facts that the experts do not request.'" *Hovey v. Ayers*, 458 F.3d 892, 925 (9th Cir. 2006) (quoting *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999)). "Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's 'duty to seek out such

66

evidence and bring it to the attention of the experts.'" *Id.* (quoting *Wallace*, 184 F.3d at 1118); *see also Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995); *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). The entirety of the mitigation investigation in Djerf's case consisted of approximately eleven hours of interviews of Djerf's mother, father, and sister. These interviews were not recorded or otherwise memorialized, and Art Hanratty, the defense investigator who conducted them, could recall only the vaguest of details from those interviews.

According to the 1989 ABA Guidelines, which were in effect at the time of Djerf's sentencing trial, defense counsel are required to begin investigation into the penalty phase of the trial "immediately upon counsel's entry into the case" and investigation "should be pursued expeditiously." 1989 ABA Guideline 11.4.1(A), "Investigation"; *see also Crandell I*, 25 F.3d at 755 (finding counsel's failure to do anything at all during the first two months of representing a defendant in a capital case was "unusual enough within our experience to raise doubts about the lawyer's competence"). This investigation is extensive and constitutionally required, and cannot be waived by counsel. *See Williams*, 529 U.S. 362. Sentencing phase investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced" by the prosecution. 1989 ABA Guideline 11.4.1, "Investigation."

67

According to the ABA Guidelines, a thorough penalty-phase investigation must

include, but not be limited to:

> [M]edical history, (mental and physical illness or injury,
> alcohol and drug use, birth trauma and developmental
> delays); educational history (achievement, performance
> and behavior) special educational needs [(]including
> cognitive limitations and learning disabilities); military
> history (type and length of service, conduct, special
> training); employment and training history (including
> skills and performance, and barriers to employability);
> family and social history (including physical, sexual or
> emotional abuse); prior adult and [j]uvenile record; prior
> correctional experience (including conduct or supervision
> and in the institution/education or training/clinical
> services); and religious and cultural influences.

1989 Guideline 11.4.1.2 (C) "The Accused."

Here, counsel were presented with a client with no significant history of

violent crime, who, at the age of twenty-three (a typical age for the onset of

schizophrenia in males), was charged with the violent murder of four people,

including a child, in the course of one afternoon. Although such a crime cries out

for an explanation, Djerf's attorneys, relying on an investigator with no mitigation

experience, devoted only eleven hours over the course of two years in an effort to

find that explanation. They wasted important opportunities to gather crucial

information regarding Djerf's family history that would have alerted their mental

68

health experts to the likelihood that Djerf was suffering from schizophrenia. They similarly wasted the opportunity to question Djerf's former live-in girlfriend, Emily Boswell, about Djerf's bizarre and obsessive behavior in the months preceding September 1993.

"The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court expounded on the *Strickland* standard in *Williams*, 529 U.S. 362. There the Court concluded that counsel's failure to discover and present mitigating evidence could not be justified as a tactical decision because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396.

Counsel performed unreasonably when they failed to conduct an adequate and timely mitigation investigation in this case. *See Strickland*, 466 U.S. at 688; *see also Williams*, 529 U.S. at 396. The failure to uncover and present a more thorough case in mitigation cannot be justified as a tactical decision because, as in *Williams*, counsel "'had not 'fulfill[ed] their obligation to conduct a thorough investigation of [Djerf's] background.'" *Wiggins*, 539 U.S. at 522 (quoting *Williams*, 529 U.S. at 396). Counsel's failures at sentencing were "'the result of inattention, not reasoned strategic judgment.'" *Rompilla*, 545 U.S. at 395-96 (O'Connor, J., concurring)

69

(quoting *Wiggins*, 539 U.S. at 534). Counsel so delayed their investigation of penalty phase issues that they were unprepared to proceed on the date set for sentencing. Their unpreparedness was apparent when Simpson informed the court that the defense would not be prepared to go forward with its case in mitigation at the sentencing trial and would need a continuance of several months before being able to proceed. Even after receiving a continuance of three months, Simpson still was not prepared to complete his mitigation presentation because he had not yet completed his mental health investigation.

The scope of investigation was also inadequate because counsel hired an investigator who was wholly unqualified to perform a mitigation investigation. Hanratty testified that, despite being appointed as the investigator in September 1993, he did not begin mitigation interviews until April or May of 1995. The interviews he conducted were extremely brief and, unsurprisingly, produced little useful information. Hanratty knew very little about Djerf's family and could provide only vague information that was unhelpful at sentencing. He failed to conduct any substantive interviews with people in Djerf's life, past or present, aside from his mother, father, and sister. Hanratty also failed to request and obtain records relevant to Djerf's background aside from a few school records which he only briefly reviewed and about which he remembered nothing at trial. Moreover, there is no

70

evidence in the record that counsel performed any mitigation investigation themselves. So little was learned about Djerf's background that after Hanratty testified, Simpson informed the court that he felt that he needed to have Djerf testify about his childhood and adolescence. (ER 303.)

Djerf has demonstrated that Vaughn and Simpson rendered deficient performance when they failed adequately to investigate and prepare his case for sentencing. To date, however, he has been prevented from fully demonstrating the second prong of the *Strickland* analysis, namely, that he was prejudiced by his attorneys' failings. Djerf requested, but was denied, evidentiary hearings in both state and federal court. (ER 084-089, 094-095, 248-250, 251-252.) The state court concluded that Djerf "failed to present any evidence to support this claim," and denied the claim without a hearing.[13] (ER 095.) The district court similarly denied an evidentiary hearing, concluding that Djerf was not diligent in state court in developing the factual basis of the claim. (ER 088.)

---

[13] The state court's conclusion was plainly wrong. In fact, Djerf submitted as exhibits to his state post-conviction petition the reports of Drs. Marc Walters, Mickey McMahon, and Drake Duane, each of which had been prepared for his trial counsel. (ER 254-284.) In denying Djerf both an evidentiary hearing and relief, the PCR court erroneously concluded that these reports were "considered by the court prior to sentencing." (ER 094.) In reality, although these reports were prepared for defense counsel, they were never used at sentencing.

71

The district court erred in denying Djerf an evidentiary hearing on this claim. This Court has long held that, if a state court denies a habeas petitioner's request for an evidentiary hearing, when the petitioner seeks a hearing on the claim in federal court, the court cannot deny the hearing on the grounds that the petitioner failed to develop the factual basis of the claim in state court. *Jones v. Wood*, 114 F.3d 1002, 1012 (9th Cir. 1997); *Correll v. Stewart*, 137 F.3d 1404, 1413 (9th Cir. 1998); *accord Libberton v. Ryan*, 583 F.3d 1148, 1165 (9th Cir. 2009) (citing *Correll*). Accordingly, this Court should reverse the district court's summary rejection of this claim and, at the very least, remand to the district court to conduct an evidentiary hearing.

## III. THE DISTRICT COURT ERRED IN REJECTING DJERF'S CLAIM THAT HIS GUILTY PLEAS WERE NOT KNOWING, VOLUNTARY, AND INTELLIGENT AND WERE THUS CONSTITUTIONALLY INFIRM.

Djerf alleged in Claim Two[14] of his Amended Habeas Petition that his guilty pleas were not knowing, intelligent, and voluntary because the trial court failed to inform him that, by pleading guilty, he was forfeiting his right to proceed to trial

---

[14] In its order of May 16, 2017, this Court expanded the certificate of appealability to include Claim 5.2 (9th Cir. ECF No. 68), which alleges that appellate counsel was ineffective for failing to raise Claim 2. Because Claim 2 was found to have been raised on direct appeal in a subsequent state post-conviction proceeding, and the district court found this issue to be moot on remand, Djerf need not address the merits of Claim 5.2 here. (Dist. Ct. ECF 128 n.1.)

represented by competent counsel. Specifically, at Djerf's change of plea hearing, the trial court told him, "You also have the right to go to trial, a jury trial, and you can either represent yourself or have Mr. Vaughn and Mr. Simpson represent you[.]" (ER 174.) In other words, the court informed Djerf that his choices were to proceed to trial *pro se* or with incompetent counsel. The court failed to explain that Djerf had a Sixth Amendment right to proceed to trial with *competent* attorneys representing him. *See Richardson*, 397 U.S. at 771 n.14 (Sixth Amendment right to counsel is right to effective assistance of counsel).

According to the trial court's explanation of his rights, Djerf had only three options, none of which was acceptable: (1) he could enter an uncounseled plea of guilt to four counts of first-degree murder; (2) he could represent himself through trial with the "assistance" of incompetent advisory counsel; or (3) he could turn his case over to those same constitutionally ineffective attorneys and proceed to trial. Unaware that the United States Constitution guaranteed him the right to a trial at which he would be represented by competent counsel, Djerf chose the lesser of the three evils presented to him and pleaded guilty. Under no plausible definition of the terms were Djerf's guilty pleas knowing, voluntary, and intelligent.

The district court addressed the merits of this issue on remand. (Dist. Ct. ECF No. 128 at 28.) The court rejected Djerf's claim, finding that he "d[id] not attack

73

the state court's overall analysis of the record" but rather argued "that the state court failed to conduct a contextual analysis because it did not explicitly consider [his] history with trial counsel." (Dist. Ct. ECF No. 128 at 31.) Relying on the case of *Arrendondo v. Neven*, 763 F.3d 1122 (9th Cir. 2014), a non-capital case, the court found that the Supreme Court has never held that trial courts are required "to apprise defendants in any particular form of the risks of proceeding to trial pro se." *Id.* at 1130. Then, without any analysis, the court held that it was "clear that the state court performed a contextualized review of the record and, thus, did not rely on an unreasonable application of federal law." (Dist. Ct. ECF No. 128 at 31.) The district court also rejected Djerf's claim that the state court decision was based on an unreasonable determination of facts, stating that Djerf "exaggerate[d] the state of his relationship with advisory counsel when he pleaded guilty[,]" and denied that counsel were "grossly deficient." (Dist. Ct. ECF No. 128 at 32.) The district court erred when it found that the Arizona Supreme Court's adjudication of this claim was not contrary to or an unreasonable application of clearly established federal law or did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(1) and (2).

74

The state supreme court concluded that the trial court complied with its obligation to inform Djerf of the constitutional rights he was waiving by pleading guilty. (ER 115-117.) Yet, in conducting the colloquy at Djerf's change of plea hearing, the trial court simply informed him, "You . . . have the right to go to trial, a jury trial, and you can either represent yourself or have Mr. Vaughn and Mr. Simpson represent you[.]" (ER 174.) In *Boykin v. Alabama*, 395 U.S. 238 (1969), the United States Supreme Court noted, "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction[.]" *Id*. at 242. As such, the Court found that before a guilty plea may be accepted, a defendant must fully understand the constitutional rights at stake before he can voluntarily waive them. *Id*. The Court also noted that "ignorance, incomprehension, [and] coercion[ ]" were all potential issues that weighed against finding a plea was voluntarily given. *Id.* at 242-43. In Djerf's case, "ignorance, incomprehension, [and] coercion[ ]" were all at play because the trial court incorrectly informed him that he could either enter an uncounseled guilty plea, or proceed to trial *pro se* or with incompetent counsel. Because the court incorrectly informed him about his right to proceed to trial with competent counsel, Djerf's plea cannot be deemed constitutionally valid.

75

Clearly established Supreme Court law has long required that "[t]he determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst*, 304 U.S. at 464. The Supreme Court's adherence to this case-specific approach has not wavered in the seventy years since it decided *Zerbst*. *See, e.g.*, *Patterson v. Illinois*, 487 U.S. 285, 298 (1988) (noting "pragmatic approach" to type of warning required to ensure valid waiver of Sixth Amendment right to counsel). As the Supreme Court observed in *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), "a waiver of counsel [i]s intelligent when the defendant 'knows what he is doing and his choice is made with eyes open.'" *Id.* (quoting *Adams*, 317 U.S. at 279). The Court found, "The information a defendant must possess in order to make an intelligent election [to forego the right to counsel], our decisions indicate, will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Tovar*, 541 U.S. at 88 (citing *Zerbst*, 304 U.S. at 464).

In this case, the most relevant case-specific factor was the grossly deficient performance Djerf received from his court-appointed attorneys prior to entering his guilty plea, which is discussed in great detail in the fact section and in Claim I of

76

this brief, *supra*.  By the time Djerf stood before the court at his change of plea hearing, the trial judge was well aware that Djerf's dissatisfaction with Vaughn's and Simpson's ineffectiveness was so great that he had chosen to proceed *pro se* rather than be represented by them any longer.  The record leaves no doubt that the relationship between Djerf and his then-advisory counsel had irreparably broken down.  Yet, in accepting Djerf's guilty pleas to four counts of capital murder, the trial judge did not explain to him that he was waiving his right to proceed to trial represented by the competent counsel envisioned by the Sixth Amendment.  Instead, he told Djerf that he could go to trial either representing himself or represented by attorneys with whom he had an irreparable conflict and who had failed to prepare for his defense in any meaningful way.  The district court fails to discuss these facts and offers no principled basis for finding that counsel's performance was not "grossly deficient" given the specific facts of the case.  Applying *Zerbst*, *Patterson*, and *Tovar* to this factual scenario, it cannot be said that Djerf knowingly, intelligently, and voluntarily waived his Sixth Amendment right to be represented by competent counsel at trial.  The Arizona Supreme Court's contrary conclusion in Djerf's direct appeal constituted an adjudication that was contrary to or an unreasonable application of clearly established federal law or, in the alternative, an

77

unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). Djerf is entitled to relief on this claim.

**IV. THE DISTRICT COURT ERRED IN DENYING RELIEF PURSUANT TO *MARTINEZ v. RYAN* ON REMAND ON DJERF'S CLAIM THAT HIS TRIAL COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE APPROXIMATELY FIFTEEN MONTHS THEY REPRESENTED HIM DURING THE MERITS PHASE OF HIS TRIAL.**

**A. INTRODUCTION**

In Claim 3 of his Amended Habeas Petition, Djerf alleged he had been deprived of his Sixth Amendment right to the effective assistance of counsel during the approximately fifteen months he was represented by his appointed attorneys, Vaughn and Simpson, at the merits phase of his trial. (PSER[15] 101-103.) The district court concluded that Claim 3 had not been raised in state court, and was "technically exhausted" and procedurally defaulted. (ER 070-072.) The district court summarily rejected this claim, citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987) and 28 U.S.C. § 2254(i). (ER 071-074.) In a separate claim in his Amended Habeas Petition, Claim 6, Djerf also alleged he received ineffective assistance of counsel during his post-conviction proceedings. (Dist. Ct. ECF No. 55 at 67-82.) The district court also rejected Djerf's argument that his post-conviction counsel's ineffectiveness

---

[15] "PSER" indicates Petitioner's Supplemental Excerpts of Record filed with this replacement opening brief.

constituted cause for failing to exhaust Claim 3. (ER 071-072.) Djerf timely appealed the district court's ruling. (Dist. Ct. ECF No. 101.)

On March 20, 2012, while Djerf's appeal was pending before this Court, the Supreme Court of the United States issued its ruling in *Martinez*, 566 U.S. 1. In *Martinez*, the Supreme Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. In light of *Martinez*, on April 19, 2012, Djerf filed a motion seeking a partial remand of his appeal to permit him to return to district court to litigate whether inadequate representation by his state post-conviction attorney excused his failure to exhaust Claim 3. (9th Cir. ECF No. 54.) This Court granted Djerf's motion for partial remand on August 19, 2014. (9th Cir. ECF No. 62.) In its Order, the Court found that for purposes of the remand, Djerf's claim of ineffective assistance of trial counsel was "substantial." (9th Cir. ECF No. 62 at 2.) Djerf filed his supplemental brief in the district court on April 17, 2015. (Dist. Ct. ECF No. 124.) The district court denied relief, ruling that Djerf failed to demonstrate that his post-conviction counsel was deficient and also failed to demonstrate that his trial counsel were prejudicially ineffective. (Dist. Ct. ECF No. 128 at 24.) The district court concluded that Claim 3 was "not excused under *Martinez* and the claim remain[ed] defaulted and barred from federal review." (Dist.

79

Ct. ECF No. 128 at 24.)

## B.    RELEVANT LEGAL STANDARDS

### 1.    *MARTINEZ* AND CAUSE AND PREJUDICE

A habeas corpus petitioner procedurally defaults a claim if he fails "to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). A petitioner with a technically exhausted but procedurally defaulted claim must show cause and prejudice before the federal courts can address the merits of the defaulted claim. *See Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998).

In *Martinez*, the Supreme Court identified the circumstances under which a federal habeas court may find cause to excuse procedural default of a claim of ineffective assistance of trial counsel:

> (1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim; and (4) state law requires that [such a claim] be raised in an initial-review proceeding.

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (quoting *Martinez*, 132 S. Ct. at

80

1318-19, 1320-21) (internal quotation marks and emphasis omitted).[16]

Arizona's procedural framework requires petitioners to raise ineffective assistance claims in collateral proceedings. *See Martinez*, 566 U.S. at 4; *State v. Apelt*, 861 P.2d 654, 659 (Ariz. 1993). Accordingly, consistent with Arizona law, Djerf's state post-conviction proceeding was the "initial review proceeding" for his claims of ineffective assistance of counsel. The third and fourth elements of the *Martinez* test are thus satisfied in this case.

The first prong, substantiality of the underlying ineffective-assistance-of-trial-counsel ("IAC") claim, is likewise satisfied in this case. Specifically, to satisfy the "substantial claim" requirement of *Martinez*, Djerf need only demonstrate that the underlying IAC claim has sufficient merit to satisfy the standard for issuance of a certificate of appealability. *See Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). "Under the standard for issuing a certificate of

---

[16] In *Martinez*, the Supreme Court carved out an equitable exception to its longstanding procedural default rules and reasoned that the exception was necessary to "protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel" because "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim." *Martinez*, 566 U.S. at 1, 9. The Court was clear that even "*potentially* legitimate" ineffective assistance claims must not be lost to procedural default, as the right to effective assistance at trial is a "bedrock principle in our justice system" and serves as "the foundation for our adversary system." *Id.*

appealability, 'a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc) (plurality) (quoting *Miller-El*, 537 U.S. at 336 (internal quotation marks and alterations omitted)).

In granting Djerf's motion for partial remand in this case, this Court expressly found that his underlying claim of ineffective assistance of counsel was "substantial." (9th Cir. ECF No. 62 at 2.) Thus, the sole remaining element of the *Martinez* test that was left for the district court to resolve on remand was whether cause for the procedural default existed in the form of the ineffective assistance of Djerf's state post-conviction attorney. (Dist. Ct. ECF No. 113 at 2.) In *Martinez*, the Supreme Court observed, "When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, . . . *or* that the attorney in the initial-review collateral proceeding did not perform below constitutional standards." 566 U.S. at 15-16 (emphasis added). In other words, under *Martinez*, cause is established by a showing that deficient performance by state post-conviction counsel resulted in default of a substantial trial counsel ineffective assistance claim. *See id.*

82

The method for establishing the prejudice element of the cause-and-prejudice test is indisputably settled under established law. Generally, once cause has been shown, a federal court will consider whether there is prejudice based on the underlying constitutional claim. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 315 (2011) (describing cause-and-prejudice as "cause for the delay in asserting his claims and actual *prejudice resulting from* the State's alleged *violation of his constitutional rights*" (emphasis added)); *Smith v. Murray*, 477 U.S. 527, 533 (1986) ("actual prejudice resulting from the alleged constitutional violation") (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). For example, the Supreme Court has held that a prisoner can overcome a procedural default in cases where the State has suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by demonstrating default prejudice simply by satisfying the *Brady* prejudice standard. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 282 (1999) (equating prejudice standard for showing *Brady* violation with the prejudice standard for showing cause and prejudice to overcome default); *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (same). Translating these generally accepted principles to the *Martinez* setting means that Djerf should be able to establish default prejudice by demonstrating that he has a meritorious *Strickland* claim against trial counsel. This was the conclusion of the plurality in the Ninth Circuit's en banc ruling in *Detrich*, 740 F.3d at 1245.

83

Despite the well-established Supreme Court precedent discussed above, a panel of the Ninth Circuit ruled in *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014), *overruled on other grounds by McKinney*, 813 F.3d 798, that a petitioner seeking to demonstrate cause under *Martinez* must show both that his state post-conviction attorney performed deficiently *and* that the petitioner sustained actual prejudice under *Strickland*, 466 U.S. 668 resulting from PCR counsel's deficient performance. In other words, to show prejudice, "a petitioner must establish a reasonable probability that the result of the postconviction proceeding would have been different." *Clabourne*, 745 F.3d at 377. Djerf respectfully submits that *Clabourne* misapplies established cause-and-prejudice principles by requiring a second showing of prejudice above and beyond the merits of his underlying constitutional claim.

The district court disagreed with the cause and prejudice standard as set forth by this Court in *Detrich*, 740 F.3d at 1246, on which Djerf relies. Djerf believes that because the district court held that Djerf's post-conviction counsel failed to raise Claim 3 (ER 070), and this Court found that Djerf's underlying claim of ineffective assistance of counsel was "substantial" when it ordered a remand (9th Cir. ECF No. 62 at 2), he only needed to present a colorable claim that his state post-conviction attorney, Jamie McAlister, performed below the standards of a minimally competent

84

capital post-conviction attorney in failing to raise the claims at issue in order to be granted relief.

In its scheduling order, the district court accepted this Court's finding that Djerf's underlying claim of ineffective assistance of trial counsel was "substantial." (Dist. Ct. ECF No. 113 at 2.)  The district court stated, "Because the Ninth Circuit has already found the remanded claims substantial, prejudice has been established." (Dist. Ct. ECF No. 113 at 2.)  However, the district court disagreed with Djerf on how "cause" is analyzed in the context of a *Martinez* claim.  The district court rejected the "cause" standard as put forth in the *Detrich* opinion; instead, following the "cause" standard as enunciated in *Clabourne*.  The district court found that in order to demonstrate "cause" Djerf must establish that post-conviction counsel was ineffective under the standards of *Strickland*, which requires him to demonstrate both deficient performance and prejudice.  (Dist. Ct. ECF No. 128 at 6-7.)  The court also found that a finding of prejudice requires a petitioner to demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (Dist. Ct. ECF No. 128 at 8.)

The analysis in *Clabourne*, requiring an additional showing of prejudice during post-conviction proceedings is confounding.  The court in *Clabourne* recognizes there is "overlap between the two requirements[,]" and that the finding

85

that a "reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." 745 F.3d at 377. However, the court then explains, "The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different." *Id.* This statement seems to ignore the fact that to meet the standard under *Martinez*, the underlying claim of ineffectiveness of trial counsel must be substantial, therefore, it would not be implausible. Additionally, the court fails to explain why, given that the showing of prejudice as part of the "cause" standard for post-conviction counsel's performance is linked "to the strength of the argument that trial counsel's assistance was ineffective[,]" a higher standard for demonstrating post-conviction prejudice is required above that the Supreme Court held was necessary to demonstrate prejudice related to trial counsel in the *Martinez* context.

In *Detrich*, the Court explained that if a petitioner was required to demonstrate that a defaulted claim of ineffective assistance of trial counsel "fully satisfied *Strickland* in order to satisfy the second *Martinez* requirement, this would render superfluous the first *Martinez* requirement of showing that the underlying *Strickland*

86

claims were 'substantial'—that is, that they merely had 'some merit.'" *See Detrich*, 740 F.3d at 1246. Djerf believes the district court erred in following *Clabourne* because the standard for cause in *Clabourne* requires a showing of prejudice beyond what was necessary to demonstrate that the underlying claim of ineffectiveness of trial counsel was substantial. If the United States Supreme Court intended the standard for prejudice to be that which is required under *Strickland* when considering *Martinez* claims, it would have so held.

### 2. *STRICKLAND* AND INEFFECTIVE ASSISTANCE

In *Powell*, 287 U.S. at 69, the Supreme Court recognized that the accused in a criminal proceeding is entitled to the "guiding hand of counsel" to assist him in preparing and presenting defenses prior to trial. The Supreme Court has consistently held that assistance of counsel, if inadequate, does not satisfy the Sixth Amendment's requirements. *See Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *Richardson*, 397 U.S. at 771; *Reece v. Georgia*, 350 U.S. 85, 89-90 (1955); *Zerbst*, 304 U.S. at 462; *Powell*, 287 U.S. at 71. The failure to provide effective assistance is a fundamental constitutional error that undermines the entire adversarial process. *See Strickland*, 466 U.S. at 685-87.

In *Strickland*, the Court outlined the test for determining whether counsel has provided ineffective assistance. As described by the Court, "the benchmark for

87

judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Under *Strickland*, counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 669. Effective assistance of counsel is ultimately concerned with the fundamental right to a fair trial, "a trial whose result is reliable." *Id.* at 687. A "reasonable probability that . . . the result of the proceeding would have been different" is simply "a probability sufficient to undermine confidence in the outcome," and is less than a preponderance of the evidence standard. *Id.* at 694. Finally, and of particular relevance to the claim currently before this Court, *Strickland* holds that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

### C. DEFICIENT PERFORMANCE OF POST-CONVICTION COUNSEL

Given that *Martinez* was the first federal decision to place the effective representation of post-conviction counsel in issue, little case law exists concerning the standards for determining whether a capital post-conviction attorney has met the

88

minimal standards of competency. The Supreme Court, however, acknowledged in *Bobby v. Van Hook*, 558 U.S. 4 (2009), that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails . . . [where] they describe the professional norms prevailing when the representation took place." *Id.* at 7 (citing *Strickland*, 466 U.S. at 688). In light of *Van Hook*, Djerf will therefore address first the professional standards expected of capital post-conviction attorneys in 2000 through 2002, the period in which McAlister represented Djerf. Djerf will then discuss McAlister's general lack of qualifications to act as a capital PCR attorney, her severe mental illness throughout her representation of Djerf, and her specific failings in Djerf's case.

### 1.  PROFESSIONAL STANDARDS

At the time of Djerf's state post-conviction proceeding, it was well established that post-conviction counsel had a duty to raise all potentially meritorious claims. *ABA Guidelines for the Appointment & Performance of Counsel in Death Penalty Cases* § 11.9.3(C) (1989) ("Postconviction counsel should seek to present to the appropriate court or courts all arguably meritorious issues . . . ."); Nat'l Legal Aid & Defender Ass'n, *Counsel Standards* § 11.9.3(c) (1985). Moreover, prevailing standards clearly required that post-conviction counsel conduct a reasonable investigation of prior counsel's representation to ensure that the client had received

89

effective assistance of counsel during the prior proceedings. *See, e.g.*, *ABA Standards for The Defense Function* § 4-8.5 (1979) (hereinafter "The Defense Function"). The same normative standards hold that PCR counsel has the same duties as trial counsel insofar as assuring that a reasonable investigation is conducted. Because "a postconviction proceeding is fundamentally an original judicial proceeding, involving problems of investigation, preparation, and trial, the standards governing lawyers in these tasks are essentially the same as those outlined in these standards for the defense of a criminal case." *Id.* at cmt. By definition, PCR counsel has the corresponding duty to investigate trial counsel's performance. *See* The Defense Function § 4-8.6 & cmt. (discussing investigation of prior counsel's performance).

Of course, perhaps most compelling, *Martinez* itself contemplates as a given that PCR counsel has a duty to reasonably examine the performance of trial counsel and that this examination will require PCR counsel to conduct a reasonable investigation within the context of the particular case. "Without the help of an adequate attorney, a prisoner will have similar difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim. Claims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." *Martinez*, 566 U.S. at 11; *see id.* at 13 (recognizing again that "[i]neffective assistance claims

90

often depend on evidence outside the trial record" and counsel will need "adequate time . . . to investigate").

### 2. MCALISTER'S LACK OF QUALIFICATION

At the time of Djerf's post-conviction proceedings, Rule 6.8 of the Arizona Rules of Criminal Procedure required counsel to have practiced criminal litigation for the previous three years, to have a demonstrated proficiency and commitment in capital cases, to have been lead counsel in a capital appeal or post-conviction relief proceeding within the previous three years, and to have been lead counsel in the appeal of at least three felony convictions and one post-conviction relief proceeding that resulted in an evidentiary hearing. Ariz. R. Crim. P. 6.8(a)(2)-(3) & (c)(1) (2000). In lieu of the last requirement, counsel was required to have served as lead counsel in the appeal of at least six felony convictions, at least two of which were for first or second degree murder convictions, and lead counsel in at least two post-conviction relief proceedings that resulted in an evidentiary hearing. Ariz. R. Crim. P. 6.8(c)(1). In addition, appointed counsel was required to have attended and successfully completed twelve hours of capital defense education within one year of appointment. Ariz. R. Crim. P. 6.8(c)(2).

If counsel seeking appointment was not qualified, "[i]n exceptional circumstances and with the consent of the Supreme Court, an attorney [could have

91

been] appointed who d[id] not meet the qualifications . . . providing that the attorney's experience, stature and record enable[d] the Court to conclude that the attorney's ability significantly exceed[ed] the standards set forth in th[e] rule and that the attorney associate[d] with himself or herself a lawyer who d[id] meet the standards set forth in th[e] rule." Ariz. R. Crim. P. 6.8(d).

The Supreme Court established the Indigent Defense Standards Committee ("Committee") to screen applicants for appointment to post-conviction representation. *In the Matter of the Committee on Appointment of Counsel for Indigent Defendants in Capital Cases*, Adm. Order No. 96-63 (Dec. 27, 1996). The committee, however, disbanded in 2001. *In the Matter of Disbanding the Committee on Appointment of Counsel for Indigent Defendants in Capital Cases*, Adm. Order No. 2001-55 (May 9, 2001). Its charge was to carry out the legislative mandate to the Arizona Supreme Court to maintain a list of qualified attorneys for post-conviction relief appointments. The Indigent Defense Standards Committee, appointed by the Arizona Supreme Court, was chaired by Judge Michael Ryan, who coincidentally was the judge who sentenced Djerf to death. The Committee was charged with recommending to the Court those applicants who met the statutory and rule requirements for appointment. John A. Stookey & Larry A. Hammond, *Arizona's Crisis in Indigent Capital Representation*, 34-MAR Ariz. Att'y 16 (1998).

92

In September 1998, Jamie McAlister submitted an application to the Committee seeking appointment as counsel in capital post-conviction proceedings. (PSER 001-003.) Because she did not satisfy the minimum requirements of Rule 6.8(c), however, the Committee recommended that the Supreme Court consider her (along with eight other candidates) for positions as "second chair" attorneys to be assigned to work with more experienced lawyers. (PSER 006.) The Arizona Supreme Court, however, did not heed the Committee's advice. Instead, within four months, it appointed McAlister as lead counsel in *State v. James Erin McKinney*, CR 91-90926, Maricopa County Superior Court, a capital post-conviction proceeding. And, on February 29, 2000, it appointed her to represent Djerf in his state post-conviction proceedings.

### 3. McAlister's "Psychotic Break" During Her Representation of Djerf

In addition to being unqualified under the Arizona Rules of Criminal Procedure to represent capital defendants in post-conviction proceedings, McAlister was seriously mentally ill during her representation of Djerf. In fact, as Djerf explains below, records indicate that she suffered a "psychotic break" in 2000, the precise period of time in which she was supposed to be investigating, researching and drafting Djerf's Rule 32 petition.

93

McAlister was suspended by the State Bar of Arizona in October 2002 for unethical acts she committed in two unrelated cases in 2000, during the time she represented Djerf. (PSER 009-051.) The Joint Memorandum in Support of Agreement for Discipline by Consent, which is part of the Supreme Court's record in McAlister's disciplinary proceedings, addresses her difficulties with mental illness in 2000:

> The mitigating factor that should be given the greatest weight is Respondent's mental disability. Attached are two medical reports, one from a psychologist retained by Respondent and one from the psychiatrist retained by the State Bar to perform an independent medical exam. Both medical reports provide extensive insight into the difficulties experienced by Respondent during the time period relevant to this matter. Dr. Schulte, who performed the IME, concluded that Respondent's bipolar disorder and its inappropriate treatment significantly contributed to Respondent's fraudulent behavior.

(PSER 016.)

The "psychologist retained by Respondent" was Richard M. Samuels, Ph.D., the very same psychologist McAlister retained to evaluate Djerf for purposes of his Rule 32 proceeding. As part of the investigation for Djerf's federal habeas corpus proceedings, prior federal habeas counsel interviewed Dr. Samuels on March 31, 2003, concerning his evaluation of Djerf. At that time, Dr. Samuels provided the Office of the Federal Public Defender with a copy of his psychological evaluation

94

of McAlister.[17]  (PSER 053-065.)[18]

Dr. Samuel's report details McAlister's medical and psychological state in

2000:

> In 1998, Jamie McAlister's fledgling partnership with [another] attorney broke up and she was left with "the bills and too many clients."  She began to suffer from depression due to this situation and developed a simultaneous flair up of her chronic, fibromyalgia condition.  She attributes her medical flair up to the emotional stresses she faced suddenly being thrust into a solo practice, and the increasing financial problems.  Her pain escalated and reached its height in 2000.  "Throughout 2000 the pain was acute but since I had no health insurance, I could not get the treatment I needed.  COBRA ended in September of 1999 and I was unable to pay for insurance.  My medical bills for 2000 were about $25,000.00 and I was nine months behind in my mortgage!"
>
> As her pain became acute, she sought treatment from a primary care physician who "threw pain pills at me.  I literally begged her for help."

---

[17] McAlister died on February 23, 2003, approximately 5 weeks before the FPD's interview of Dr. Samuels. (PSER 052.)

[18] Counsel for Djerf does not know whether the report given to him by Dr. Samuels is the same report submitted as part of McAlister's state bar disciplinary proceedings.  Pursuant to Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, Djerf sought leave of from the district court to issue a subpoena duces tecum to the Director of the Certification and Licensing Division of the Supreme Court of the State of Arizona to obtain the two sealed psychological reports.  (Dist. Ct. ECF No. 117.)  The court denied Djerf's motion, reasoning that whether McAlister was suffering a psychotic break during her representation of Djerf was not relevant to the *Strickland* deficient performance analysis.  (Dist. Ct. ECF No. 123.)  Djerf respectfully submits that the court's ruling was in error.  *See, e.g.*, *Bell v. Cone*, 535 U.S. 685, 697 n.4 (2002) (addressing claim of ineffective assistance of counsel and faulting petitioner for failing to present evidence of his attorney's mental health).

> She was referred to a rheumatologist, who "threw more pain pills at me." She stated that her condition worsened further under the pressure of a March 2000 trial and she began having trouble sleeping. "I hadn't been able to sleep well for the past year. I was averaging only eight to twelve hours of sleep per week. I was really racing. I see now that the antidepressant I was taking probably triggered a manic episode like it had earlier in my life due to the stress I was under."

(PSER 056.)

McAlister also told Samuels that, in September 2000, her physician, Barbara Berry, concluded that she had "suffered a psychotic break." (PSER 056.) McAlister was appointed to Djerf's case on February 29, 2000, and filed his initial PCR petition on August 4, 2000. Thus the most critical stages of Djerf's Rule 32 proceedings—the investigation, researching, and drafting of his legal claims—all occurred during McAlister's severe physical and psychological breakdown.

A December 2000 *pro se* motion filed by another of McAlister's clients seeking to have her dismissed as his attorney provides possible insight into McAlister's state of mind at that time:

> During the most recent conversations with Ms. McAlister she made it clear she could not effectively [sic] represent me to the best of her ability due to "according to her statements," she is incompetent[.] [W]e cannot communicate with one another and I have made several attempts to communicate newly discovered material evidence to Ms. McAlister that is pertinent to my case[.] However she dont [sic] even except [sic] my calls at times. [S]he has a very unproffesional [sic] attitude towards me and verbally abuses me and has gone as far as

96

calling me names and hanging up the phone on me because Ive [sic] directed her to file motions and investigate possible leads in my case.

(PSER 067.)

McAlister's medical and emotional difficulties in 2000 would have raised serious questions about the ability of even a seasoned capital post-conviction attorney to provide minimally competent representation. McAlister, however, was not a seasoned capital post-conviction attorney. As discussed, *supra*, she did not even satisfy Arizona's minimal qualifications for appointment as a capital post-conviction attorney. And, as is discussed in the following section, McAlister failed to take even the most basic steps to fulfill her legal and ethical obligations to Djerf in his Rule 32 proceeding.

### 4. MCALISTER'S GROSS INEFFECTIVENESS IN DJERF'S CASE

Apparently, McAlister never obtained any pleadings or transcripts from Djerf's trial court proceedings. In other words, she had no record upon which to base an investigation of trial counsel's performance during the guilt and penalty phases of Djerf's case. This fact alone should conclusively demonstrate McAlister's

deficient performance in Djerf's Rule 32 proceedings.[19]  However, because this glaring error was not the only one committed by McAlister during the course of her representation of Djerf, a fuller account of her deficient performance is set forth below.

Interestingly, McAlister's first activity in Djerf's case appears to have been letters she wrote to Djerf's prior attorneys, *more than a month prior to her actual appointment by the Arizona Supreme Court*, identifying herself as Djerf's Rule 32 attorney and requesting that Djerf's trial and appellate files be sent to her.  (PSER 069.)  Of course, McAlister technically was not Djerf's counsel until her appointment by the state supreme court, so her assertion to prior counsel in January 20 was dubious.  In any event, if she believed herself to be Djerf's legal representative at that time, she failed to inform Djerf of that fact.  On February 13, 2000, three weeks after she sent the letters to prior counsel, Djerf wrote the following letter to McAlister:

> I received the copies of the letters that you sent to Attorneys Vaughn, Simpson and Martin.
>
> Since you are seeking paperwork on my case from my previous

---

[19] It also goes a long way toward explaining why both the initial and amended petitions contain no record cites and primarily address issues that are more appropriate for a direct appeal than an initial post-conviction proceeding.

attorneys, and since I haven't heard otherwise, I'm going to assume that you've been appointed to represent me on my Rule 32. If this is the case, the file that you seek, at least to the extent of what I received from Ms. Martin, is currently being held at the Federal Public Defender's office. (See attached letter.)[20] It includes the transcripts of all my court proceedings, along with other documents.

Along with this letter, I'm sending a letter to [the] Federal Public Defender's office letting them know to expect your inquiries. You can contact them to make whatever arrangements that need to be made.

(PSER 073.)[21]

McAlister never obtained the transcripts and pleadings from the FPD during her representation of Djerf. On April 3, 2002, after the FPD had been appointed to represent Djerf, FPD paralegal Angela Fairchild wrote McAlister a letter inquiring as to whether McAlister had forgotten to include the transcripts when she provided the FPD with her file. (PSER 075.) The following day, Fairchild spoke with McAlister regarding the transcripts and summarized her conversation in an email to the other members of Djerf's legal team:

Jamie McAlister (PCR counsel) just called me back regarding the transcripts (I called her and sent her a letter asking if she had any of the trial level transcripts because there were none in her files she gave

---

[20] The copy of Djerf's letter found in McAlister's file did not contain a copy of the attached letter; however, an August 21, 1998 letter from the Tucson office of the FPD to Djerf acknowledged the receipt of his files. (PSER 072.)

[21] McAlister also received notification from Lisa Martin that she had returned the transcripts and pleadings to Djerf. (PSER 074.)

to us). She said, "There wasn't a trial so there weren't any transcripts." I acknowledged there was no trial but that there were other hearings. She then agreed "there should've been transcripts from the change of plea, agg/mit hearing, and sentencing." She said, "I don't think direct appeal counsel ever got them." Then she asked me, "You don't have any? They weren't in the file?" I told her there were no transcripts in the file. She stated, "Well, I gave you everything had." I thanked her and hung up.

(PSER 076.)

Further, in her January 26, 2000 letters to Djerf's trial counsel, Vaughn and Simpson, McAlister stated: "I also need to meet with you to discuss issues that you identified, as well as, to discuss the course of preparation for trial/sentencing." (PSER 069-071.) McAlister's billing records, however, contain no indication that she ever conducted these necessary interviews of prior counsel. (PSER 077-080.)[22]

Thus, without the transcripts and pleadings in Djerf's case, and without interviewing Djerf's prior attorneys, McAlister proceeded to prepare Djerf's Rule 32 petition. However, because McAlister failed to perform even the most minimal

---

[22] McAlister did meet with Djerf on two occasions, once in April 2000 and once in May 2000. Arizona Department of Corrections ("ADOC") records indicate that McAlister's visit with Djerf on April 13, 2000, lasted for one hour. (PSER 082.) She billed the Office of Court Appointed Counsel ("OCAC") three hours for the visit (which she incorrectly identified as occurring on April 16, 2000), despite the fact that the billing records indicate that travel time was billed to another client. (PSER 077.) Her meeting with Djerf on May 16, 2000, lasted one hour and twenty minutes. (PSER 082.) She billed OCAC two hours for the visit, which she incorrectly identified as occurring on May 15, 2000. (PSER 078.)

100

duties of a post-conviction attorney (*i.e.*, obtaining the record and interviewing trial counsel), any decision she made concerning what claims to include in the petition cannot be considered reasoned or strategic. *See Strickland*, 466 U.S. at 690-91 ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

Moreover, the claims McAlister *did* include in the Rule 32 petition themselves demonstrate the importance of the claims she failed to include. With specific relevance to Claim 3, which McAlister failed to raise, the petition argued that the trial court erred in failing adequately to inquire into Djerf's request to remove Vaughn and Simpson as his trial attorneys. *See* Amended Petition for Post-Conviction Relief, CR 93-07792 (Maricopa County, Arizona), filed November 16, 2000, at 9-12. McAlister argued that, because Vaughn and Simpson were not acting as competent counsel, Djerf had an irreconcilable conflict with them and was therefore entitled to appointment of new counsel. *Id.* The *sine qua non* of this argument, of course, is the deficient performance rendered by trial counsel in the months prior to Djerf's request to proceed *pro se*. Yet, remarkably, McAlister failed entirely to raise a claim (ultimately pled as Claim 3 of Djerf's First Amended Petition for a Writ of Habeas Corpus) that Vaughn and Simpson had rendered ineffective

101

assistance of counsel within the meaning of the Sixth Amendment. Plainly, no legitimate argument can be made that McAlister strategically decided not to raise such a claim because it lacked merit given that the issue of trial counsel's ineffectiveness was the very underpinning of one of the claims she *did* raise.

### D. THE DISTRICT COURT ERRED IN REJECTING DJERF'S ALLEGATIONS OF INEFFECTIVENESS OF POST-CONVICTION COUNSEL

The district court disagreed with each of Djerf's arguments and denied relief. With regard to McAlister's lack of qualifications to handle a capital post-conviction case, the court recognized that the Indigent Defense Standards Committee declined to recommend appointment of McAlister because she failed to meet the requirements of Rule 6.8(c), but stated that because the state court appointed her as lead counsel in a post-conviction proceeding, it presumably recognized the she met the requirements under Rule 6.8(d). (Dist. Ct. ECF No. 128 at 11.) Rule 6.8(d) allows appointment when the formal requirements under subsection (c) cannot be met but when counsel's "ability significantly exceeds the standards set forth in t[he] rule." Rule 6.8(d). However, a brief look at McAlister's application makes clear that she not only failed to meet the requirements of subsection (c), but also did not have abilities exceeding these requirements. (PSER 001-003.)

According to her application, McAlister had six years of criminal litigation

experience, but did not have "a demonstrated proficiency and commitment in capital cases." She had never worked on a capital appeal, and had worked on one capital post-conviction proceeding, but not as lead counsel. She describes this post-conviction experience as "prep clemency hearing for Luis Mata[,]" which, of course, is a vastly different task than a post-conviction proceeding. While she was appointed to four non-capital felony appeals, she had only completed one at the time of her application, which she describes as a non-capital post-conviction case. Only one of these appeals involved a murder conviction. She had never served as lead counsel in a post-conviction proceeding that resulted in an evidentiary hearing, although she stated that she was presently appointed to a post-conviction case. (PSER 002.) Therefore, there is no support for the district court's finding that McAlister was qualified to represent Djerf in his post-conviction proceeding under any subsection of Rule 6.8.

The district court also rejected Djerf's allegations with regard to McAlister's mental health at the time she represented him. (Dist. Ct. ECF No. 128 at 14.) Despite the fact that Djerf presented evidence indicating that McAlister had a psychotic break in the midst of his post-conviction proceedings, in an evidentiary ruling on remand, the district court stated that whether McAlister was suffering a psychotic break during her representation of Djerf was not relevant to the *Strickland*

103

deficient performance analysis. (Dist. Ct. ECF No. 123.) The court later ruled there was no authority supporting a finding that counsel could be rendered ineffective solely on an allegation that she suffered from mental health disorders at the time of her representation, even if that allegation was that counsel suffered from a psychotic break. (Dist. Ct. ECF No. 128 at 14.)

The district court also rejected Djerf's argument that McAlister was ineffective for failing to include Claim 3 in the post-conviction petition. The court held that because this claim was meritless, counsel was not deficient for failing to raise it. (Dist. Ct. ECF No. 128 at 15.) Finally, the court rejected Djerf's claim that McAlister failed to obtain transcripts of the trial and failed to interview trial counsel. While Djerf presents credible evidence in support of each allegation, the district court rejects each, relying on vague statements by counsel with regard to the transcripts and finding that there is no authority requiring post-conviction counsel to interview trial counsel before filing a petition. (Dist. Ct. ECF No. 128 at 16-17.)

The district court erred in rejecting Djerf's claim that post-conviction counsel was deficient in her representation of him. Djerf has presented a colorable argument that McAlister rendered deficient performance in his Rule 32 proceedings and is entitled to relief.

104

### E.  PREJUDICE

As the Ninth Circuit expressly found, Claim 3 is "substantial."  (9th Cir. ECF No. 62 at 2.)  Accordingly, Djerf was necessarily prejudiced by post-conviction counsel's failure to raise that claim.  Under *Martinez*, post-conviction counsel's failure to raise a substantial claim will satisfy the prejudice requirement for purposes of deciding the second prong of post-conviction counsel's ineffectiveness.  If, however, this Court finds that the prejudice analysis requires a showing that the result of the post-conviction proceedings would have been different, Djerf can also meet this standard.

As set forth, *supra*, Djerf's counsel provided ineffective assistance during the fifteen months they represented him prior to their removal.  Djerf relies on the extensive facts and authority he provides in the fact section of this brief and in Claim I(B)(1) in support of his argument here.  Djerf also sets forth the following argument in support of prejudice.

Under *Strickland*, prejudice resulting from counsel's deficient performance exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 669.  Effective assistance of counsel is ultimately concerned with the fundamental right to a fair trial, "a trial whose result is reliable."  *Id.* at 687.  A "reasonable probability

that . . . the result of the proceeding would have been different" is simply "a probability sufficient to undermine confidence in the outcome," and is less than a preponderance of the evidence standard. *Id.* at 694.

Djerf was prejudiced because trial counsel's deficient performance led him to request their removal from his case, which in turn led, grievously, to his self-representation and guilty plea without an agreement as to sentence. Djerf has demonstrated that the only reason he proceeded *pro se* was because of the ineffective assistance he received from Vaughn and Simpson during the fifteen months they represented him in the guilt/innocence phase of his case. Additionally, on August 1, 1995, Djerf wrote the lead prosecutor, seeking an alternative to trial that would allow him to avoid the death penalty in the event of his conviction:

> I am writing you this letter in a weak attempt at negotiating a pleas agreement allowing me to avoid the death penalty.
>
> I have nothing at all to offer the state, other than my willingness to accept the maximum sentences on all counts; consecutive of course!
>
> I agree that this isn't much of an offer, but it allows the families of the victims to move on with their lives, without having all the terrible details of this incident brought out, and the State of Arizona will save the many millions of taxpayer dollars it will cost for the trial and the many appeals.
>
> Take some time and consider this opportunity to do justice to the victims and their families, and let me know your answer as soon as possible, so that I may prepare accordingly.

(PSER 090-091.) The prosecution responded that it "refuse[d] to relinquish its request for the death penalty." (PSER 092.) Rather, it offered Djerf a plea in which he would agree to plead guilty to four counts of first-degree murder without any agreement as to sentence in return for the prosecution's dismissal of the non-murder counts. (PSER 092.) Djerf ultimately entered the plea agreement proposed by the prosecution. A letter Djerf wrote to Vaughn after his guilty pleas strongly suggests that Djerf would not have pled guilty if Vaughn had advised him against it:

> When I recieved [sic] the response from the state in regards to a plea agreement . . ., I contacted you on August 9th of 1995, to let you know I was considering accepting the states [sic] proposal. I asked you to come down to the jail so we could discuss this matter. On August 10th, you and I discussed this matter for approximately 15 minutes, at which time you did not advise me one way or the other what you thought of my decision, you never once gave me the impression that you had a problem with my decision. This was also the case on August 15th when we spent approximately an hour going over the plea agreement, before I signed it. I didnt [sic] find out that you had a problem with the "wisdom" of my decision, until I was in the courtroom, changing my plea, you should have discussed this with me prior to the proceedings, and I dont [sic] appreciate hearing something that I should have heard from you, from the media. We talked on several occasions prior to my change of plea, in which you could have discussed, with me, your opinion or offer me what ever [sic] advice you felt was appropriate. You chose not to say anything to me and then voiced your opinions to the media.

(PSER 096-097.)

The Supreme Court held in *Hill v. Lockhart*, 474 U.S. 52, 59 (1985), that a

107

pleading defendant can establish *Strickland* prejudice by demonstrating "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Here, a reasonable probability plainly exists that, but for the deficient performance of Vaughn and Simpson, Djerf would not have gone *pro se* and would not subsequently have pleaded guilty.

*Uncertified Issue*

## V.   THE DISTRICT COURT ERRED IN REJECTING DJERF'S CLAIM THAT THE STATE COURT FAILED PROPERLY TO CONSIDER THE MITIGATING EVIDENCE HE PRESENTED.

The district court rejected Djerf's claim that the Arizona state courts failed to consider and give effect to mitigating evidence of a difficult family background because he did not establish a causal nexus between his mitigating evidence and the crimes for which he was convicted.  (ER 050-057.)  Despite specific language in both the trial court's sentence and the Arizona Supreme Court's opinion that evidence of a difficult family background is not mitigating evidence unless the defendant can demonstrate a causal connection between the evidence and the crime, the district court erroneously concluded it was "readily apparent that the trial court and the Arizona Supreme Court performed their constitutional duty and properly considered the mitigating evidence, even citing *Lockett* and *Eddings*."  (ER 057.)

108

The district court was plainly wrong in its interpretation of the state courts' treatment of this evidence.

## A. THE STATE COURTS' TREATMENT OF DJERF'S MITIGATION EVIDENCE

Mr. Djerf was sentenced to death on May 22, 1996, for murders committed in September of 1993. (ER 131-135.) At the penalty phase of his trial, Djerf presented mitigating evidence of his difficult childhood through the defense investigator Art Hanratty.[23] (ER 338-364.) At sentencing, the trial court found "that [Djerf] failed to show his difficult family background is a mitigating circumstance. There is no evidence that any alleged difficult family background had any effect on the defendant's behavior during these killings that was beyond the defendant's control." (ER 140.) The Arizona Supreme Court acknowledged on direct appeal that the trial court "found that defendant failed to prove" this mitigating factor. *Djerf*, 959 P.2d at 1288. The court then agreed with the trial court's finding that this evidence was irrelevant, noting that "Arizona law states that a difficult family background is not

---

[23] Djerf does not concede that Hanratty's testimony constitutes the entirety of relevant mitigating evidence concerning his family background. As Djerf explained in Issue II, *supra*, his attorneys rendered constitutionally ineffective assistance of counsel in developing his case in mitigation. Nevertheless, for purposes of this issue, it is sufficient to note that the trial court refused to consider even the limited testimony Hanratty provided.

relevant unless the defendant can establish that his family experience is linked to his criminal behavior." *Id.* at 1289 (*citing State v. Ross*, 886 P.2d 1354, 1362 (Ariz. 1994)).

**B.    THE ARIZONA COURTS' EXCLUSION OF RELEVANT MITIGATING EVIDENCE FROM THE SENTENCING CALCULUS VIOLATED MR. DJERF'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW.**

At the time of Djerf's sentencing, the Arizona Supreme Court required a defendant to show that a causal connection existed between mitigating evidence regarding his background and the commission of the crime. *See McKinney*, 813 F.3d at 803.  This causal-nexus test was applied by Djerf's sentencing judge and the Arizona Supreme Court in its independent review of Djerf's sentence.  As a result, Djerf's mitigation about his family background was taken out of the sentencer's effective reach in violation of the Eighth and Fourteenth Amendments to the United States Constitution. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982); *see also Lockett v. Ohio*, 438 U.S. 586 (1978); *Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

In *Eddings*, the Supreme Court held, "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence."

110

455 U.S. at 113-14 (emphasis in the original). In *Penry*, the Court clarified, "it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and *give effect* to that evidence in imposing sentence." 492 U.S. at 319 (emphasis added). While this Court has held that the existence of a causal connection between mitigating evidence and the crime may be considered when assigning weight to this evidence, *see Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011), *overruled on other grounds by McKinney*, 813 F.3d 798, a court may not exclude mitigating evidence from the sentencing calculus on the basis that a causal connection was not established. *See Eddings*, 455 U.S. at 114-15.

It is clear from the facts of Djerf's case, and the specific language of the state courts, that Djerf's mitigating evidence was categorically screened from the state courts' sentencing consideration because it lacked a causal connection to the crimes. Moreover, it is not surprising that the state courts did this because at the time Djerf was sentenced and at the time the Arizona Supreme Court independently reviewed his sentence, the law in Arizona required that a causal connection be established between mitigating evidence and the crime before this evidence could be considered in a sentencing decision. *See McKinney*, 813 F.3d at 813.

111

In *McKinney*, this Court found that from the late 1980s until the mid-2000s, the Arizona Supreme Court repeatedly articulated a test for non-statutory mitigation that required a defendant to establish a causal connection between evidence of a difficult family background or mental condition and the crime before this evidence could be considered as relevant mitigating evidence. *Id.* at 813-818 (citing *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989); *State v. Ross*, 886 P.2d 1354, 1363 (Ariz. 1994); *Djerf*, 959 P.2d at 1289; *State v. Hoskins*, 14 P.3d 997, 1021-22 (Ariz. 2000)). The Court noted that it was not until the United States Supreme Court "emphatically reiterated" the rule in *Eddings* in *Tennard v. Dretke*, 542 U.S. 274 (2004), that "the Arizona Supreme Court finally abandoned its unconstitutional causal nexus test for nonstatutory mitigation." *McKinney*, 813 F.3d at 817 (citing *State v. Anderson*, 111 P.3d 369, 392 (Ariz. 2005)).

The "law" in the state of Arizona at the time of Djerf's direct appeal, as expressly stated in the Arizona Supreme Court opinion in his case was "that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior." *Djerf*, 959 P.2d at 1289 (citing *Ross*, 886 P.2d at 1362). The Court in *McKinney*, specifically addressed how the Arizona Supreme Court treated evidence of a difficult family background in Djerf's case:

112

> [In Djerf's case], the Arizona Supreme Court explained that it read *Eddings* and *Lockett* to require a sentencer to 'consider' evidence offered in mitigation. In the usage of the Arizona Court, however, 'considering' such evidence did not mean weighing it to determine how much mitigating effect to give it. Rather, it meant 'considering' such evidence to determine whether it satisfied the causal nexus test for nonstatutory mitigation. If it satisfied the test, the sentencer was required to determine how much weight, if any, to give to it. If [it] did not satisfy the test, the sentencer was required, as a matter of law, to treat it as irrelevant and to give it no weight.

*McKinney*, 813 F.3d at 814.

The Court in *McKinney* also relied on the Arizona Supreme Court's analysis in *State v. Hoskins*. In *Hoskins*, a case decided two years following Djerf's case, the Arizona Supreme Court reiterated what it had written in *Djerf*:

> A dysfunctional family background or difficult childhood can be mitigating only if the defendant can establish that early experiences, however negative, affected later criminal behavior in ways that were beyond his control. . . . If the defendant fails to prove causation, the circumstances will not be considered mitigating. However, if the defendant proves the causal link, the court then will determine what, if any, weight to accord the circumstance in mitigation.

14 P.3d 997, 1021-22 (Ariz. 2000) (citations omitted). The Court in *McKinney* found that "[t]he decisions of the Arizona Supreme Court make clear that family background or a mental condition could be given weight as a nonstatutory mitigating factor, but only if defendant established a causal connection between the background or condition and his criminal behavior." 813 F.3d at 815.

113

In Djerf's case, the sentencing court unconstitutionally required Djerf to demonstrate a causal connection between evidence of his difficult childhood and the crimes for which he had been convicted before it would consider this evidence as relevant to its sentencing determination. During habeas proceedings, Respondents conceded as much in their Answer to the Amended Habeas Petition, where they acknowledged that the "Arizona Supreme Court agreed with the trial court's conclusion that Petitioner failed to show a causal nexus between his childhood and the murders." (Dist. Ct. Dkt. 66 at 43.) The State argued, "For a difficult childhood to have any significant mitigation value, it must be relevant to the circumstances of the offense and thus have a 'causal connection' to the crime." (Dist. Ct. Dkt. 66 at 45) (citing *State v. Sansing*, 26 P.3d 1118 ¶¶ 38-40 (Ariz. 2001), and noting that *Sansing* rejected an identical *Eddings*/*Lockett* argument and reiterated the well-established causal nexus requirement). Respondents also asserted that Arizona's causal nexus requirement was "consistent with *Lockett* and *Eddings*." (Dist. Ct. Dkt. 66 at 45.)

The causal-nexus requirement, as applied in Djerf's case, was not used as a means of weighing mitigating evidence already considered by the court, but worked to prevent the sentencing judge from considering and giving effect to evidence of Djerf's difficult childhood, which may have resulted in a sentence less than death.

114

*See Penry*, 492 U.S. at 319*; see also Eddings*, 455 U.S. at 112; *Lockett*, 438 U.S. at 604; *Williams*, 529 U.S. at 395-97; *Wiggins*, 539 U.S. at 535; *Rompilla*, 545 U.S. at 391-92. The state courts' application of the causal-nexus requirement in Djerf's case violated his right to a fair sentencing determination and his right against the imposition of cruel and unusual punishment in contravention of the Eighth Amendment to the United States Constitution and established United States Supreme Court precedent. As such, the state courts' adjudication of this claim was contrary to clearly established federal law under 28 U.S.C. § 2254(d)(1), and this Court should reverse the district court's decision denying habeas relief.

### C. DJERF WAS PREJUDICED WHEN THE ARIZONA SUPREME COURT EXCLUDED RELEVANT MITIGATING EVIDENCE FROM ITS SENTENCING DECISION BECAUSE IT FOUND IT LACKED A CAUSAL CONNECTION TO THE CRIME.

In *McKinney*, the Court held that *Eddings*'s error is subject to review for harmless error. 813 F.3d at 821-22. The Court recognized that the standard for harmless error on habeas review is whether "the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 822 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). The Court noted that while a petitioner must establish actual prejudice under *Brecht*, "the 'risk of doubt' is placed 'on the State.'" *Id.* (citing *O'Neal v. McAninch*, 513 U.S. 432, 439 (1995)). The Court

reiterated that in a federal habeas case, "in the absence of structural error that requires automatic reversal, 'relief is appropriate only if the prosecutor cannot demonstrate harmless error.'" *Id.* (citation omitted).

In Djerf's case, the exclusion of mitigating evidence had a "substantial and injurious effect or influence" on the sentencing outcome. *See Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). While trial counsel presented little in the way of mitigating evidence, there was sufficient evidence to demonstrate prejudice here. Djerf presented evidence that his mother had a difficult birth with him and that his birth father was an alcoholic. (ER 342-343, 351.) When Djerf was a toddler, he had a head injury that was never examined or treated. (ER 355-356.) After his parents divorced, Djerf was left to be raised by his alcoholic father because his mother remarried a man out of state who did not like children. (ER 347.) His stepfather wanted nothing to do with Djerf and one occasion slammed him against a wall. (ER 355.) He had minimal contact with his mother because she lived out of state and her husband did not want the children around. (ER 341-356.) His mother also rarely called him. (ER 350.) Djerf was raised in a lonely and isolated home because of his father's nightly drinking and minimal interaction with him. (ER 296, 357-360, 362-363.) While his father provided food and shelter, he never helped Djerf with his homework or had any interaction with Djerf's

116

teachers. (ER 358.) Djerf's father also had minimal interaction with him, and only showed Djerf affection on one occasion, when he hugged him. (ER 364.) Djerf's father would make dinner every night, but never ate with Djerf. Instead, Djerf's father ate dinner with his girlfriend in front of the television and Djerf ate alone every night in his room. (ER 296, 361.) Neither of Djerf's parents ever made efforts to have Djerf interact with other children, even at a young age, so he had few friends and was described by his father as a loner. (ER 345, 348, 352, 360.) Djerf felt abandoned by his mother and neglected and unwanted by both parents. (ER 296.)

Evidence of this type has been considered to be particularly relevant by the United States Supreme Court because it may lessen the defendant's moral culpability in the eyes of the sentencer. *See Eddings*, 455 U.S. at 115; *see also Lockett*, 438 U.S. at 594; *Penry*, 492 U.S. at 319. Despite this, the state courts impermissibly excluded this compelling evidence from the sentencing calculus, and instead found that Djerf had failed to demonstrate the existence of *any* mitigating evidence. *Djerf*, 959 P.2d at 1290. It defies logic to conclude that the excluded mitigation would not have mattered to a reasonable sentencer making an individualized determination about the appropriateness of the death penalty. It is, therefore, impossible to say "with fair assurance . . . that the judgment was not substantially swayed by the error[.]" *McKinney*, 813 F.3d. at 822 (quoting *Kotteakos*, 328 U.S. at 765). This

117

Court should find that the exclusion of this evidence had a "substantial and injurious effect or influence" on the sentencing decision in Djerf's case and grant him relief. *Id.* (quoting *O'Neal*, 513 U.S. at 436).

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's order dismissing Djerf's First Habeas Petition with prejudice, and remand the matter with instructions either to grant the writ or to permit further proceedings on the merits of Djerf's claims.

Respectfully submitted this 21st day of November, 2017.

Jon M. Sands
Federal Public Defender
Therese Michelle Day

By:  s/Therese Michelle Day
Counsel for Petitioner-Appellant

118

**Certificate of Compliance Pursuant to Circuit Rule 32-1**
**Case No. 08-99027**

This opening brief exceeds the page limitation required under Ninth Circuit Rule 32-4. It is proportionately spaced, has a typeface of 14 points, and contains 27,650 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f). The brief's type size and type face comply with Federal Rules of Appellate Procedure 32(a)(5) and (6). As a result, Djerf has simultaneously filed a motion with this Court asking for permission to file an oversized brief, pursuant to Ninth Circuit Rule 32-2(a).

Dated:  November 21, 2017                     By:  s/Therese Michelle Day
                                                    Counsel for Petitioner-Appellant

119

## STATEMENT OF RELATED CASE

I certify that there are no cases pending before this Court that are related to this case within the meaning of 9th cir. R. 28-2.6.

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

By: _s/Daniel Juarez_
   Legal Secretary
   Capital Habeas Unit