# No. 08-99027

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Richard Kenneth Djerf,

      Petitioner-Appellant,

      –vs–

Charles L. Ryan, et al.,

      Respondents-Appellees.

**On Appeal from the United States District Court for the District of Arizona,**
No. CV-02-582-PHX-JJT
(Formerly No. CV–02-00358-JAT)

## RESPONDENTS-APPELLEES' REPLACEMENT ANSWERING BRIEF

Mark Brnovich
Attorney General
(Firm State Bar No. 14000)

Lacey Stover Gard
Chief Counsel

Ginger Jarvis
Assistant Attorney General
Capital Litigation Section
2005 N. Central Avenue
Phoenix, Arizona 85004–1580
Telephone: (602) 542–4686
CADocket@azag.gov
State Bar Number 014487

Attorneys for Respondents-Appellees

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES................................................................... iii

STATEMENT OF JURISDICTION .........................................................1

QUESTIONS PRESENTED FOR REVIEW ............................................2

STATEMENT OF THE CASE ................................................................3

SUMMARY OF ARGUMENT................................................................16

ARGUMENTS.........................................................................................18

    I

    THE STATE COURT REASONABLY DETERMINED THAT
    DJERF VOLUNTARILY WAIVED COUNSEL .........................................18

    II

    THE STATE COURT REASONABLY DETERMINED THAT
    DJERF WAS NOT DENIED EFFECTIVE ASSISTANCE OF
    COUNSEL AT SENTENCING .....................................................36

    III

    THE STATE COURT REASONABLY DETERMINED THAT
    DJERF KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY
    PLEADED GUILTY TO THE FIRST-DEGREE MURDER OF
    FOUR MEMBERS OF THE LUNA FAMILY .............................................52

IV

THE DISTRICT COURT DID NOT ERR IN DETERMINING
THAT DJERF'S POST-CONVICTION COUNSEL WAS NOT
INEFFECTIVE UNDER *MARTINEZ* FOR NOT RAISING A
MERITLESS POST-CONVICTION CLAIM ALLEGING THAT
TRIAL COUNSEL WERE INEFFECTIVE DURING THE
APPROXIMATELY FIFTEEN MONTHS THEY REPRESENTED
HIM DURING PRE-TRIAL PROCEEDINGS.............................................61

CONCLUSION.........................................................................................95

CERTIFICATE OF COMPLIANCE ........................................................96

STATEMENT OF RELATED CASES .....................................................97

# TABLE OF AUTHORITIES

**CASES**                                                                                       **PAGE**

Aiken v. Blodgett 921 F.2d 214 (9th Cir. 1997) .................................................7

Bell v. Cone, 535 U.S. 685 (2002)............................................................ 13, 14

Blackledge v. Allison, 431 U.S. 63 (1977) ...........................................................57

Bloom v. Calderon, 132 F.3d 1267 (9th Cir. 1997) ...........................................74

Bobby v. Van Hook, 558 U.S. 4 (2009) ................................................ 34, 41, 85

Bonin v. Calderon, 59 F.3d 815 (9th Cir. 1995) ........................................ 49, 65

Boyde v. Brown, 404 F.3d 1159 (9th Cir. 2005)................................................75

Boykin v. Alabama, 395 U.S. 238 (1969) ........................................ 52, 53, 60

Bradshaw v. Stumpf, 545 U.S. 175 (2005) ........................................ 55, 56

Brady v. United States, 397 U.S. 742 (1970)....................................... 55, 56

Brecht v. Abrahamson, 507 U.S. 619 (1993)............................ 16, 36, 52, 61, 94

Brewer v. Hall, 378 F.3d 952 (9th Cir. 2004) .......................................13

Brown v. Payton, 544 U.S. 133 (2005)............................................................14

Campbell v. Wood, 18 F.3d 662 (9th CIr. 1994)...........................................82

Carey v. Musladin, 549 U.S. 70 (2006) ........................................ 13, 26

Carriger v. Stewart, 132 F.3d 463 (9th Cir. 1997) .......................................7

Chizen v. Hunter, 809 F.2d 560 (9th Cir. 1986).............................................57

Clabourne v. Ryan, 745 F.3d 362 (9th Cir. 2014)............ 77, 78, 79, 80, 81, 94

Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003) ...........................................13

Coleman v. Thompson, 501 U.S. 722 (1991) ........................................ 76, 78, 79

Cook v. Schriro, 516 F.3d 802 (9th Cir. 2008) ...........................................12

Cook v. Schriro, 538 F.3d. 1000 (9th Cir. 2008) ...........................................35

Cooper v. Calderon, 255 F.3d 1104 (9th Cir.)....................................................83

Crandell v. Bunnell, 25 F.3d 754 (9th Cir. 1994) ................ 35, 70, 71, 90, 91, 92

Cuffle v. Goldsmith, 906 F.2d 385 (9th Cir. 1990)............................................89

Daniels v. Woodford, 428 F.3d 1181 (9th Cir. 2005)........................................74

Davila v. Davis, ___ U.S. ___, 137 S. Ct. 2058 (2017)...................................16

Delgadillo v. Woodford, 527 F.3d 919 (9th Cir. 2008)......................................12

Detrich v. Ryan, 740 F.3d 1237 (9th Cir. 2013)......................... 63, 77, 78, 79, 80

Early v. Packer, 537 U.S. 3 (2002) ...........................................................14

Eddings v. Oklahoma, 455 U.S. 104 (1982) ...........................................................3

Edwards v. Arizona, 451 U.S. 477 (1981) ........................................ 24, 30, 33

Faretta v. California, 422 U.S. 806 (1975) ...........................................................30

Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)..............................................66

Harrington v. Richter, 562 U.S. 86 (2011)..................... 13, 15, 50, 61, 71, 72, 84

Harris v. Vasquez 949 F.2d 1497 (9th Cir. 1990)....................................................75

Hill v. Lockhart, 474 U.S. 52 (1985) ...............................................................55

Iowa v. Tovar, 541 U.S. 77 (2004)...................................................................56

Jackson v. Calderon, 211 F.3d 1148 (9th Cir. 2000)........................................7, 83

Jackson v. Virginia, 443 U.S. 307 (1979) ............................................................7

Johnson v. Thurmer, 624 F.3d 786 (7th Cir. 2010) ...........................................65

Johnson v. Williams, 568 U.S. 289 (2013) ................................................. 13, 50

Johnson v. Zerbst, 304 U.S. 458 (1938).................................................... 52, 56

Kansas v. Marsh, 548 U.S. 163 (2006) ................................................................4

Kercheval v. United States, 274 U.S. 220 (1927).............................................55

Knowles v. Mirzayance, 556 U.S. 111 (2009) ....................................... 67, 77, 94

Lambert v. Blodgett, 393 F.3d 943 (9th Cir. 2004).......................................11, 55

Lindh v. Murphy, 521 U.S. 320 (1997)................................................................12

Little v. Crawford, 449 F.3d 1075 (9th Cir. 2006) .............................................56

Lockhart v. Fretwell, 506 U.S. 364 (1993)........................................................83

Lockett v. Ohio, 438 U.S. 586 (1978)...................................................................3

Lockyer v. Andrade, 538 U.S. 63 (2003)............................................................13

Martinez v. Ryan, 566 U.S. 1 (2012) ...........1, 2, 18, 61-63, 75-79, 81, 85, 89, 94

Miller-El v. Cockrell, 537 U.S. 322 (2003).......................................................77

Mitchell v. Esparza, 540 U.S. 12 (2003)...........................................................14

Morris v. Slappy, 461 U.S. 1 (1983) ......................................... 25, 70, 87, 91, 92

Murray v. Carrier, 477 U.S. 478 (1986)..................................................... 76, 85

Nguyen v. Curry, 736 F.3d 1287, 1294–96 (9th Cir. 2013) ...............................78

Parke v. Raley, 506 U.S. 20 (1992)....................................................................56

Patterson v. Illinois, 487 U.S. 285 (1988)........................................................35

Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008)....................................... 25, 87

Porter v. McCollum, 130 S.Ct. 447 (2009).......................................................40

Powell v. Alabama, 287 U.S. 45 (1932) ..................................................... 69, 90

Premo v. Moore, 562 U.S. 115 (2011) ....................................... 40, 50, 55

Ring v. Arizona, 536 U.S. 584 (2002) ...............................................................11

Rompilla v. Beard, 545 U.S. 374 (2005) ..................................................... 34, 41

Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) ............................... 70, 88, 89, 91

Seidel v. Merkle, 146 F.3d 750 (9th Cir. 1998) .................................................74

Sexton v. Cozner, 679 F.3d 1150 (9th Cir. 2012).......................................... 67, 77

Smith v. Robbins, 528 U.S. 259 (2000) ..................................................... 66, 87

State v. Barnes, 805 P.2d 1007 (1991) ................................................. 53, 66, 85

State v. Bishop, 781 P.2d 581 (1989)..................................................................53

State v. Brewer, 826 P.2d 783 (1992).......................................................... 13, 53

State v. Djerf, 191 Ariz. 583 (1998)............... 3, 7, 8, 9, 21, 31, 50, 54, 60, 74, 92

Stokley v. Ryan, 659 F.3d 802 (9th Cir. 2011)....................................................89

Strickland v. Washington, 466 U.S. 668 (1984) ......................................... passim
Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004) ................................... 14, 15, 68
Turner v. Calderon, 281 F.3d 851 (9th Cir. 2002)..............................................85
United States v. Broce, 488 U.S. 563 (1989).....................................................54
United States v. Ceballos, 302 F.3d 679 (7th Cir. 2002)............................. 88, 89
United States v. Colman, 707 F.2d 374 (9th Cir. 1983).....................................49
United States v. Cronic, 466 U.S. 648 (1984)........................... 25, 70, 82, 87, 91
United States v. D'Amore, 56 F.3d 1202 (9th Cir. 1995) ...................................22
United States v. Frady, 456 U.S. 152 (1982) ....................................................76
United States v. Gonzalez, 113 F.3d 1026 (9th Cir. 1997)........................... 22, 23
United States v. Jimenez-Dominguez, 296 F.3d 863 (9th Cir. 2002) .................57
United States v. Molina, 934 F.2d 1440 (9th Cir. 1991)............. 32, 70, 88, 89, 91
Von Moltke v. Gillies, 332 U.S. 708 (1948) ................................................ 34, 35
West v. Ryan, 608 F.3d 477 (9th Cir. 2010)................................................7, 89
Wiggins v. Smith, 539 U.S. 510 (2003)....................................................... 34, 41
Williams v. Taylor, 529 U.S. 362 (2000) ..........................................................13
Wong v. Belmontes, 130 S.Ct. 383 (2009) ............................................ 41, 49, 51
Wood v. Allen, 130 S.Ct. 841 (2010).................................................................12
Woodford v. Garceau, 538 U.S. 202 (2003) .....................................................11
Woodford v. Visciotti, 537 U.S. 19 (2002) ...................................................7, 11
Woods v. Donald, ___ U.S. ___, 135 S. Ct. 1372 (2015)...................................15
Wright v. Van Patten, 552 U.S. 120 (2008) .......................................................58

## STATUTES

28 U.S.C. § 1291.................................................................................................1
28 U.S.C. § 2253.................................................................................................1
28 U.S.C. § 2254.................................................................................................1
28 U.S.C. § 2254(d) ............................................................... 12, 14, 25, 50
28 U.S.C. § 2254(d)(1) ............................................................... 7, 13, 36
28 U.S.C. § 2254(d)(2) .....................................................................................14
28 U.S.C. § 2254(e) ...........................................................................................12
28 U.S.C. § 2254(e)(1) ............................................................... 12, 14
28 U.S.C. §§ 2254(d)(1), (e)(1) ..........................................................................7
A.R.S. § 13-703 ..................................................................................................8
A.R.S. § 13-703(F)(5), (F)(6), (F)(8), (F)(9) ..................................................8, 9
A.R.S. § 13-703(G) ...........................................................................................47
A.R.S. § 13-703.01 .............................................................................................8
A.R.S. §§ 13-751 and -752 ................................................................................8

**CONSTITUTIONAL PROVISIONS**

U.S. Const., amend. VI ........................... 24, 25, 32, 33, 40, 70, 71, 77, 87, 91, 92

**RULES**

9th Cir. R. 28–2.6 ...................................................................96
Ariz. R. Crim. P. 17.2 ..............................................................53
Ariz. R. Crim. P. 6.8 ................................................................64
Ariz. R. Crim. P. 6.8(d) ...........................................................64
Fed. R. App. P. Rule 4(a) ...........................................................1
Fed. R. App. P. Rule 22–1(f) ......................................................3
Fed. R. Civ. P. Rule 54(a), .........................................................1
Fed. R. Civ. P. Rule 58, .............................................................1

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254.  On September 30, 2008, the district court entered its order denying the petition, which was a final order under Rules 54(a) and 58 of the Federal Rules of Civil Procedure.  On November 4, Djerf filed a notice of appeal that was timely under Rule 4(a) of the Federal Rules of Appellate Procedure.  On October 31, 2008, the district court granted a certificate of appealability.

Briefing in this case was complete in this Court on February 11, 2011, upon the filing of Djerf's Reply Brief—the Opening and Answering Briefs having been filed on April 4, 2010, and November 22, 2010, respectively.  (Dkt. 27; 43; and 49.)[1]  Over a year after the filing of Djerf's reply brief, the United States Supreme Court issued its opinion in *Martinez v. Ryan*, 566 U.S. 1 (2012).  Over Respondents' objection, this Court issued a limited remand to the district court for reconsideration of three claims in light of *Martinez*.  (Dkt. 62, at 1–2.)  On April 4, 2017, the district court issued a ruling denying all three claims.  (Dkt. 65.)  On May 16, 2017, this Court struck the previously-filed briefs in this case and *sua sponte* expanded the certificate of appealability.  (Dkt. 68.)

This Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and –2253.

1

## CERTIFIED ISSUES PRESENTED FOR REVIEW

1.  Did the state courts reasonably determine that Djerf voluntarily waived counsel?

2.  Did the state courts reasonably determine that Djerf was not denied effective assistance of counsel at sentencing?

3.  Did the state courts reasonably determine that Djerf knowingly, intelligently and voluntarily plead guilty to the first-degree murder of four members of the same family? [2]

4.  Did the district court correctly determine that Djerf's post-conviction counsel was not ineffective under *Martinez* for not raising a meritless claim alleging that trial counsel were ineffective during the approximately fifteen months they represented him during pre-trial proceedings?

## UNCERTIFIED ISSUE PRESENTED FOR REVIEW[3]

_____
( ... continued)

[1] "Dkt." refers to this Court's docket.

[2] This Court's expanded certificated of appealability also includes Djerf's *Martinez* claim that state appellate counsel was ineffective for failing to raise this claim on direct appeal, however, because the state court found that this claim was raised on direct appeal, only the district court's dismissal on the merits is addressed. Moreover, The United States Supreme Court has specifically held that a federal habeas court is not permitted to hear a substantial, but procedurally defaulted, claim of ineffective-assistance-of-appellate-counsel based on a contention that post-conviction counsel was ineffective for failing to raise the claim. *Davila v. Davis*, ___ U.S. ___, 137 S. Ct. 2058, 2063, 2065–66 (2017). This overruled this Court's expansion of *Martinez's* scope to also include procedurally defaulted claims of ineffective appellate counsel. *See Nguyen v. Curry*, 736 F.3d 1287, 1294–96 (9th Cir. 2013).

Did the district court properly conclude that the state courts lawfully considered all of Djerf's proffered relevant mitigation evidence pursuant to *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982)?

## STATEMENT OF THE CASE

On September 28, 1993, a Maricopa County Grand Jury indicted Richard Kenneth Djerf for the following crimes:  Count One, first-degree murder of Albert B. Luna, Sr.; Count Two, first-degree murder of Damien Luna; Count Three, first-degree murder of Patricia Luna; Count Four, first-degree murder of Rochelle Luna; Count Five, first degree burglary; Counts Six through Nine, kidnapping; Count Ten, sexual assault; Counts Eleven through Fifteen, aggravated assault; Count Sixteen, attempted arson of an occupied structure; Count Seventeen, theft; and Count Eighteen, misconduct involving weapons. (ER 523);[4] *State v. Djerf*, 959 P.2d 1274, 1280–81, ¶ 13 (1998); (SER 1423).

The Arizona Supreme Court found that the following facts supported Djerf's convictions and sentences:[5]

_____

( ... continued)

[3] Respondents respectfully decline to respond to the uncertified issue unless and until this Court orders them to do so.  *See* Fed. R. App. P., Cir. R. 22–1(f).

[4] "ER" refers to Petitioner's Excerpts of Record; "SER" refers to Respondents' Supplemental Excerpts of Record; "PSER" refers to Petitioner's Supplemental Excerpts of Record.

[5] While Djerf acknowledges that the deaths of four members of the Luna family were "profoundly tragic," he "limits the facts to those relevant to the issues in this appeal."  (Dkt. 75, at 12.)  However, the facts and circumstances of the

(continued ...)

[Djerf] and Albert Luna, Jr. met and became friends while working as night custodians at a Safeway supermarket. In January 1993, Luna entered [Djerf's] apartment without [Djerf's] permission and took several items, including a television, a VCR unit, stereo equipment, a car alarm, and an AK-47 assault rifle. Although [Djerf] told Glendale police he suspected Luna had committed the crime, the police took no action. The matter festered for several months until [Djerf], still angered by the burglary and frustrated by police inaction, determined to take revenge.

In the late morning hours of September 14, 1993, [Djerf] went to the Luna family home, taking his nine-millimeter Beretta handgun, a knife, latex gloves, handcuffs, red fuse cord, and artificial flowers in a vase to use as a ruse to gain entry. When Luna's mother, Patricia, answered the door to receive the flowers, [Djerf] pushed his way into the house, showing her his gun. [Djerf] took Patricia into the master bedroom and bound her, letting her five-year-old son, Damien, run free. Later, while holding Damien

_____

( ... continued)

crime are intrinsically relevant to whether a crime is a capital offense, and whether, pursuant to relevant Arizona statutes, there is sufficiently substantial mitigation to call for leniency. As the United States Supreme Court has recognized, necessary factors in the question of the appropriateness of leniency are the nature, circumstances and facts of the underlying crime—particularly when fact-specific aggravating factors, such as those proven beyond a reasonable doubt in the instant case, have authorized the death penalty. *See Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006) ("Together, our decisions in *Furman v. Georgia*, and *Gregg v. Georgia*, establish that a state capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit [the sentencer] to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, *and the circumstances of his crime*.") (Internal citations omitted, emphasis added.) Moreover, in this appeal, Djerf alleges ineffective assistance of counsel, and the *Strickland* standard includes an analysis of whether any alleged ineffectiveness resulted in prejudice—which can *only* be evaluated in light of the facts and circumstances of the crime. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

hostage, [Djerf] freed Patricia and forced her to place items of property into the Luna family car, including two VCR units, a telephone, a caller ID box, a stereo CD player, four watches, change, and a money clip with food stamps. He then took Patricia and Damien into the kitchen and bound them to chairs with rope and black electrical tape. More than once, he asked Patricia whether she or her son should die first. He also asked her if she knew the whereabouts of her son, Albert Jr.

Around 3:00 p.m., Rochelle, Patricia's daughter, age eighteen, came home. [Djerf] took Rochelle to her bedroom, gagged her with tissue paper and tape, tied her wrists to the bed, cut and removed her clothes with a knife, and raped her. [Petitioner] then stabbed Rochelle four times in the chest and slit her throat, severing the jugular vein. Two of the chest wounds and the throat wound were potentially fatal. Rochelle further suffered multiple shallow knife wounds to the back of her head while she was alive, and one, probably postmortem, superficial stab wound to her right temple. Her earring had been torn through the earlobe. At some point while still alive, Rochelle vomited behind the gag and aspirated the vomit. [Djerf] then told Patricia he had raped and killed her daughter.

Around 4:00 p.m., Albert Luna, Sr. arrived home from work. [Djerf] handcuffed him, forced him to crawl to the master bedroom, and placed him face down on the bed. He struck Albert in the back of the head multiple times with an aluminum baseball bat, inflicting three large lacerations and spattering blood throughout the room. The medical examiner testified that hemorrhaging from these wounds was potentially fatal. [Djerf] removed the handcuffs from Albert, taped his hands and wrists together, and left him for dead. He then walked to the kitchen and told Patricia that he had killed her husband.

[Djerf] next attempted to snap Damien's neck by twisting the head abruptly from behind, "like he had seen in the movies." In fact, he "turned [Damien's head] all the way around and nothing happened," so he freed the child's head. In an attempt to electrocute Damien, [Djerf] cut an electrical cord from a lamp in the kitchen, stripped the insulation from the wires, and taped it to

the skin on Damien's calf. The cord was found unplugged at the scene.

Albert, although badly injured, freed himself from the tape around his wrists, went to the kitchen, and charged [Djerf] with a pocketknife, wounding him seriously. During the ensuing struggle, [Djerf] stabbed Albert with enough force to drive a knife through the right arm and into the torso. [Djerf] managed to pull the Beretta from his belt and shot Albert six times. Albert fell at the feet of his wife and son.

[Djerf] asked Patricia, "Do you want to watch your kid die, or do you want your kid to watch you die?" [Djerf] then shot both Patricia and Damien in the head at close range.

[Djerf] splashed gasoline on the bodies and throughout the house. His girlfriend, Emily Boswell, testified that [Djerf] told her he lit the red fuse cord but put it out when he realized there were children playing outside and he could not leave the house immediately without being seen. A short while later, he turned on two of the kitchen stove burners, placed an empty pizza box and a rag on the stove, and left the house. [Djerf] then drove to his apartment in the Lunas' family car, the stolen property inside, where he encountered Boswell at about 6:00 p.m. He told Boswell that he had been stabbed by two men who tried to rob him. He later went to the hospital and was admitted.

For some reason, the pizza box and rag failed to ignite the gasoline. Albert Jr. had not gone to his home the night of September 13, and did not return until 11:45 p.m. the day of the murders, September 14. Numerous unanswered calls to the house had made him anxious. When Luna entered the home and discovered the bodies of his parents and brother, he immediately left and drove to his girlfriend's house where he called the police.

The next day, September 15, [Djerf] disclosed to Boswell that he had murdered four members of the Luna family and described to her how he had done it. [Djerf] told Boswell that the blood dripping from Patricia's gunshot wound was "really awesome" and "you should have been there." On September 16, a

friend, Travis Webb, checked [Djerf] out of the hospital, but [Djerf] was unwilling to go to his own apartment. Webb rented a motel room, where [Djerf] stayed until September 18. Also on September 16, [Djerf] called another friend, Daniel Greenwood, in California, and once again, revealed his role in the four murders. While in the motel room, [Djerf] also told Webb of his involvement in the murders at the Luna home.

On September 18, Phoenix police executed search warrants on the motel room and [Djerf's] car and apartment. The police found handcuffs, a nine-millimeter Beretta, a stereo CD player, two VCR units, a U.S. West caller ID unit, artificial flowers and a vase, watches, Rochelle's charm necklace, a cardboard knife sheath, Patricia's car keys, a telephone, loose change, food stamps, and a red fuse cord. Police arrested [Djerf] the same day. At the time of arrest, the police found a handcuff key and a newspaper section containing an article about the killings in his possession.

SER 1421–23); *Djerf*, 959 P.2d at 1279–80, ¶¶ 2–12. These factual findings by the Arizona Supreme Court are not only entitled to deference, but are also presumed correct. 28 U.S.C. §§ 2254(d)(1), (e)(1); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Carriger v. Stewart*, 132 F.3d 463, 473 (9th Cir. 1997); *Aiken v. Blodgett*, 921 F.2d 214, 217 (9th Cir. 1997). Moreover, state courts are generally presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

On August 16, 1995, Djerf entered a plea agreement with the State in which he pled guilty to four counts of first-degree murder in the deaths of Albert Sr., Damien, Patricia, and Rochelle Luna with no limits on sentencing—including a sentence of death—for any and all of the murder counts. (SER 205–

10, 386–407, 1423); *Djerf*, 959 P.2d at 1281, ¶ 17. In exchange, the State agreed to dismiss the remaining counts. *Id.*

On May 22, 1996, following a lengthy aggravation/mitigation hearing, the trial court rendered a special verdict, finding that the State had proved beyond a reasonable doubt as follows:

> [T]hat the murders were committed for pecuniary gain (A.R.S. section 13-703(F)(5)), in an especially heinous, cruel, or depraved manner (A.R.S. section 13-703(F)(6)), and during the commission of one or more other homicides (A.R.S. section 13-703(F)(8)), and at the time of the offense, [Djerf] was an adult and one of the victims, Damien Luna, was under fifteen years of age (A.R.S. section 13-703(F)(9)).[6]

(SER 211–232, 1387–1403, 1423); *Djerf*, 959 P.2d at 1281, ¶ 19. The trial court further found that Djerf had failed to prove any statutory mitigating factors or the non-statutory mitigating factors of post-arrest conduct, disadvantaged childhood, psychological disorder, remorse, adjustment to confinement, and acceptance of responsibility. (SER 225–230, 1403–1408); *Djerf*, 959 P.2d at 1281, ¶ 19. The court therefore sentenced Djerf to death for each of the four counts of first degree murder. (SER 32–39, 229–232, 1409–1410, 1423–24); *Djerf*, 959 P.2d at 1281 ¶ 19.

---

[6] A.R.S. sections 13–703 and –703.01 have since been renumbered as 13–751 and –752, respectively. However, all references in this brief will be to the earlier numbers.

On automatic, direct appeal to the Arizona Supreme Court, Djerf raised the following issues:

1.    Djerf's waiver of counsel was not voluntary.

2.    Djerf's guilty pleas were not knowingly, intelligently, or voluntarily made.

3.    The trial court erred when it found that the aggravating factors outweighed the mitigating factors.

4.    The trial court abused its discretion in granting Djerf's request to proceed *pro se*.

5.    The trial court applied the wrong standard to the evidence the State introduced at sentencing to establish the aggravating factors.

The Arizona Supreme Court rejected Djerf's claims of trial error and affirmed his convictions.   (SER 1433); *Djerf*, 959 P.2d at 1290, ¶ 68.   The supreme court further determined that the aggravating circumstances the trial court found (A.R.S. § 13-703(F)(5), (F)(6), (F)(8) for each murder, and, additionally, (F)(9) for the murder of Damien Luna) were established beyond a reasonable doubt and affirmed the death sentences.   (SER 1429–33); *Djerf*, 959 P.2d 1274, 1286–88, 1289–90, ¶¶ 45–58, 67–68.

Following his unsuccessful direct appeal, Djerf filed a Petition for Post-Conviction Relief.   In his post-conviction relief proceedings, Djerf raised the following claims:

1. The trial court failed to conduct an adequate inquiry into why Djerf requested different counsel when Djerf wanted to represent himself.

2. The trial court erred by reappointing Michael Vaughn and Alan Simpson as advisory counsel.

3. The trial court erred by appointing Vaughn and Simpson as Djerf's counsel when Djerf requested legal assistance at sentencing without finding out why Djerf was previously dissatisfied with them.

4. The trial court erred by appointing Vaughn and Simpson as Djerf's counsel for sentencing.

5. Djerf received ineffective assistance of counsel at trial.

6. Djerf received ineffective assistance of appellate counsel.

7. Arizona death penalty statute is unconstitutional.

The trial court summarily dismissed the post-conviction petition, finding none of Djerf's claims colorable or otherwise meritorious.[7] (ER 091–95.) Djerf then filed a petition for review in the Arizona Supreme Court, which that court denied. (SER 1434–53; ER 090.)

Djerf subsequently filed a Petition for Writ of Habeas Corpus in the United States District Court for the District of Arizona, raising a number of

_____

[7] On March 17, 2009, Petitioner filed a successive Notice of Post-Conviction Relief, which the trial court dismissed on April 6, 2009; the Arizona Supreme Court denied review on September 23, 2009. (ER 001, 005.)

claims.[8]  In an order dated September 30, 2008, the district court denied Djerf's claims, and granted a certificate of appealability with regard to one issue.  (ER 063–64.)  On October 31, 2008, the district court issued a second order denying Djerf's subsequent motion to alter or amend the court's judgment, and expanding the certificate of appealability to include a second issue.  (ER 009–13.)  Djerf filed a timely notice of appeal with this Court.  Following this Court's grant of a limited remand, the district court issued a ruling denying all three remanded claims, and this Court expanded the certificate of appealability. (Dkt. 62; 65; and 68.)

## STANDARD OF REVIEW UNDER AEDPA

This Court reviews the district court's denial of a habeas petition *de novo* and reviews its factual findings and credibility determinations for clear error. *See Earp v. Ornoski*, 451 F.3d 1158, 1166 (9th Cir. 2005).  And a prisoner bears the burden of proving his habeas claims.  *See Lambert v. Blodgett*, 393 F.3d 943, 969 n.16 (9th Cir. 2004).

Because Djerf filed his habeas petition after April 24, 1996, the provisions of the Anti-terrorism and Effective Death Penalty Act ("AEDPA") apply to his case.  *Woodford v. Garceau*, 538 U.S. 202, 204 (2003); *Lindh v. Murphy*, 521

---

[8] Djerf also filed a motion to hold his case in abeyance in light of *Ring v. Arizona*, 536 U.S. 584 (2002), which the district court denied.

U.S. 320, 336 (1997). Under AEDPA, the Court "must defer to the state court's resolution of federal claims," *Delgadillo v. Woodford*, 527 F.3d 919, 924 (9th Cir. 2008), and may grant habeas relief only if the state court's decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also Wood v. Allen*, 558 U.S. 290, 293 (2010). The Court must also presume that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). In evaluating whether a state court decision was contrary to, or involved an unreasonable application of, federal law, or involved an unreasonable factual determination, the federal courts review the last-reasoned state court decision addressing the claim. *Cook v. Schriro*, 516 F.3d 802, 816 (9th Cir. 2008).

The phrase "clearly established Federal law," as set forth in 28 U.S.C. § 2254(d)(1), "'refers to the holdings, as opposed to the *dicta* of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v.*

*Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "While circuit law may be persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (quotations and citations omitted); *accord Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004).

"For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotations omitted). *See also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002) (unreasonable application distinct from incorrect one). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quotations omitted). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102. Rather, a prisoner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

13

A state court decision is "contrary to" clearly established federal law when the court has applied a rule of law that contradicts the governing law set forth in Supreme Court precedent, or has encountered a set of facts that are "materially indistinguishable" from a Supreme Court decision and yet reached a different result than the Supreme Court. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see also Brown v. Payton*, 544 U.S. 133, 141 (2005); *Bell v. Cone*, 535 U.S. at 694. A state court decision need not cite or discuss applicable Supreme Court precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (quotations omitted); *see also Packer*, 537 U.S. at 8.

Under 28 U.S.C. § 2254(d)(2) and (e)(1), this Court "may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). Where a petitioner challenges a state court's factual findings based exclusively on the state court record, 28 U.S.C. § 2254(d)(2)'s "unreasonable determination" clause governs his claim, and requires particular deference to the state court's findings:

> What the 'unreasonable determination' clause teaches us is that, in conducting this kind of intrinsic review of a state court's processes, we must be particularly deferential to our state-court colleagues. For example, in concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if

this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. Similarly, before we can determine that the state-court factfinding process is defective in some material way, or perhaps non-existent, we must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.

*Taylor*, 366 F.3d at 999–1000 (citation omitted).

"This is a daunting standard—one that will be satisfied in relatively few cases." *Taylor*, 366 F.3d at 1000. If the state court's factual determinations survive the foregoing "intrinsic review," they "are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, *i.e.*, evidence presented for the first time in federal court." *Id.* A federal court may only overturn these findings if a petitioner establishes, by clear and convincing evidence, that they are erroneous. *Id.*

"Adherence to these principles serves important interests of federalism and comity." *Woods v. Donald*, ___ U.S. ___, 135 S. Ct. 1372, 1376 (2015). And if AEDPA's "standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102. This is because, as the United States Supreme Court has acknowledged, federal habeas review inflicts a "harm" on federalism:

Federal habeas review of state convictions entails significant costs, and intrudes on state sovereignty to a degree matched by few exercises of federal authority. It frustrates both the States'

> sovereign power to punish offenders and their good-faith attempts to honor constitutional rights. It degrades the prominence of the state trial, and it disturbs the State's significant interest in repose for concluded litigation and denies society the right to punish some admitted offenders.

*Davila*, 127 S. Ct. at 2064, 2065–66 (internal quotations and citations omitted).

As such, "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). As such, habeas petitioners are not entitled to relief "unless they can establish that it resulted in actual prejudice." *Id.* at 637.

## SUMMARY OF ARGUMENT

### I. THE STATE COURTS REASONABLY DETERMINED THAT DJERF VOLUNTARILY WAIVED COUNSEL.

Djerf contends that he did not voluntarily waive counsel because the trial court did not adequately inquire into his reasons for representing himself, and that, in actuality, he wanted different counsel because his counsel was performing incompetently by not visiting him with sufficient frequency. This contention is belied by the factual record. Furthermore, no clearly established United States Supreme Court precedent imposes upon the trial court a duty to discover an alternate motive when a competent defendant knowingly, voluntarily and intelligently exercises his constitutional right to represent himself.

16

## II. THE STATE COURTS REASONABLY DETERMINED THAT DJERF WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING.

Djerf argues that he was denied effective assistance of counsel at sentencing. The factual record does not support a finding, under clearly-established United States Supreme Court precedent, that Djerf's sentencing counsels' performance was deficient, or that, even if it were, Djerf suffered prejudice. There is no reasonable likelihood that the trial court's sentencing decision would have been different with the addition of any newly-alleged mitigating evidence.

## III. THE STATE COURTS REASONABLY DETERMINED THAT DJERF KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY PLEAD GUILTY TO THE FIRST-DEGREE MURDER OF FOUR MEMBERS OF THE SAME FAMILY.

Djerf contends that his guilty pleas were not knowing, intelligent and voluntary because the trial court "failed" to inform him that he forfeited his right to proceed with competent counsel by pleading guilty. The factual record does not support a finding, under clearly established United States Supreme Court precedent, that the state courts' acceptance of Djerf's guilty pleas was constitutionally infirm—in part because Djerf's stated reason for pleading guilty to the first-degree murder of four members of the same family was to keep the facts of his crimes from inflaming a jury.

17

**IV.** **THE DISTRICT COURT CORRECTLY DETERMINED THAT DJERF'S POST-CONVICTION COUNSEL WAS NOT INEFFECTIVE UNDER *MARTINEZ* FOR NOT RAISING A MERITLESS CLAIM ALLEGING THAT TRIAL COUNSEL WERE INEFFECTIVE DURING THE APPROXIMATELY FIFTEEN MONTHS THEY REPRESENTED HIM DURING PRE-TRIAL PROCEEDINGS.**

Djerf alleges that his post-conviction counsel was ineffective for failing to raise a meritless claim of ineffective assistance of trial counsel for the approximately 15 months they represented him during pre-trial proceedings. The factual record does not support relief under *Martinez* because post-conviction counsel made an objectively reasonable decision to raise other post-conviction claims for relief and to not raise an ineffective-assistance-of-trial-counsel-during-fifteen-months-pretrial claim. Moreover, the underlying claim—while assumed "substantial" by this Court for the limited purpose of a remand to district court for a *Martinez* analysis—is without merit.

## ARGUMENTS

## I

## THE STATE COURT REASONABLY DETERMINED THAT DJERF VOLUNTARILY WAIVED COUNSEL.

Djerf contends that his waiver of counsel was not voluntary, specifically because the trial court did not make adequate inquiry into the reason he requested to proceed *pro se* and because he was forced to choose between being represented by "incompetent counsel" and no counsel. (Dkt. 75, at 38–70.) The Arizona Supreme Court reasonably rejected this claim, and so did the district

18

court.

## A.    *Factual and procedural background.*

The district court detailed the lengthy background of this claim, and the

state court's ruling, as follows:

> Following indictment in September 1993, Petitioner was appointed two counsel, Michael Vaughn and Alan Simpson.  On February 15, 1995, Petitioner filed a *pro se* motion for change of counsel, asking the court to remove Vaughn and Simpson and allow him to proceed *pro se*.  On February 17, during a previously scheduled hearing for pretrial motions, the trial court acknowledged receipt of Petitioner's motion.  The court asked Petitioner if he continued to desire to proceed *pro se*, to which he responded affirmatively.  Rather than resolve the matter, the court determined that Petitioner should think about his decision for a few days and scheduled a hearing on his motion for February 23.  Due to the unresolved motion, however, the court asked Petitioner if he wanted his counsel to litigate the motions for which argument had already been scheduled.  Petitioner conferred with his counsel and informed them that he wanted them to argue those motions to the court.  At no time during the hearing did Petitioner express any dissatisfaction with his counsel.

> Between indictment and the motion to proceed *pro se*, the trial court conducted monthly pretrial conferences, as well as other hearings dealing with pretrial motions.  Because the trial court had been monitoring the case on a monthly basis, the court was familiar with the progress of the case and whether counsel was effectively handling Petitioner's defense.  During this time period, two firm trial dates had to be continued due to the scheduling of a consolidated DNA hearing before another trial judge.  Ten criminal cases, including Petitioner's, had been consolidated for the purposes of hearing expert testimony regarding the DNA evidence that was to presented in each case.[FN4]

>> FN4 Due to the postponement of the consolidated DNA hearing, the trial court did not reestablish a firm

trial date for Petitioner's trial until its pretrial hearing on July 12, 1995. The consolidated DNA hearing was held during the months of June and July, 1995.

On February 21, the trial court received a letter from Petitioner advising the court that he did not believe he was receiving proper representation from counsel because they had not properly or consistently communicated with him about the status of his case. In the letter, dated February 14, Petitioner expressed concern about his lack of communication because trial was scheduled for March 1.[FN5]

> FN5 Evidently, prior to the writing of this letter, Petitioner had not been advised that his non-firm trial date of March 1 was going to be continued and that a firm trial date for his trial was not going to be established until after the consolidated DNA hearing was concluded.

On February 23, the court convened a hearing to resolve Petitioner's motion to proceed *pro se*. Prior to asking Petitioner why he had filed the motion, the court inquired whether he had discussed this matter with his counsel. Petitioner informed the court that he had "very thoroughly" discussed the matter with counsel. Before concluding that Petitioner had knowingly, intelligently, and voluntarily waived his right to counsel, the court went over in detail the ramifications of his decision.

In addition, the court inquired about why Petitioner wanted to remove Vaughn and Simpson and represent himself. Petitioner advised the court that he was not happy with his representation because counsel had not been keeping him advised of what was happening in his case and that "I just assume that I can do this myself." The trial court strongly disagreed that Vaughn and Simpson were not representing him well, noting their interviews with many witnesses,[FN6] their work on the consolidated DNA hearing, and their handling of other experts in fingerprints and handwriting analysis. Petitioner indicated that he understood all the work his counsel had put into his case. Other than lack of communication, Petitioner did not present any other allegations of

ineffectiveness.

> FN6 At a subsequent status conference, a record of witness interviews was made indicating that counsel for Petitioner personally interviewed more than fifty witnesses, with some witness interviews lasting several days.

On direct appeal, the Arizona Supreme Court rejected Petitioner's argument that his waiver of counsel was not intelligent, knowing, and voluntary.

> At the initial hearing on February 23, held on the waiver of counsel motion, the trial court fully informed [Petitioner] of his right to counsel, the minimum, maximum, and presumptive sentences, the dangers of self-representation, and the difficulties involved in defendant oneself without formal legal training. [Petitioner's] attorneys informed the court they did not think it was in [Petitioner's] best interest that he defend himself, but both indicated to the court they believed he was competent to do so. When asked, [Petitioner] told the trial court his reason for requesting the waiver was that he felt there was insufficient communication between himself and his attorneys. The trial court explained to [Petitioner] that his attorneys had been fully engaged, working on his behalf.

*Djerf*, 959 P.2d at 1282.

The Arizona Supreme Court also rejected Petitioner's argument that it was error for the trial court not to construe his motion as a request for new counsel instead of a motion to proceed *pro se*, because he indicated to the trial court that he was dissatisfied with his counsel.

In a supplemental brief, [Djerf] argues that the trial court abused its discretion by granting [Djerf's] request to remove trial counsel and to substitute himself as counsel pro se. He asserts that the trial judge erred by failing to inquire into the reasons [Djerf] wanted his own substitution as counsel and alleges that the court's actions fail the test of *United States v. Gonzalez*, 113 F.3d 1026, 1028 (9th Cir. 1997) (when deciding motion for change of counsel, reviewing court looks at adequacy of trial court's inquiry, extent of conflict between defendant and counsel, and timeliness of motion). *See also United States v. D'Amore*, 56 F.3d 1202, 1204-05 (9th Cir. 1995). In support [Djerf] refers to a letter he wrote to the judge dated February 14, 1995, describing dissatisfaction with what he perceived as a lack of communication between himself and trial counsel. Because the letter preceded his February 15 motion to "substitute himself" as counsel, [Djerf] argues, the trial judge should have known that [Djerf] "was really seeking representation of counsel who would communicate with him."

Although not expressly stated in his supplemental brief, [Djerf] apparently wishes now to treat the motion at issue as one to change counsel rather than to waive counsel and substitute self. The impetus for his characterization seems to be (1) the aforementioned letter and (2) the title of the form upon which he asked to represent himself. The motion was titled "CHANGE OF COUNSEL" and stated:

I, RICHARD K. DJERF, hereby request that MICHEAL [sic] VAUGHN/ALAN SIMPSON be withdrawn as my counsel of record that that RICHARD K. DJERF be substituted as my attorney in all future proceedings in the trial court.

[Djerf's] later characterization of the motion as one to obtain new counsel is contradicted by the

record. In his letter of February 13, [Djerf] enumerated his complaints about counsel, but never once suggested that he wanted new counsel appointed. At a hearing on February 17, the trial judge (who had not yet received the letter but did have the motion) stated that what he had before him was "basically" a motion for self-representation by [Djerf] and asked [Djerf] if he still desired to represent himself. [Djerf] replied in the affirmative, and the trial judge scheduled the February 23 hearing. (The trial court did not receive [Djerf's] letter until February 21.) At the February 23 hearing, the court treated the motion as stated on its face, to proceed *pro se*, and neither [Djerf] nor his attorneys objected to this or gave any sign that this was not consistent with [Djerf's] intent. [Djerf] never characterized his request as one for new counsel, not in his letter nor at the hearing nor at any time prior to his supplemental brief in this court. He requested only that he be allowed to represent himself. Further, in a later motion [Djerf] himself characterized his February 15 motion as a request to proceed *pro se*.[FN4]

> FN4. "Because [Djerf] was constantly being put aside by his court appointed attorneys, [Djerf] decided to represent himself. On February 15 [Djerf], requesting to represent himself, filed his motion. [Djerf] figured that the only way to eliminate these problems was to defend himself." [Djerf's] Motion for Change of Counsel, Sept. 6, 1995.

Because [Djerf] has an absolute constitutional right to act *pro se*, the trial court correctly determined that [Djerf] was competent and that the waiver of counsel was made voluntarily, knowingly, and intelligently. [Djerf's] argument is meritless, and *Gonzalez*, which describes the test for whether a trial court has abused its discretion in denying a motion to change counsel, is inapplicable.

23

(ER 26–30, original internal citations omitted.)

The district court subsequently concluded that Djerf was not entitled to habeas relief on this issue because Djerf had identified no clearly-established federal law finding a Sixth Amendment violation when a defendant is represented by two lawyers free of any actual conflicts of interest, but who a defendant just maintains are not communicating with him regularly. The court further found that the Arizona Supreme Court had reasonably found that Djerf sought to proceed *pro se*—not change counsel—and did not contravene federal law by not inquiring into counsel's effectiveness. Finally, the court found that Djerf failed to show counsel was ineffective. (ER 30–32.)

### B.    *Clearly established federal law.*

A defendant has a federal constitutional right to waive counsel and represent himself. *Faretta v. California*, 422 U.S. at 806, 836 (1975). Self-representation is a "fundamental constitutional right." *Id.* However, a waiver of counsel must be made knowingly, intelligently, and voluntarily, "which depends upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

The United States Supreme Court has determined that the Sixth Amendment guarantee of effective assistance "is not to improve the quality of

24

legal representation, . . . but is simply to ensure that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689. The appropriate focus when evaluating a Sixth Amendment claim is on the adversarial process, not the defendant's relationship with his lawyer. *See United States v. Cronic*, 466 U.S. 648, 656-57 (1984). Indeed, the Sixth Amendment does not guarantee a "meaningful relationship" between an accused and his counsel. *Morris v. Slappy*, 461 U.S. 1, 13–14 (1983). As stated by the district court:

> Petitioner has cited no Supreme Court case—and this Court is not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by two lawyers free of any actual conflicts of interest, but who the defendant maintains are not communicating with him on a regular basis.

(ER 030.), *citing Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc) (applying the AEDPA and denying habeas relief in the absence of controlling Supreme Court precedent regarding petitioner's motion to change counsel due to dislike and distrust of his lawyer).

   **C.**   ***The state court reasonably denied this claim because Djerf clearly indicated his desire to represent himself and he knowingly and voluntarily chose to do so.***

Djerf has not demonstrated that the state court's denial of this claim was either contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d). Moreover, no clearly-established federal law required the trial court to inquire into Djerf's

currently-claimed reason for desiring self-representation. *See Musladin*, 549 U.S. at 74 (clearly established federal law refers to holdings, not dicta, of United States Supreme Court decisions at the time of the relevant state court decision).

As detailed by the district court in its ruling, the record shows that on February 14, 1995, Djerf wrote a letter to the trial court expressing his displeasure concerning the representation that he felt he was receiving from his attorneys. (ER 026–30; SER 42–43.) Specifically, Djerf expressed his desire to be "completely involved, in all aspects, of this matter." (SER 43.) The following day, Djerf filled out a motion for change of counsel—substituting himself as counsel. (SER 40.) In the motion, Djerf requested the trial court to remove Michael Vaughn and Alan Simpson as his counsel of record and allow him to represent himself in all future court proceedings. (*Id.*)

On February 17, 1995, the trial court held a hearing on pending motions. (SER 3–4, 307–25.) During this hearing, the trial court addressed Djerf's motion for change of counsel:

> THE COURT: I have also received a request by Mr. Djerf. *Basically, it appears to be a request to represent himself.* Is that still your desire, Mr. Djerf?
>
> [PETITIONER]: *Yes. Yes, Your Honor.*
>
> THE COURT: All right. You may be seated.
>
> MR. VAUGHN: Judge, would it be permissible if either Mr. Simpson or I would be allowed to make a record on this issue prior

to any argument that Mr. Djerf may want to proffer?

THE COURT: Well, there [are] a couple of things we need to do. First of all, I want you to think about this some more, Mr. Djerf. All right? I will tell you right now you do have an absolute right to represent yourself, but I am sure your attorneys have talked to you about this. Nevertheless, I want you to think about it for a few days. I want you to know thoroughly what the possible sentences that could be imposed in this matter are. Frankly, the form we have, I am going to have to do another form because there's not enough room here to include all the charges, so I really want to make sure that you absolutely know what you are stepping into. All right?

[PETITIONER]: All right.

THE COURT: Do you agree with that?

[PETITIONER]: Yeah.

THE COURT: But we will certainly have a hearing on this next week sometime.

Do you agree to that—

[PETITIONER]: Yes.

THE COURT: —procedure?

[PETITIONER]: Yes.

(*Id.* 308–09, emphasis added.) At the conclusion of the hearing, the trial court scheduled another hearing on February 23 to specifically address Petitioner's request to represent himself. (SER at 324.)

At the February 23 hearing, the trial court fully informed Djerf of his right to counsel, the minimum, maximum, and presumptive sentences, the dangers of

27

self-representation, and the difficulties involved in defending oneself without formal legal training. (SER 327–44.) Djerf's attorneys also informed the trial court that they did not think it was in Djerf's best interest that he defend himself, but both lawyers indicated to the trial court that they believed he was competent to do so. (SER 329–30, 338–39.) When asked why he wanted to waive his right to counsel and represent himself, the following colloquy took place between the trial court and Djerf:

> THE COURT: Why don't you briefly tell me why you want to do this.
>
> [PETITIONER]: What? Oh, gosh. I haven't been happy with the way I have been represented because, you know, they haven't been coming down there, and they haven't been, you know, keeping me advised of everything that's going on. So I just assume I can do this myself.
>
> THE COURT: Well, you know, they are doing a lot of work on this case.
>
> [PETITIONER]: *I know that*.
>
> THE COURT: They are interviewing a lot of witnesses. This case involves some very complex evidence such as DNA evidence, fingerprint evidence, handwriting analysis, and all of that has to be examined by the attorneys.
>
> [PETITIONER]: I understand.
>
> THE COURT: They do that, and to do that and have them run down to the county jail every night and tell you what they have done is not a very good use of their time.
>
> [PETITIONER]: Well, the last time one was down to the jail to

visit me, besides last Thursday, was in July for the deposition of Emily Boswell. To me, that's not satisfactory.

MR. VAUGHN: That's not true.

THE COURT: What?

[PETITIONER]: Huh?

MR. VAUGHN: That was the last longest conversation we had.

THE COURT: Well, you may not be happy with the number of times they come down and see you, but I want to tell you that I have been monitoring this case. *They have been advising me of what they have been doing, and they have been doing a lot of work on your behalf.*

[PETITIONER]: *I understand.*

THE COURT: And there is an extremely complicated, lengthy hearing set for March 20th and 24th on DNA evidence.

[PETITIONER]: I understand that, too.

THE COURT: If you represent yourself, you are going to have to handle that. The matter won't be continued to allow you to educate yourself in that area.

[PETITIONER]: Yes, sir.

THE COURT: And these attorneys are prepared to do that. Do you understand that?

[PETITIONER]: Yes.

THE COURT: *And you are telling me you still wish to represent yourself?*

[PETITIONER]: *Yes, sir.*

29

(SER 327–44, emphasis added.) This detailed colloquy complied with the relevant Supreme Court precedents. *See Faretta*, 422 U.S. at 836; *Edwards*, 451 U.S. at 482.

Djerf contends that "the trial court failed to conduct an inquiry adequate to ensure that he was knowingly, voluntarily, and intelligently waiving his right to counsel," and that the court "ignored Djerf's concerns that Vaughn and Simpson were not properly representing him" because of infrequent visits, and, further, that the court "turned a blind eye to apparent deficiencies in defense counsel's trial preparation." (Dkt. 75, at 44.) A thorough examination of the record in this case proves the opposite is true.

As demonstrated above, the trial court specifically asked Djerf *why* he wanted to represent himself—and Djerf did not respond that he wanted new counsel. Moreover, in his letter of February 14, Djerf enumerated his complaints about his counsel, but never once suggested that he wanted new counsel appointed; rather, he wanted to be "completely involved" and did not want to "allow *anybody* to do as they please with his life, and that *includes defense counsel*." (SER 42–43, emphasis added.) Further, at the February 17 hearing, the trial court stated that what he had before him was "basically" a motion for self-representation by Djerf and asked Djerf if he still desired to represent himself. (SER 308.) Djerf replied in the affirmative, and then the trial

court scheduled a second hearing on February 23 to further discuss Djerf's intention to represent himself—cautioning him to consider the decision carefully. (SER 308–09, 324.)

At the February 23 hearing, the trial court treated the motion as stated on its face, to proceed *pro se*, and neither Djerf nor his attorneys objected to this or gave any sign that this was not consistent with Djerf's intent. (SER 329–44.) Djerf never characterized his request as one for new counsel—not in his initial letter to the trial court, nor at the hearing after direct questioning by the trial court. (*Id.*) Djerf requested only that he be allowed to represent himself. (*Id.*) In fact, in a later motion, Djerf himself characterized his February 15 motion as a request to proceed *pro se*. (SER 50–51.) [9]

The Arizona Supreme Court correctly determined that Djerf's waiver of counsel was made voluntarily, knowingly, and intelligently. *Djerf*, 191 Ariz. at 592; (SER 1426–27.) The state court's rejection of this claim was not an unreasonable application of United States Supreme Court precedent nor based on an unreasonable assessment of the facts. As such, the district court correctly dismissed Djerf's claim that he did not in fact wish to proceed *pro se*, but rather

---

[9] Additionally, the trial court ordered a court-appointed doctor to screen Djerf for competency to represent himself, and, following the doctor's examination and report, specifically found Petitioner competent to represent himself. (SER 349, 353–354.)

desired a change of counsel.

Similarly, Djerf's contention that he was "forced" to choose between allegedly incompetent counsel and representing himself is spurious. The record reflects that, as monitored and recognized by the trial court, Djerf's attorneys had done extensive work on Djerf's case, including interviewing many witnesses and preparing for a complicated DNA hearing. (SER 268–69, 330, 336–39.) Djerf's attorneys had regular conferences with the trial court, apprising the trial court of the progress of the case, as well as requesting necessary extensions of time for various reasons. (SER 237–325.) Refuting any allegation of constitutionally ineffective counsel, the record reflects that Djerf's attorneys were investigating and preparing for a trial in his case. Further, any dissatisfaction on Djerf's part that he was not being visited, or communicated with, frequently enough does not amount to constitutional ineffectiveness. *See United States v. Molina,* 934 F.2d 1440, 1448 (9th Cir. 1991). *See also*, *Strickland*, 466 U.S. at 689 (purpose of Sixth Amendment is simply to ensure a fair trial).

Moreover, even if Djerf had indicated to the trial court that he wished to substitute counsel, any allegation of constitutional ineffectiveness was premature—as there had not yet been a trial, much less a verdict, at the time Djerf requested to exercise his constitutional right to self-representation. Part of

the necessary showing a convicted defendant must make to succeed on a claim of ineffective assistance of counsel is that "counsel's errors were so serious as to *deprive the defendant of a fair trial, a trial whose result is unreliable*." *Strickland*, 466 U.S. at 687, emphasis added. Thus, even were this claim controlled by *Strickland*, rather than *Faretta* and *Edwards*, *Strickland* does not entitle Djerf to relief. Seeking and requesting continuances so as to proceed to trial fully prepared—which is what the record reflects Djerf's counsel did—does not exhibit deficient performance, and prejudice cannot be presumed.

Further, Djerf's repeated citation to the ABA Guidelines in an attempt to elevate his desire for more personal attention from his attorneys to the level of constitutional ineffectiveness is unavailing. (Dkt. 75, at 49–52, 57–58, 96–90.) In *Strickland*, the United States Supreme Court specifically held that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. at 688. The Court further stated:

> More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance.

*Id.* The Court also specifically addressed the role of the ABA Guidelines as "guides to determining what is reasonable, but they are only guides." *Id.* The Court further explained:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by

33

> defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause.

*Id.* at 688–89. The Court has repeatedly affirmed this principle—that such rules are "only guides to what reasonableness means, not its definition." *Bobby v. Van Hook*, 558 U.S. 4, 8–9 (2009); *See also, Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Thus, even to the extent that the ABA Guidelines at the time may have suggested that counsel "develop a relationship" with Djerf, Djerf's attorneys did not fall below an objective standard of reasonableness by not visiting Djerf with a frequency to Djerf's satisfaction such that *Strickland* would require the trial court to make a premature conclusion that counsel was constitutionally ineffective. The district court correctly dismissed Djerf's claim.

Djerf also argues, as he did in a motion to alter or amend the district court's dismissal of this claim, that *Von Moltke v. Gillies*, 332 U.S. 708 (1948), a case predating *Faretta* by nearly thirty years, supplements the clearly established law in *Faretta* and compels habeas relief on this claim. (Dkt. 75, at 40–45; ER 009.) Djerf's reliance on *Von Moltke* is misplaced. As detailed by the district court, *Von Moltke* is factually distinguishable from the instant case. *Von Moltke*

34

involved a World War II espionage prisoner who, other than at her arraignment, was never represented by counsel and signed a written waiver of counsel form and pleaded guilty at a five-minute change of plea hearing where she was not informed by the court of the potential sentencing consequence (which included a death sentence) nor inquired of by the court regarding her ability to retain, or desire for, counsel.  (ER 010–11); *Von Moltke*, 332 U.S. at 709–18.

> As the district court succinctly stated:
>
> The factual record in [Djerf's] case is readily distinguished from *Von Moltke*.  [Djerf], like *Faretta*, already had counsel and was not taking a plea; rather, [Djerf] desired to waive counsel so that he could represent himself at trial.  It is the *Faretta* waiver colloquy that establishes the constitutional standard for defendants desiring to dismiss counsel.  *See Patterson v. Illinois*, 487 U.S. 285, 308 (1988); *Cook v. Schriro*, 538 F.3d 1000, 1015 (9th Cir. 2008).

(ER 011.)

Similarly, the district court properly rejected Djerf's argument, made again on appeal to this Court, relying on Ninth Circuit precedent *Crandell v. Bunnell*, 25 F.3d 754 (9th Cir. 1994), that a waiver of counsel due to counsel's alleged ineffectiveness offends the Constitution.  (Dkt. 75, at 60–70; ER 011–12.)  As the district court concluded, *Crandell* is factually distinguishable from the instant case because defense counsel in this case were competently litigating the case, according to both the district court and the Arizona Supreme Court's review of the record.  (ER at 012.)  Moreover, *Crandell* is a pre-AEDPA circuit

case and thus is not clearly established federal law as dictated by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1) (clearly established federal law is determined by the United States Supreme Court). Djerf is not entitled to relief on this claim, and the district court properly dismissed it. *See also Brecht*, 507 U.S. at 634–39.

## II

### THE STATE COURT REASONABLY DETERMINED THAT DJERF WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING.

Djerf contends that he was denied effective assistance of counsel at his sentencing proceeding by "failing to investigate, develop, and present adequate and appropriate mitigation." (Dkt. 75, at 70.) This contention lacks merit and was reasonably rejected by the state courts, as well as the district court.

### A. *Factual and procedural background.*

The district court summarized the factual background for this claim, including the state court ruling, as follows:

> On August 16, 1995, [Djerf] pleaded guilty to four counts of first degree murder. Subsequently, [Djerf] decided to discontinue proceeding *pro se* and moved to have counsel represent him at sentencing. On October 5, 1995, the trial court granted [Djerf's] motion, appointing former advisory counsel Vaughn and Simpson to represent him at sentencing.

36

*Dysfunctional family*

The trial court held a mitigation hearing in February 1996, at which [Djerf's] investigator, Art Hanratty, testified. Hanratty relayed mitigation information he had obtained from [Djerf's] father, mother, and sister. He testified that [Djerf's] parents divorced when he was young and that he was mostly raised by his father, who was in the Navy. Although [Djerf's] father worked two jobs to support the family financially, he did not offer much emotional support for [Djerf] by way of hugging or touching or words of encouragement. [Djerf's] father drank beer, and had alcoholic episodes where he was passed out inside his home. [Djerf's] father never physically abused him; he only yelled and hollered to get his point across. They did not have family dinners and [Djerf] usually ate in his room while watching television. When [Djerf] started high school, his father did not like some of [Djerf's] friends, so he did not allow him to bring them to the house. As a result, [Djerf] started leaving the home on weekends; however, the father did not check up on him to make sure he was all right.

Hanratty further testified that [Djerf's] mother had informed him that [Djerf] suffered a closed head injury when he was a toddler. [Djerf] did not lose consciousness, but he had a large bump on his forehead, which did not require medical attention. [Djerf] reinjured this area of his head a number of times as a toddler.

While [Djerf's] father was away at sea, [Djerf's] mother became pregnant, resulting in a child being born out-of-wedlock. This led to the dissolution of the marriage. [Djerf's] mother described his father as an alcoholic. After the divorce, [Djerf's] mother remarried. [Djerf's] step-father did not like having children in his home, so [Djerf] came to live with his father. Once when [Djerf] was visiting his mother, his step-father slammed him against the wall. [Djerf's] mother never physically abused him; she only yelled and hollered while disciplining the children. Because the step-father did not like children, when [Djerf] visited his mother on summer vacation, he spent his time fishing and riding horses, mostly alone.

Hanratty testified that [Djerf's] sister, who is two years younger, often saw her father passed out drunk on the couch. [Djerf's] sister indicated that she loved her dad and described him as a good loving father.

*Mental health*

Counsel sought and obtained authorization for the appointment of three mental health experts, Dr. Mickey McMahon, a psychologist, Dr. Marc Walter, a neuropsychologist, and Dr. Drake Duane, a neurologist. In January 1996, Dr. McMahon prepared an initial report suggesting that [Djerf] undergo neuropsychological testing. Accordingly, Dr. Walter performed such testing and prepared a report suggesting that [Djerf] may have "focal cerebral deficit." Dr. Walter recommended further testing by a neurologist.

In March 1996, [Djerf] was examined by Dr. Duane. In his interview notes, Dr. Duane specifically noted the report of a closed head injury occurring while [Djerf] was a toddler. Dr. Duane performed routine EEG testing and advanced brain-mapping testing upon [Djerf]. Dr. Duane's findings were forwarded to Dr. McMahon, but not to the prosecution or the court. Dr. Duane concluded that [Djerf's] testing indicated a personality disorder, not brain dysfunction as Dr. Walter had theorized.

Dr. McMahon was responsible for compiling the results of testing obtained by all three mental health professionals. The court set April 22, 1996, as the deadline for submission of his final report. On April 19, 1996, Dr. McMahon compiled the mental health reports and faxed trial counsel his conclusion that [Djerf] suffered from an antisocial personality disorder. Dr. McMahon specifically rejected a diagnosis of schizophrenia and rejected any diagnosis that [Djerf] suffered from any mental health issue that precluded his ability to appreciate the wrongfulness of his behavior or resulted in an inability to conform his behavior to the requirement of the law. On April 23, 1996, trial counsel notified the court they would not be utilizing either Dr. McMahon's report or his testimony at sentencing. Trial counsel requested and the

court established a deadline for Dr. Walter to submit a final report. However, there is no record of Dr. Walter completing and submitting such a report.

*PCR Proceedings*

[Djerf] presented [this claim] during his PCR proceedings. Prior to filing his amended PCR petition, [Djerf] sought and obtained appointment of a mental health expert, Dr. Richard Samuels. On two occasions, the PCR court granted contact visits for Dr. Samuels to perform mental health testing upon [Djerf]. Even though Dr. Samuels conducted a neuropsychological examination of [Djerf], PCR counsel did not submit any expert report in support of [this claim].

Ultimately, the PCR court concluded that [Djerf] had not established a colorable IAC claim and summarily dismissed the claim without granting an evidentiary hearing. The court explained:

> The only evidence [Djerf] presents to support this claim are psychiatric and psychological evaluations of [Djerf] done either before the entry of the plea or before sentencing. Based on these numerous reports, which were available and considered by the court prior to sentencing, [Djerf] simply speculates that there might be other mitigating information that should have been presented. This showing does not constitute a colorable claim for relief.

Regarding the allegation that trial counsel failed to conduct an adequate social and family history investigation, the PCR court stated that "[Djerf] has failed to present any evidence to support this claim; instead, he simply speculates that if his childhood was investigated, some mitigating evidence might have been discovered."

(ER 034–37, internal citations omitted.) The district court also denied this claim, finding that the state court had reasonably found no deficient performance. (ER 038–40.)

**B. *Clearly established federal law.***

The United States Supreme Court has articulated the two-pronged standard for a state prisoner to prevail on a claim of ineffective assistance of counsel at a capital sentencing proceeding as follows:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. Specifically, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Court has repeatedly reiterated this standard. *See, e.g., Premo v. Moore*, 562 U.S. 115, 121–23 (2011); *Porter v. McCollum*, 558 U.S. 30, 38–39 (2009); *Wong v.*

*Belmontes*, 558 U.S. 15, 19–20 (2009); *Van Hook*, 558 U.S. at 7; *Rompilla*, 545

U.S. at 380; *Wiggins*, 539 U.S. at 521.  Moreover, the Court has clarified that:

> *Strickland* does not require the State to 'rule out' a sentence of life
> in prison to prevail.  Rather, *Strickland* places the burden on the
> defendant, not the State, to show a 'reasonable probability' that the
> result would have been different.

*Belmontes*, 558 U.S. at 27.  Djerf's counsels' actions during sentencing do not

provide grounds for federal habeas relief under *Strickland*¸ and the district court

correctly denied this claim.

### C. *The state court reasonably denied Djerf's ineffective assistance of counsel claims because counsel thoroughly investigated and presented available mitigating evidence.*

The district court did not err in rejecting Djerf's habeas claim of

ineffective assistance of sentencing counsel for failure to investigate and present

mitigation information regarding his dysfunctional family background and

mental health.  The state court's denial of this claim was not contrary to, nor an

unreasonable application of, clearly established federal law, nor was it the result

of a decision based on an unreasonable determination of the facts in light of the

evidence below.

Djerf's counsel took appropriate measures to ensure that the trial court

would be fully informed about their client's social history prior to imposition of

the sentence.  In order to obtain the "life history" of Djerf, his attorneys retained

an experienced licensed investigator, who testified at length at the mitigation

hearing. (SER 1255–1300.) Djerf's investigator contacted and interviewed Richard Djerf, Sr. (Djerf's father); Louise Patrogen (Djerf's mother); Laura Djerf (Djerf's sister); and Ellen Dickens (girlfriend of Djerf's father). (SER 1257, 1278.) Through these lengthy interviews, Djerf's investigator uncovered evidence that provided the trial court with a comprehensive view of Djerf's family and social history.

For example, Djerf's attorneys presented the trial court with evidence concerning Djerf's traumatic birth and early-childhood medical history. (SER 1259–63.) The trial court also heard testimony regarding closed-head injuries that Djerf allegedly sustained on a number of occasions as a young child. (SER 1272–73.) In addition to Djerf's medical history, Djerf's attorneys also proffered evidence regarding his turbulent family life. (SER 1261–66.) The trial court heard testimony about the breakup of Djerf's family, how Djerf's mother in effect abandoned him at an early age and how Djerf was forced to live his life as a "loner." (SER 1261–72, 1277–78.) Djerf's lack of parental love and supervision was also presented to the trial court at sentencing, as well as Richard Djerf, Sr.'s alcohol problem. (SER 1265–81.)

In addition to all the evidence concerning Djerf's life history as presented by his investigator, Djerf's attorneys also introduced the transcript of a taped interview that defense counsel Alan Simpson conducted with Djerf. In the

42

interview, Djerf corroborated all of the life history evidence that had been uncovered by the investigator. (SER 184–98.) In this interview, Djerf recounted a sad and pathetic childhood, devoid of parental love and affection. (SER 186–96.)

Djerf's attorneys also submitted a detailed presentence memorandum to the trial court. (SER 178–83.) In the memorandum, Djerf's attorneys responded to the aggravating factors proffered by the State and advanced their own arguments as to why the trial court should find leniency and impose a sentence other than death. (*Id*.) In addition, Djerf's attorneys consulted and employed at least three mental health experts, although, ultimately for tactical reasons, they elected not to present their opinions and/or reports at the mitigation hearing. (SER 95–110.) This fact was acknowledged at the mitigation hearing as follows:

> [THE PROSECUTOR]: There is just one portion of the record to be expanded upon, Your Honor. At various hearings we have discussed the appointment of experts to examine the defendant. No experts have been called, but at least three mental health experts have examined the defendant. Dr. Mickey McMahon has, I believe, interviewed him on numerous occasions and I believe that there was a preliminary report submitted by Dr. McMahon. There was an examination by Dr. Marc Walter, a neuropsychologist, and there was an examination by Dr. Drake Duane, a neurologist. I think the record ought to reflect that although those witnesses weren't called, there was ample evidence that the defendant was seen by those mental health experts.
>
> THE COURT: Mr. Simpson.

MR. SIMPSON: As the Court will recall, I have always objected to filtered information from the defense to the State. I don't think the State intends—but I don't think this Court should draw any inference on the lack of expert witnesses to be presented today. My feeling is that, again, the information that the State speaks about is information that they should have had, so I ask the Court not to draw any negative inferences from them.

THE COURT: I don't think that's the point. The point is that I think the time to establish that there was or there were examinations conducted on that—it was a decision by you on whether or not to use that information.

MR. SIMPSON: That is correct.

THE COURT: Is that an accurate statement?

MR. SIMPSON: That is accurate.

THE COURT: I can't draw any inference from that. The burden is on the State, but I think the record should be clear that the Court has monitored this. I have authorized various transportation orders and so forth so those examinations could be conducted, and unless I hear otherwise, I think that should be part of the record, and you don't dispute that; is that correct:

MR. SIMPSON: That's correct.

THE COURT: And you are absolutely correct. I can't draw an inference from the fact that you, for whatever reasons, decided not to present that evidence.

(SER 1359–60.) Although the trial court did not draw any inference from this fact with regard to imposing Djerf's sentences of death, for purposes of habeas review of an ineffective assistance of counsel claim, the record reflects that Djerf's trial attorneys sought and obtained several mental health evaluations but

44

simply made the tactical decision not to present the evidence.[10]  Thus, Djerf's

contention that his counsel did not investigate potential mental health mitigation

is belied by the record.  (Dkt. 75, at 73.)

Contrary to Djerf's assertion, his attorneys were engaged and active

during the sentencing proceedings in this case, and they provided Djerf

constitutionally effective legal representation.  In fact, Djerf's attorneys were

active and involved prior to, and even after being, relegated to advisory counsel

in the period during which Djerf exercised his constitutional right to self-

representation.  (SER 359–422.)  This was specifically noted by the prosecutor,

and acknowledged by both Djerf and defense counsel in the trial court:

> [THE PROSECUTOR]: The court knows well what degree of work
> advisory counsel have put into this case but the appellate record
> does not reflect that, and what I want the record to reflect is the
> work that they have put in, including personally interviewing many,
> many witnesses. I can't tell you the exact number, but I am
> confident it's more than 50 witnesses that have been personally
> interviewed, and some of those interviews went over multiple days.
> For example, the interview of Dr. Ann Bucholtz may have taken
> three or four days to complete.  Counsel did all the major
> interviews themselves.  Counsel attended a review of evidence with
> me and the police officers at the Phoenix police property room.
> That review took the majority of one entire day, and we reviewed
> literally everything that was in evidence that the police seized
> connected with this case.  They filed motions, and they have tried
> to negotiate on behalf of the defendant.  So I want the appellate
> record to reflect that also, because we know the work that's gone

---

[10] This decision is reviewed "applying a heavy measure of deference to counsel's
judgments."  *Strickland*, 466 U.S. at 691.

on, but I think it's important that the reviewing court also be aware of the efforts that they have placed on this case.

\*\*\*

THE COURT: . . . Is there any dispute as to the statements [the prosecutor] made about the work that counsel did prior to [Djerf] exercising his right to represent himself?

MR. DJERF: No.

THE COURT: Mr. Vaughn or Mr. Simpson?

MR. VAUGHN: No. Thank you, Your Honor.

MR. SIMPSON: No, Your Honor. No comment.

THE COURT: In other words, I take it by your silence you agree with what he said as far as the work that you two have done.

MR. SIMPSON: Is the question directed to myself, Your Honor?

THE COURT: Yes.

MR. SIMPSON: Yes, Your Honor. I do agree.

THE COURT: Mr. Vaughn?

MR. VAUGHN: Yes, I agree.

(SER 420–22.) Shortly thereafter, Djerf withdrew his waiver of counsel, and

Mr. Vaughn and Mr. Simpson returned to the status of Djerf's counsel of record.

(SER 424–26.) As such, Djerf cannot show, and has not shown, that his

sentencing counsel performed deficiently under *Strickland*.

Likewise, even assuming Djerf has met the deficient performance prong, there can be no showing of *Strickland* prejudice given weak mitigation, strong aggravation, and the horrific facts of Djerf's crimes. In its special verdict, the trial court addressed the lack of evidence to support each statutory mitigating circumstance, specifically noting that "[Djerf], in several press conferences, has maintained that he suffers from no mental illness or substance abuse problems." (SER 225, 1404.) The court further noted that Djerf's "record, his appearances in Court, and his temporary representation of himself here show that he is capable of making reasoned decisions. He is aware of the consequences of his actions." (SER 226, 1405.) After finding the existence of no statutory mitigating factors, the trial court addressed whether there were any non-statutory mitigating circumstances sufficiently substantial to call for leniency[11] and stated as follows:

> The Court considered [Djerf's] sentencing memorandum, the testimony presented at the sentencing hearings, and the interview conducted by his attorney. The additional nonstatutory factors presented are: post-arrest conduct; a disadvantage[d] childhood; psychological disorder; remorse; adjustment to confinement; and acceptance of responsibility.
>
> 1. The Court finds that [Djerf's] post-arrest conduct is not a mitigating circumstance here. He had no place to go, and his friends were talking to the police. Consequently, his compliance with the arresting officers is not a mitigating circumstance.

---

[11] *See* A.R.S. § 13-703(G).

2. The Court finds that [Djerf] has failed to show his difficult family background is a mitigating circumstance. There is no evidence that any alleged difficult family background had any effect on [Djerf's] behavior during these killings that was beyond [Djerf's] control.

3. The Court finds no evidence that [Djerf] is suffering from any psychological disorder or mental impairment. In fact he denies suffering from any such problems.

4. The Court finds that [Djerf] failed to prove that he was genuinely remorseful for what he has done. He blames Albert Luna, Jr. for the murders. Further, he told William Hermann of Phoenix newspapers, Inc. that he pled guilty because "that if he had a jury hearing all of the things that had happened at the Luna house, that it would inflame them, and it would be harder on him than if he just went before a judge." Moreover, he told reporter J.W. Brown, of Phoenix Newspapers, Inc. that "under the right circumstances, he could kill again." These statements, and numerous others, absolutely refute any claim that [Djerf] is truly remorseful for his actions on September 14, 1993. His guilty plea was clearly a tactical decision made in the face of overwhelming evidence of guilt.

5. [Djerf] proved by a preponderance of the evidence that he has adjusted to confinement. However, he is not a model inmate. He has had several disciplinary write-ups for minor infractions. Thus, the Court does not find this circumstance to be a mitigating factor.

6. [Djerf] fails to prove by a preponderance of the evidence that he accepts responsibility. He told J.W. Brown that everything resulted from the burglary of his apartment by Albert Luna. "And 'if he didn't rip-off my apartment, none of this would have happened. I am kind of upset that innocent people had to die because of a problem that resulted from him, Albert Luna, Jr.'" Additionally, he told Ms. Brown that "he did not have problems sleeping. Pretty much he packaged it somewhere in his mind and really didn't think about it." These statements, and others, show a

> lack of remorse and a failure to accept responsibility in a genuine manner. Lastly, the argument that his guilty plea is evidence of acceptance of responsibility is not supported by the evidence. It was clearly a tactical decision intended to minimize the facts of what happened in the Luna home on September 14th, 1993.

(SER 227–29, 1405–08.)

"In cases with overwhelming evidence of guilt, it is especially difficult to show prejudice from a claimed error on the part of trial counsel." *United States v. Colman*, 707 F.2d 374, 378 (9th Cir. 1983). Similarly, in cases where the aggravating factors are so overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence. *Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir. 1995). This Court must assess the possible prejudice suffered by Djerf in a realistic manner based on the totality of the evidence. Accordingly, it would be improper for this Court to focus solely on *additional* potentially mitigating evidence; this Court must also consider the nature and extent of the evidence in aggravation. *See Belmontes*, 558 U.S. at 27–28 ("It is hard to imagine expert testimony and *additional* facts about Belmontes' difficult childhood outweighing the facts of McConnell's murder.") (emphasis in original).

Even if Djerf's attorneys had not met the *Strickland* competency standard, this Court must additionally "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the

49

errors." *Strickland* 466 U.S. at 696. The Supreme Court has made clear that the standard for reviewing state court decisions under § 2254(d) is difficult to meet. *Richter*, 562 U.S. at 102; *Johnson v. Williams*, 568 U.S. 289, 292–93 (2013). Even when a state court decision is unaccompanied by an explanation for its reasons for denying the claim, § 2254(d)'s bar against relitigating claims adjudicated on the merits applies. *Richter*, 562 U.S. at 98–99. The Supreme Court's decisions in *Richter*, *Williams*, and *Premo* extend AEDPA's relitigation bar to the state court's adjudication of Djerf's ineffective assistance of sentencing counsel claim despite no reasoned decision on the *Strickland* prejudice prong. Thus, even assuming deficient performance, Djerf must also show *Strickland* prejudice. Djerf has not, and cannot, meet this burden.

As detailed by the Arizona Supreme Court, and recited in the special verdict, the murders in the instant case constituted a prolonged, horrifying, and despicable attack on two adults, a teenage girl, and a defenseless five-year-old child. (SER at 211–25, 1388–1403, 1421–23); *Djerf*, 959 P.2d 1274, 1279–80, ¶¶ 2–12. Among other things, Patricia Luna was bound and forced to witness vicious attacks on her children and husband before being shot to death; Rochelle Luna endured a violent rape before being stabbed to death; Albert Luna survived repeated blows to the head with a baseball bat before being stabbed and shot to death at his wife and son's feet; and five-year-old Damien witnessed his father's

50

murder and endured an attempted neck-snap and electrocution before Djerf shot him in the head, killing him. *Id.*

Given the overwhelmingly cruel, heinous and depraved nature of these killings, in addition to the other aggravating factors, there is no reasonable likelihood that the trial court's sentence would have been different had Djerf's alleged additional mitigating evidence also been introduced. As the United States Supreme Court observed when rejecting a claim for habeas relief even where there had actually been deficient performance of counsel, prejudice is difficult to establish when there has been an overwhelmingly savage murder. *See Belmontes*, 558 U.S. at 27–28.

Djerf has not shown prejudice.[12] The death sentences in this cases are not "only weakly supported by the record." *Strickland*, 466 U.S. at 696. Djerf has not demonstrated a reasonable probability that the introduction of evidence concerning his possible mental health history would have changed the trial court's sentencing decisions. As such, the state courts' rejection of this claim was not an unreasonable application of United States Supreme Court precedent;

_____

[12] As previously noted, Djerf's repeated recitations of the ABA Guidelines do not change the *Strickland* standard of "reasonableness." *Strickland*, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.").

nor was it based on an unreasonable assessment of the facts. Djerf is not entitled to relief on this claim. *See also Brecht*, 507 U.S. at 634–39.

## III

### THE STATE COURT REASONABLY DETERMINED THAT DJERF KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY PLEADED GUILTY TO THE FIRST-DEGREE MURDER OF FOUR MEMBERS OF THE LUNA FAMILY.

Djerf also contends that the district court erroneously rejected his claim that his four guilty pleas to first-degree murder were not knowing, intelligent and voluntary because the trial court "failed to inform him that, by pleading guilty, he was forfeiting his right to proceed to trial represented by competent counsel." (Dkt. 75, at 79–85.) Djerf's contention fails because the Arizona Supreme Court reasonably rejected this claim.

### A. *Factual and procedural background.*

The Arizona Supreme Court dismissed Djerf's claim regarding the knowing, intelligent and voluntary nature of his pleas as follows:

> A plea of guilty, when accepted, involves the waiver of constitutionally protected rights. Accordingly, waiver "must be 'an intentional relinquishment or abandonment of a known right or privilege.' " *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). A plea of guilty, like a waiver of counsel, must be entered voluntarily, intelligently, and knowingly. *Id.* at 242. Because the death sentence may result from a guilty plea, the court must take special care "to make sure [a defendant] has a full understanding of what the plea connotes and of its consequence." *Id.* at 243–44. The

52

standard of review is whether the trial court abused its discretion in finding that the defendant waived his rights and entered into a plea agreement. *State v. Brewer*, 826 P.2d 783, 792 (1992). The court must determine if "reasonable evidence" supports the finding that the defendant was competent to enter the plea. *Id.* (citing *State v. Bishop*, 781 P.2d 581, 582 (1989)). Under this standard, the court considers the facts in a light most favorable to sustaining the trial court's finding. *Bishop*, 781 P.2d at 582.

Both state and federal law require that the trial court, before accepting a guilty plea, determine that the defendant understands (1) the nature of the charges, (2) the nature and range of possible sentences, including any special conditions, (3) the constitutional rights waived by pleading guilty, (4) the right to plead not guilty, and (5) that the right to appeal is also waived if the defendant is not sentenced to death. Ariz. R. Crim. P. 17.2; *Boykin*, 395 U.S. at 243; *State v. Barnes*, 805 P.2d 1007, 1010 (1991).

This record shows that the trial judge fully satisfied each requirement and informed defendant before the guilty pleas were accepted that a presentence hearing would be held to determine sentencing. Defendant does not dispute the record. Rather, he asserts that the trial court erred in failing to inform him that the presentence hearing would be trial-like in that evidence and testimony would be given and witnesses would be examined and cross-examined. Defendant argues that had he understood the character of the hearing, he would not have pled guilty and would instead have gone to trial. His guilty pleas were thus neither informed nor intelligent.

Defendant cites no authority for this argument. Moreover, the record reveals that at no time before the pleas were accepted did defendant inform the trial court that he entered the plea agreement in order to avoid a proceeding resembling a trial. The statement in the record upon which he relies was made to a news reporter, who repeated it in testimony to the trial court during the presentence hearing, long after the plea had been accepted. The trial court correctly determined that defendant knowingly, intelligently, and voluntarily waived his rights. Acceptance of the pleas was not an abuse of discretion.

*Djerf*, 959 P.2d at 1285, ¶¶ 35–38 (internal parallel citations omitted). Moreover, the Arizona Supreme Court noted that Djerf told a news reporter that he pled guilty not because he was loathe to proceed with "incompetent" counsel—but because "if he had a jury hearing all of the things that had happened at the Luna house, that it would inflame them, and it would be harder on him than if he just went before a judge." *Id.* at 1285 n.6 (quoting Special Verdict, at 18.)[13] Additionally, the state supreme court noted that Djerf had never moved to withdraw his pleas. *Id.* at n.7. The district court also denied the claim on the merits, finding that the state court had reasonably applied clearly-established federal law and reasonably determined the facts and, alternatively, that any error was harmless. (Dkt. 65, at 31–35.)

## B. *Clearly established federal law.*

A guilty plea and ensuing conviction comprehend all the factual and legal elements necessary to sustain a binding final judgment of guilt and a lawful sentence. *United States v. Broce*, 488 U.S. 563, 569 (1989). To be valid, a guilty plea must be knowing, intelligent, and voluntary. The United States Supreme Court has explained:

> A plea of guilty differs in purpose and effect from a mere admission or an extrajudicial confession; it is itself a conviction. Like a

---

[13] The Special Verdict can be found at SER 211–32.

54

verdict of a jury, it is conclusive. More is not required; the court has nothing to do but give judgment and sentence. Out of consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences.

*Kercheval v. United States*, 274 U.S. 220, 223 (1927); *See also Brady v. United States*, 397 U.S. 742, 748 (1970). The guilty plea must be a voluntary expression of the defendant's own choice. *Kercheval*, 274 U.S. at 223. Voluntariness can be determined only by considering all the relevant circumstances surrounding the plea. *Brady*, 397 U.S. at 749. *See also Hill v. Lockhart*, 474 U.S. 52, 56 (1985).

A petitioner's guilty plea "limits the grounds upon which he can subsequently challenge his detention" in a habeas petition. *Lambert*, 393 F.3d at 979. A petitioner can only raise claims regarding (1) counsel's deficient advice to plead guilty, or (2) the guilty plea's voluntary and intelligent nature. *See, e.g.*, *Bradshaw v. Stumpf*, 545 U.S. 175, 186 (2005) (defendant entitled to relief only if he "made the unfavorable plea on the constitutionally defective advice of counsel," or "could not have understood the terms of the bargain he and [the State] agreed to"). "Acknowledging guilt and accepting responsibility by an early plea respond to certain basic premises in the law and its function." *Premo*, 562 U.S. at 124. These principles "are eroded if a guilty plea is too easily set

aside based on facts and circumstances not apparent" to competent counsel at the time. *Id.*

As the trial court noted, the United States Supreme Court has held that "[t]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst*, 304 U.S. at 465. Further, "[t]he information a defendant must possess in order to make an intelligent election depends on a range of case-specific factors, including his education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Iowa v. Tovar*, 541 U.S 77, 88 (2004).

It is the petitioner's burden to show that a guilty plea is not knowing and voluntary. *Little v. Crawford*, 449 F.3d 1075, 1080 (9th Cir. 2006), *citing Parke v. Raley*, 506 U.S. 20, 31–34 (1992). A plea is not bad because it was in retrospect a poor deal. *Stumpf*, 545 U.S. at 182. A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats, misrepresentation, or improper promised. *Mabry v. Johnson*, 467 U.S. 504, 508 (1984), *quoting Brady*, 397 U.S. at 755.

Djerf cannot show that his guilty pleas to four counts of first-degree murder were not knowing, voluntary, and intelligent.

### C. *Djerf's guilty pleas were knowing, voluntary, and intelligent.*

In *Blackledge v. Allison*, 431 U.S. 63 (1977), the Supreme Court addressed the presumption of verity to be given the plea proceeding record when the plea is subsequently challenged in a collateral proceeding. While noting that the defendant's representations at the time of his guilty plea are not "invariably insurmountable" when challenging the voluntariness of his plea, the Court stated that, nonetheless, the defendant's representations, as well as any findings made by the judge accepting the plea, "constitute a formidable barrier . . . . Solemn declarations in open court carry a strong presumption of verity." 431 U.S. at 73–74. *See also Chizen v. Hunter*, 809 F.2d 560, 562 (9th Cir. 1986). Moreover, a subsequent presentation of conclusory allegations and contentions that are wholly incredible in the face of the record are subject to summary dismissal. *Blackledge*, 431 U.S. at 74. The plea transcript colloquy provide the "best evidence" of coercion. *United States v. Jimenez-Dominguez*, 296 F.3d 863, 869 (9th Cir. 2002).

Djerf's claim regarding the voluntariness of his pleas is based on the premise that his trial counsel were ineffective, and that the trial court should somehow have advised him that he had the right to go to trial with different,

effective counsel.  (Dkt. 75, at 79–80.)   In other words, this claim simply restates his defaulted ineffective assistance of trial counsel claim.  First, Djerf's claim fails because he has not identified any Supreme Court holdings establishing that: 1) advising a defendant that, by pleading guilty, he waives the right to be represented by counsel at trial is insufficient; or 2) that a trial court is required to advise a pleading defendant that he is giving up the right to be represented at trial by *constitutionally competent* counsel; or 3) that the trial court was somehow required to advise Djerf that his trial counsel were ineffective and he had a right to go to trial with other lawyers.  A state court cannot be said to have failed to follow a *lack* of clearly established federal law. *See Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (habeas relief unauthorized where no Supreme Court cases support defendant's position because "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law").  Second, as established above (and below), Djerf's trial counsel were *not* ineffective, thus undermining the premise of this claim.

Moreover, a review of the transcript of the plea proceeding affirms the thoroughness and adequacy of the trial court's plea colloquy regarding Djerf's constitutional rights, including his rights to be presumed innocent; remain silent; proceed to a jury trial; be represented by counsel; be found guilty beyond a reasonable doubt; present evidence on his own behalf; subpoena witnesses;

cross-examine his accusers; testify on his own behalf; and appeal. (SER 387–407.) Further, as stated previously, Djerf was specifically and thoroughly aware of his right to counsel through the trial court's inquiries surrounding his waiver of counsel prior to the plea proceedings. Djerf avowed to the trial court that he was entering his pleas "freely and voluntarily." (*Id.* at 396.) The trial court then asked a second time:

> THE COURT: So you are deciding to enter this guilty plea freely and voluntarily and you know what you are doing; is that right?
>
> MR. DJERF: *That's correct*.

(*Id.* at 397, emphasis added.) Djerf went on to admit:

> I stabbed Rochelle Luna multiple times, killing her. I hit Albert Luna over the back of the head multiple times with a baseball bat. I shot him several times, killing him. I shot Damien Luna in the head, killing him. I shot Patricia Luna in the head, killing her.

(*Id.* at 400.) Djerf then added more details about the assaults and injuries he inflicted on each victim. (*Id.* at 400–03.) The trial court also noted:

> . . . Dr. Potts, for the record, clearly stated that Mr. Djerf knows what he is doing and can represent himself, and he is clearly competent to do so. Based on that, I find that he's competent to enter this guilty plea.

(*Id.* at 403–04.) The trial court again checked with Djerf regarding his willingness to enter the pleas and his understanding of the consequences:

THE COURT: Mr. Djerf, do you understand here that the only concession that's being made is that they are dismissing the other counts, that there will be a presentence hearing where I make a determination on whether or not you receive the death penalty or life sentences on any of the counts? Do you understand that?

MR. DJERF: I understand.

THE COURT: You are still willing to go ahead?

MR. DJERF: Yes, sir.

THE COURT: Okay. Do you wish to have the Court accept this guilty plea as to these four counts of first degree murder?

MR. DJERF: Yes.

(*Id.* at 405.) The trial court also asked advisory counsel if he had any concerns about Djerf's "mental state," to which Mr. Vaughn replied, "I have concerns about the propriety of what Mr. Djerf has done before this Court, but I have no questions about his mental state at all." (*Id.* at 406.) The court thus found that Djerf had "knowingly, intelligently, and voluntarily" entered his guilty pleas. (*Id.* at 407.) The Arizona Supreme Court subsequently correctly identified the applicable clearly established federal law and reasonably applied it. *Djerf*, 959 P.2d at 1285, ¶¶ 35–36. *See Boykin*, 395 U.S. at 243–44; *Johnson*, 304 U.S. at 464.

The state supreme court's decision finding that the trial court did not abuse its discretion in concluding that Djerf's plea was knowing, intelligent, and voluntary was neither contrary to, nor involved an unreasonable application of,

clearly established United States Supreme Court case law, nor was it an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d); *see also Richter*, 562 U.S. at 100–03. Djerf has not shown an unreasonable application of clearly established federal law, nor has he shown prejudice under *Brecht*, 507 U.S. at 634–39. The district court correctly dismissed this claim as meritless.

## IV

**THE DISTRICT COURT DID NOT ERR IN DETERMINING THAT DJERF'S POST-CONVICTION COUNSEL WAS NOT INEFFECTIVE UNDER *MARTINEZ* FOR NOT RAISING A MERITLESS POST-CONVICTION CLAIM ALLEGING THAT TRIAL COUNSEL WERE INEFFECTIVE DURING THE APPROXIMATELY FIFTEEN MONTHS THEY REPRESENTED HIM DURING PRE-TRIAL PROCEEDINGS.**

Djerf also contends that the district court erroneously rejected his claim that his trial counsel rendered constitutionally ineffective assistance of counsel during the approximately 15 months they represented him during the pre-trial proceedings, and, further, that his procedural default of this claim is excused pursuant to *Martinez* because there is a reasonable probability that his post-conviction petition would have been granted had his post-conviction counsel not performed deficiently by failing to raise this claim. (Dkt. 75, at 85–115.) Djerf's contention fails.

## A. *Factual and procedural background.*

As noted previously, pursuant to this Court's limited remand following the United States Supreme Court's 2012 opinion in *Martinez*, the district court reconsidered this claim which the court had previously dismissed as procedurally defaulted because Djerf did not raise it in his post-conviction petition. (Dkt. 62; Dkt. 65, at 5; ER 069–072.)  After a thorough and exhaustive analysis under *Martinez*, the district court again dismissed this claim, concluding that *Martinez* does not provide Djerf with an avenue to excuse the procedural default because post-conviction counsel was not deficient in failing to raise this claim, and, moreover, the claim is meritless.

The district court first correctly rejected Djerf's contention that, because this Court "conclude[ed] that the remanded claims are *for purposes of remand* substantial," (Dkt. 62, at 2) he only had to prove that post-conviction counsel was ineffective.  (Dkt. 65, at 8–10.)[14]  This Court's order recognized the distinction between "substantiality" for the narrow purpose of a limited *Martinez* remand, and whether a claim has merit because this Court also "express[ed] no opinion on the merits of [Djerf's] claims" and no "opinion as to whether evidentiary development or an evidentiary hearing is warranted." (Dkt. 62, at

---

[14] Djerf repeats this contention on appeal.  (Dkt. 75, at 89.)

2.)  Thus, although this Court found Djerf's precluded ineffective-assistance-of-trial-counsel-during-fifteen-months-pretrial claim sufficiently "substantial" to warrant a *Martinez* examination by the district court—Djerf must *still* show that the underlying defaulted trial claim has "merit" for purposes of showing *Strickland* prejudice on the part of post-conviction counsel.  As the district court explained:

> . . . The Ninth Cirtuit has addressed [Djerf's] argument multiple times, holding that *Detrich* concludes that "'prejudice' for purposes of the 'cause and prejudice' analysis requires only a showing that the trial-level [ineffective assistance] claim was 'substantial' . . . [but] does not diminish the requirement . . . that [the] petitioner satisfy the 'prejudice' prong under *Strickland* in establishing ineffective assistance by [post-conviction] counsel." *Clabourne*, 745 F.3d at 377; *see also Runningeagle*, 825 F.3d at 982 n.13; *Pizzuto*, 783 F.3d at 1178–80.

(Dkt. 65, at 9.)   As such, while "assuming substantiality for purposes of *Martinez*'s substantiality requirement, because substantiality has not been shown," the district court "for the first time, consider[ed] the prejudice requirement for [post-conviction] counsel's performance that would have been met if substantiality had actually been shown." (*Id.* at 10.)  In other words, the district considered—and found wanting—the merits of the underlying ineffective-assistance-of-trial-counsel-during-fifteen-months-pretrial      claim. (*Id.*)

**Alleged Deficient Performance**

The district court analyzed and dismissed *all* of Djerf's attacks on post-conviction counsel's performance: lack of proper qualifications; mental fitness during representation; failure to include Claim 3 in the post-conviction petition, and other alleged errors in preparation of the post-conviction petition. (Dkt. 65, at 10–17.) Specifically, the court ruled, in pertinent part, as follows.

- **State qualifications**

> Petitioner does not argue that Ms. McAlister was unqualified under Rule 6.8[15] in Petitioner's PCR proceedings. Rather, Petitioner argues that Ms. McAlister was unqualified in an unrelated proceeding that took place over a year before she was appointed to Petitioner's case. It is unclear how Ms. McAlister's failure to meet the Rule 6.8(c) criteria over a year before the Arizona Supreme Court appointed her to Petitioner's case is of any relevance to her performance in Petitioner's PCR proceedings. Further, Petitioner does not argue, or provide any evidence, that Ms. McAlister did not meet Rule 6.8(c) when she was appointed as counsel for Petitioner's PCR proceedings or that Ms. McAlister acted deficiently in any way related to the Rule 6,8(c) criteria. However, even if Ms. McAlister lacked Rule 6.8(c) qualifications when she was appointed to Petitioner's case, the Arizona Supreme Court apparently found that Ms. McAlister's "ability significantly exceed[ed] the standards set forth in [Rule 6.8(c)]." Ariz. R. Crim. P. 6.8(d).

(Dkt. 65, at 12.)

---

[15] Arizona Rule of Criminal Procedure 6.8 sets forth eligibility criteria for the appointment of counsel in a capital case. (*See* Dkt. 65, at 11.)

64

- **Mental state during representation**

The district court noted that it had "previously denied Petitioner's motion to obtain sealed psychological reports involving Ms. McAlister because the Court held that the *Strickland* inquiry involves 'an objective assessment of [an attorney's] *performance*'—not a subjective inquiry into an attorney's mental state," (*Id.* at 12) and then dismissed Djerf's attack on post-conviction counsel's mental health, in relevant part:

> To the extent that Petitioner argues that Ms. McAlister provided a deficient performance in the PCR proceedings simply because she suffered from depression or other mental health disorders, Petitioner has failed to cite any supporting authority. *See*, *e.g.*, *Bonin v. Calderon*, 59 F.3d 815, 828–29 (9th Cir. 1995) ("[I]t is clear that a habeas petitioner should not be allowed to transform what should be an inquiry into the reasonableness of counsel's performance at his trial into [a] general inquisition of defense counsel's record and reputation."); *Johnson v. Thurmer*, 624 F.3d 786, 792 (7th Cir. 2010) (rejecting a claim that "counsel's depression tainted his guidance at trial" because the petitioner "pointed to no specific acts to establish that counsel's problems led to deficient performance, and we can find none"). Further, at the Court notes below, *see infra* Section II(C)(1)(c), Petitioner fails to show that any decision by PCR counsel was "nothing short of incredible," such that mental health evidence would be useful in discounting the presumed reasonableness (or explanations) of the attorney's decisions.

(Dtk. 65, at 14.)

- **Failure to include claim 3**

The district court also dismissed Djerf's claim that post-conviction counsel's performance was constitutionally deficient for failing to include the

present claim when she included other ineffective assistance of trial counsel

claims:

> Petitioner fails to show that Claim 3 would have been "clearly stronger" than the other claims raised by Ms. McAlister. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986))). The Supreme Court has held that, to meet the first prong of *Strickland* when counsel fails to present a nonfrivolous issue, Petitioner must show that the nonfrivolous issue was "clearly stronger" than issues that counsel did present. *Id.* (reiterating that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal" (citing *Jones v. Barnes*, 463 U.S. 745 (1983))).[FN]

>> [FN] In examining PCR counsel's performance, the Court looks to analogous law applying *Strickland* to appellate counsel, "because like direct appeal counsel, PCR counsel is charged with raising and pursuing claims arising from a criminal trial." *Sampson v. Palmer*, No. 3:11-CV-00019-PRH-WGC, 2014 WL 1308628, at *7 (D. Nev. Mar. 31, 2014), *rev'd on other grounds*, 628 F. App'x 477 (9th Cir. 2015). Petitioner appears to argue that the Court should distinguish the roles of PCR counsel and appellate counsel, (Doc. 127 at 4), but Petitioner provides no basis for this distinction.

> Here, Petitioner fails to argue what makes this claim "clearly stronger" than the claims Ms. McAlister did present in the PCR proceedings. At most, Petitioner seems to argue that because Ms. McAlister presented a claim that relates to trial counsel's deficiency, there is no reason why Ms. McAlister should not have *also* raised Claim 3. (Doc. 124 at 18–19). However, this argument relies on an erroneous presumption that PCR counsel must raise every nonfrivolous claim. Furthermore, as the Court discusses

below, Claim 3 lacks merit. *See infra* Section II(C)(2); *see also Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("Counsel is not necessarily ineffective for filing to raise even a nonfrivolous claim . . . so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless." (citing *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009))).

(Dkt. 65, at 15–16.)

- **Other alleged deficiency errors**

Finally, the district court disposed of Djerf's remaining allegations of "presumptively deficient" post-conviction counsel error:

> Petitioner finally argues that Ms. McAlister committed other errors—such as failing to obtain trial transcripts and failing to interview either trial counsel—during her representation that would render her representation presumptively deficient. (Doc. 124 at 16–18). On January 26, 2000, Ms. McAlister sent letters to Petitioner's appellate attorney, Lisa Martin, and Petitioner's trial and sentencing attorneys, Mr. Vaughn and Mr. Simpson, seeking a review of files maintained over the course of representation. (Doc. 24-1 at 81–83). Petitioner informed Ms. McAlister that the Federal Public Defender's (the "FPD'S") office had taken possession of his records. (*Id.* at 87; *see also id.* at 85 (indicating the FPD's office received Petitioner's "materials" around August 1998)). Petitioner claims that Ms. McAlister never obtained the records held by the FPD's office.[FN] (Doc. 124 at 17.) Additionally, after she concluded her representation of Petitioner and provided her files to the FPD's office, Ms. McAlister did not include trial-level transcripts. (Doc. 124-1 at 93). When asked about the transcripts by an FPD paralegal, Ms. McAlister responded "there should've been transcripts from the change of plea, agg/mit hearing, and sentencing" but she gave the FPD's office "everything [she] had." (*Id.*) From this circumstantial evidence, Petitioner concluded that Ms. McAlister "[a]pparently . . . never obtained any pleadings or transcripts from Petitioner's trial proceedings." (Doc. 124 at 15.)

[FN] The Court notes that Petitioner does not cite any evidence for this assertion.

The Court notes that Petitioner's conclusion is not fully supported by the record. First, there is no evidence or argument indicating that appellate counsel's case file was the only source for trial-level transcripts which were available in the public record. Further, Ms. McAlister's billing records reveal that she reviewed trial counsel's files and sentencing transcripts, among other trial-level documents. (Doc. 124-1 at 96–98). Finally, Ms. McAlister stated, when asked whether she had the transcripts at some point, that they "should have been" in the file. (*Id.* at 93). Thus, Petitioner asks the Court to second-guess direct evidence in the record reflecting Ms. McAlister's review of trial-level transcripts and pleadings because of a hodgepodge of admittedly inconclusive and circumstantial evidence.[FN] Petitioner has failed to meet his burden under *Strickland*. *See United States v. Taylor*, 802 F.2d 1108, 1119 (9th Cir. 1986) (holding that a petitioner's "vague and speculative assertions" failed to satisfy his burden under *Strickland*).

[FN] Despite the direct involvement by the FPD's office in the communication underlying this circumstantial evidence, the Court is puzzled why the FPD's office did not directly ask Ms. McAlister whether she reviewed the trial-level documents.

Petitioner also claims that Ms. McAlister was deficient for failing to meet with trial counsel about their preparation in Petitioner's case. Petitioner cites no authority that indicates a reasonable PCR counsel would interview trial counsel before preparing a PCR petition. Instead, Petitioner relies on Ms. McAlister's letters to trial counsel, which included requests for meetings, to argue that such interviews were necessary. (*See* Doc. 124 at 17). Petitioner ignores that Ms. McAlister both met with Petitioner multiple times and reviewed trial counsel's files. (Doc. 124-1 at 95–98). Thus, the Court concludes that Ms. McAlister might have reasonably concluded that, based on her other preparation, meetings with either trial counsel were unnecessary.

(Dkt. 65, at 16–17.)

Having disposed of all Djerf's allegations regarding the *deficiency* of post-conviction counsel's performance, the district court noted that *even assuming deficiency*, Djerf's claim fails because the underlying ineffective-assistance-of-trial-counsel-for-fifteen-months-pretrial claim (Claim 3) is meritless and thus he *cannot show prejudice*. (*Id*. at 17.)

### Lack of Prejudice Because Underlying Claim is Meritless

The district court methodically analyzed—and rejected—each of Djerf's complaints about his trial counsel's performance during fifteen months of pretrial proceedings.

- ### Communication with Djerf

Rejecting Djerf's citation of *Powell v. Alabama*, 287 U.S. 45 (1932), as authority that his trial counsel performed "so little work" on his case and "had such minimal communication" with him that they were presumptively deficient, the district court reasoned, in pertinent part:

> Here, unlike the attorney in *Powell*, both trial counsel performed substantial work on Petitioner's case. For example, trial counsel interviewed "more than 50 witnesses," with some interviews occurring "over multiple days." (Doc. 125 at 24). Trial counsel also attended a nearly daylong review of evidence, filed multiple motions, and "tried to negotiate" on behalf of Petitioner. (*Id.*). Petitioner did not dispute the work trial counsel performed. (*Id.* at 25). Further, the trial judge repeatedly recognized the significant amount of work trial counsel performed. (*See*, *e.g.*, *id.*

69

at 20, 23–24). Thus, the performance of both trial counsel stands in stark contrast to the performance of counsel in *Powell*.

(Dkt. 65, at 18.) The district court similarly dismissed Djerf's reliance on

*Crandell*:

> Here, unlike the petitioner in *Crandell*, Petitioner stated that he both knew of and understood that his attorneys had done a considerable amount of work on his case. (Doc. 125 at 20, 22). Yet, despite this understanding, Petitioner insisted upon representing himself because his counsel were not sufficiently communicating with him. (*Id.* at 20). Further, Petitioner's contention that his trial counsel failed to consult with him "about *any* aspect of the case" is overstated and contradicted by the record. (Doc. 124 at 29 (emphasis added)). For example, Petitioner states that "[b]etween July 1994 and February 1995 . . . lead counsel [Mr.] Vaughn failed to . . . inform [Petitioner] of the progress of his case." (*Id.* at 25). Yet, in Petitioner's February 1995 letter to the trial court, he stated that, since July 1994, he had spoken with Mr. Vaughn multiple times "over the phone and at court." (*See id.* at 21).

> Although Mr. Vaughn did not make frequent personal visits to Petitioner, Petitioner fails to cite any case law that would render a lack of face-to-face meetings to be constitutionally deficient. *See*, *e.g.*, *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) (holding that, standing alone, an attorney's failure to meet with his client more than four short meetings did not constitute constitutionally deficient performance); *see also Morris v. Slappy*, 461 U.S. 1, 13–14 (1983) (holding that the Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between the defendant and counsel); *United States v. Cronic*, 466 U.S. 648, 657 (1984) (emphasizing that the appropriate inquiry is on the adversarial process, not on the defendant's relationship with his lawyer). Furthermore, Petitioner has not shown that a total lack of communication or a complete breakdown of the attorney/client relationship occurred. *See Schell v. Witek*, 218 F.3d 1017, 1026–27 (9th Cir. 2000) (en banc) (recognizing that "a total lack of communication" may result in the

"constructive denial of assistance of counsel" in violation of a petitioner's Sixth Amendment rights); *see also Crandell*, 25 F.3d at 754–55.

(Dkt. 65, at 18–20.)

- **Investigation of guilt phase issues**

The district court continued by dismissing Djerf's deficiency challenge to his trial attorneys' preparation for the guilt phase (before Djerf elected to plead guilty):

> Petitioner next argues that his trial counsel were deficient for failing to commence interviews of witnesses until nine months into their representation of Petitioner. (Doc. 124 at 29–30). However, Petitioner fails to cite *any* authority supporting that the delay caused trial counsel's performance to fall below the "objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688. Further, despite any initial delay in interviewing, trial counsel interviewed over 50 witnesses during their representation of Petitioner. (Doc. 125 at 24). Thus, Petitioner has failed to carry his burden. *See Harrington v. Richter*, 562 U.S. 86, 104 (2011) ("To establish deficient performance, a person challenging a conviction *must show* that counsel's representation fell below an objective standard of reasonableness." (quotation marks omitted) (emphasis added)).

(Dkt. 65, at 20.)

- **Review of discovery**

The district court also dismissed Djerf's allegation that his trial counsel were deficient as evidenced by the number of continuances they requested. (Dkt. 65, at 20.) The court concluded:

71

Petitioner cites to relevant ABA Guidelines that indicated the speed with which attorneys must begin and pursue investigation of their cases. (*See id.* at 32–33). However, the record does not reflect that trial counsel acted inconsistently with these obligations. In requesting each continuance, trial counsel indicated the volume of discovery involved in this case were the reason for the requests, not that trial counsel had not yet *begun* discovery. As a result, Petitioner has failed to cite any objective standard indicating that both trial counsel were deficient in requesting multiple continuances.

(*Id.*)

Having determined that trial counsel was not constitutionally deficient (and thus that any *Strickland* claim is meritless), the district court nevertheless analyzed for prejudice, *even assuming deficiency*. Citing *Richter*, the court concluded that Djerf also failed to show prejudice from any assumed deficiency. (Dkt. 65, at 21.) The court dismissed Djerf's contention that the alleged deficiency of his trial counsel resulted in his decision to proceed *pro se* and plead guilty, as well as his contention that, but for the alleged deficiency, trial counsel would have discovered evidence of Djerf's mental and neurological health that would have provided a defense to the first-degree murder charges, reasoning:

With regard to trial counsel's failure to thoroughly investigate and review guilt phase issues and discovery, Petitioner has not shown that a reasonable probability exists that he would not have proceeded *pro se*. Petitioner stated multiple times that he understood the significant and complex work trial counsel had completed on his case. (*See* Doc. 125 at 20–22). Petitioner also provided lack of communication—in particular, personal visits—

72

from trial counsel as the only reason for wanting to proceed *pro se*. (*See*, *e.g.*, *id.* at 20 ("I haven't been happy with the way I have been represented because, you know, [trial counsel] haven't been coming down there, and they haven't been, you know, keeping me advised of everything that's going on. So I just assume I can do this myself.")). Thus, even accepting Petitioner's argument of insufficient investigation, if trial counsel had sufficiently investigated and reviewed guilt phase issues and discovery, Petitioner would still have been upset by the lack of visitation from trial counsel and proceeded *pro se*.

With regard to trial counsel's failure to communicate competently with Petitioner, Petitioner has not shown that a reasonable probability exists that he would not have pleaded guilty. After Petitioner proceeded *pro se*, the prosecution offered Petitioner a plea in which Petitioner "would agree to plead guilty to four counts of first-degree murder without any agreement as to sentence in return for the prosecution's dismissal of the non-murder counts." (Doc. 124 at 35). Petitioner then met twice with Mr. Vaughn, in his role as advisory counsel, to review the plea agreement. (*Id.* at 34–35). After Petitioner changed his plea, he wrote a letter to Mr. Vaughn expressing anger for Mr. Vaughn's participation in media interviews. (*See* Doc. 124-1 at 121, 125). During these interviews, Mr. Vaughn apparently expressed disagreement with Petitioner's decision regarding the plea agreement. (*See id.*) Petitioner relies on this letter to argue that a reasonable probability existed that, had Mr. Vaughn still represented Petitioner, he would not have pleaded guilty. (Doc. 124 at 35–36). However, this letter never expresses regret for entering into the plea agreement. Instead, the letter expresses anger for Mr. Vaughn providing his opinions to the media rather than to Petitioner. Petitioner's letter concludes:

> The reason that I am confronting you with this is because I am considering withdrawing my waiver of [counsel] so that my sentencing may be conducted properly, but there is no way that I will do this unless I can be assured that problems like those mentioned throughout this letter will not continue. I will not put up with problems like this any longer, we need to resolve this matter.

(Doc. 124-1 at 127). Thus, Petitioner explicitly indicated that the purpose for writing the letter was to determine whether to withdraw his waiver of counsel for the sentencing phase of the case—not question his decision to enter into the plea agreement. Further, Petitioner independently justified his reason for entering into the plea agreement to a reporter, noting that "if he had a jury hearing all of the things that had happened at the [victims'] house, that it would inflame them, and it would be harder on him than if he just went before a judge." *Djerf*, 959 P.2d at 1285 n.6. Thus, the Court finds no indication that Petitioner would have rejected the plea agreement had Mr. Vaughn continued to represent him.

Petitioner next claims that, had trial counsel properly investigated the guilt phase issues of Petitioner's case, trial counsel would have discovered evidence of Petitioner's "mental and neurological health that could have been used to develop a defense to the first-degree murder charges against" Petitioner. (Doc. 124 at 36). The Ninth Circuit has "repeatedly held that defense counsel in a murder trial was ineffective where there was some evidence of the defendant's mental illness in the record but counsel failed to investigate it as a basis for a mental defense to first degree murder." *Daniels v. Woodford*, 428 F.3d 1181, 1206–07 (9th Cir. 2005 (citations omitted). For example, in *Jennings v. Woodford*, the Ninth Circuit held that the petitioner was prejudiced by trial counsel's failure to investigate the petitioner's mental health and drug abuse problems. 290 F.3d 1006, 1014–19 (9th Cir. 2002). The *Jennings* court noted that considerable drug and mental health evidence was in the record, including the petitioner's methamphetamine use, schizophrenia diagnosis, statements to the police, history of self-inflicted injuries, and involuntary commitment to a psychiatric evaluation, among other evidence. *Id.* at 1016. Because trial counsel ignored this evidence, the court found counsel's deficient performance to be prejudicial. *Id.* at 1019; *see also*, *e.g.*, *Seidel v. Merkle*, 146 F.3d 750, 755 (9th Cir. 1998) (holding that trial counsel was prejudicially ineffective for failing to conduct a reasonable investigation of guilt phase mental defenses despite "abundant signs in the record that [the petitioner] suffered from mental illness"); *Bloom v. Calderon*, 132 F.3d 1267, 1272 (9th Cir. 1997) (holding that trial counsel was prejudicially ineffective for failing to conduct a reasonable investigation of guilt

phase mental defenses despite considerable evidence in the record, including family history of mental illness, child abuse, spousal abuse, exposure to prescription drugs with psychiatric side effects, and significant findings from a psychologist and psychiatrists).

Here, Petitioner makes the conclusory statement that "evidence exists that Petitioner suffered from significant mental illness at the time of the offenses." (Doc. 124 at 36). However, Petitioner fails to cite any such evidence from the record. Rather, Petitioner relies solely on a 2005 neuropsychological evaluation that concludes that Petitioner "*may* qualifiy for a DSM-IV diagnosis of schizophrenia." (Doc. 124-1 at 131 (emphasis added)). Even if the Court were to assume that Petitioner would have retained trial counsel had they conducted additional investigations in Petitioner's mental health,[FN] and even if the Court were then to assume that Petitioner would not have still pleaded guilty due to his fears of inflaming a jury, this post-hoc neuropsychological evaluation does not show prejudicial ineffectiveness. Petitioner's citation to a mental health report conducted nine years after Petitioner pleaded guilty is insufficient to show prejudice. *See Harris v. Vasquez* 949 F.2d 1497, 1515–16 (9th Cir. 1990) ("Because psychiatrists disagree widely and frequently on what constitutes mental illness, . . . the mere presentation of a new psychological evaluations . . . does not constitute a colorable showing of actual innocence." (quotation marks and citations omitted)); *see also Boyde v. Brown*, 404 F.3d 1159, 1168–69 (9th Cir. 2005).

(Dkt. 65, at 21–24.) Thus, the district court concluded:

The Court finds that Petitioner has failed to show PCR counsel was deficient. Petitioner has also failed to show PCR counsel was prejudicially ineffective because Claim 3, which alleges that Petitioner's trial counsel were prejudicially ineffective, is meritless. Thus, the default of Claim 3 is not excused under *Martinez*, and the claim remains defaulted and barred from federal review.

(*Id.* at 24.) The district court was correct.

**B.** *Applicable law.*

- *Martinez relief*

To excuse the procedural default of a habeas claim, a petitioner must show both cause and prejudice, or a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "Cause" requires a showing that an external, objective factor impeded a prisoner's compliance with state procedural rules. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Prejudice" requires a showing that the alleged constitutional violation did not just "create[] a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

*Martinez* does not create a substantive constitutional claim for ineffective assistance of post-conviction relief counsel. 566 U.S. at 9–12. Instead, in *Martinez*, the United States Supreme Court held that an Arizona prisoner may establish cause to excuse the procedural default of an ineffective assistance of trial or sentencing counsel claim by 1) first showing that post-conviction counsel was ineffective under the standards of *Strickland* for defaulting the claim, and 2) demonstrating "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the

claim has some merit." *Id.* at 1318-19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

To establish post-conviction counsel's ineffective assistance, the petitioner must prove both *Strickland* prongs: 1) that counsel's performance was deficient and 2) a "reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Clabourne v. Ryan*, 745 F.3d 362, ___ (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015). To demonstrate post-conviction counsel's deficient performance, the petitioner "must show that PCR counsel's failure to raise the claim that trial counsel was ineffective was an error 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment,' and caused [the prisoner] prejudice." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) (quoting *Strickland*, 466 U.S. at 687). Because post-conviction "[c]ounsel is not necessarily ineffective for failing to raise even a nonfrivolous claim," he "would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton*, 679 F.3d at 1157 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009)).

In *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013), a majority of the *en banc* panel held that no showing of actual prejudice was required to overcome a

procedural default under *Martinez*; instead, the court concluded that, in the *Martinez* context, a petitioner establishes 1) cause by showing that post-conviction counsel was ineffective under *Strickland*, and 2) prejudice by showing that the underlying defaulted ineffective assistance of trial counsel claim was substantial. *Clabourne*, 745 F.3d at 377 (clarifying the multiple opinions in *Detrich* and identifying the majority's holding). Respondents contend that the *Detrich* majority incorrectly held that *Martinez* modified *Coleman's* actual prejudice requirement. The decision in *Martinez* was instead limited to whether an attorney's errors in an initial-review collateral proceeding could establish *cause*. 566 U.S. at 13–14.

The Court did not address prejudice and did not purport to overrule *Coleman*, which holds that a petitioner must show both cause *and actual prejudice* to overcome a procedural default. 501 U.S. at 750; *see Martinez*, 566 U.S. at 10 (observing that a prisoner may obtain federal review of a procedurally-defaulted claim by showing cause for the default and "prejudice from a violation of federal law"); *id.* at 18 (remanding for court of appeals to determine whether post-conviction counsel was ineffective, whether underlying trial ineffective assistance of counsel claim is substantial, and "the question of prejudice"); *see also Detrich*, 740 F.3d at 1261 (Nguyen, J., concurring in result)

(disagreeing with majority's holding that *Martinez* modified the prejudice prong of *Coleman's* prejudice requirement).

Consequently, to overcome the procedural default of a trial-level ineffective-assistance claim, a petitioner must establish cause, by showing that post-conviction counsel was ineffective under both *Strickland* prongs and that the defaulted claim is substantial, *and* prejudice, by showing that the underlying ineffectiveness "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Sexton*, 679 F.3d at 1158. However, without waiving the argument that the *Detrich* majority incorrectly held that merely showing a "substantial" defaulted claim satisfies *Coleman's* actual prejudice requirement, Respondents will address Djerf's claim under the framework set forth in *Clabourne*.

Djerf contends that *Clabourne* erroneously distinguishes between "prejudice" for purposes of "cause and prejudice" under *Martinez* and "prejudice" for purposes of determining whether post-conviction counsel was ineffective under *Strickland* and thus whether cause has been established sufficient to overcome procedural default. (Dkt. 75, at 91.) Djerf asserts that no "additional" proof of prejudice is required. (*Id.* at 91–94.) Djerf is mistaken.

In *Martinez*, the Supreme Court was clear that a petitioner must show *both* that post-conviction counsel was ineffective under *Strickland* (requiring a

79

showing of deficient performance *and* prejudice), and "must *also* demonstrate" that the defaulted claim is substantial. 566 U.S. at 14 (emphasis added). Thus, to establish cause under *Martinez*, a petitioner must show not only that post-conviction counsel performed deficiently by defaulting a substantial ineffective-assistance claim, but also that, had post-conviction counsel raised the claim in state court, there is a reasonable likelihood that the state court would have granted relief. *See Clabourne*, 745 F.3d at 377 (noting that the *Detrich* majority rejected the argument Petitioner advances here). The court in *Clabourne* recognized the overlap between these two requirements:

> . . . Within the "cause" prong there is an element of "prejudice" that must be established: to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the post-conviction proceeding would have been different. The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.

> Put in terms of the conclusions drawn from *Detrich*, the third conclusion—"prejudice" for purposes of the "cause and prejudice" analysis requires only a showing that the trial-level ineffective assistance of counsel claim was "substantial"—does not diminish the requirement of the second conclusion that petitioner satisfy the "prejudice" prong under *Strickland* in establishing ineffective assistance by post-conviction counsel. To demonstrate that there was a reasonable probability that, absent the deficient performance,

> the result of the post-conviction proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage.

*Clabourne*, 745 F.3d at 377–78.  As such, contrary to Djerf's assertion, the Ninth Circuit's conclusion that the remanded defaulted ineffective-assistance-of-trial-counsel-for-fifteen-months-pretrial claim is "substantial" for purposes of the *Martinez* remand does not absolve Djerf of the burden of proving both prongs of *Strickland*—deficient performance *and* prejudice.  (Dkt. 75, at 92–94.)

Further, the standard for determining whether a claim is substantial is *not* the standard for any subsequent review of a *Strickland* claim on the merits. A finding that a claim is "substantial" (the first *Martinez* requirement, which under *Clabourne* satisfies the prejudice prong of the cause-and-prejudice test) is comparable to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue.  *Martinez*, 566 U.S. at 14.  The *Martinez* court explained that "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief.  It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted."  132 S. Ct. at 1320.  As such, even if this Court assumed that a claim is "substantial" for purposes of a *Martinez* remand, this Court can ultimately conclude that the procedurally defaulted ineffective-assistance-of-trialcounsel-for-fifteen-months-pretrial claim fails on its merits.

- ***Strickland* standard**

To warrant relief on an ineffective assistance of counsel claim, a prisoner must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. He must satisfy both prongs of *Strickland*'s test by demonstrating that (1) counsel's performance was deficient under prevailing professional standards and (2) he suffered prejudice as a result. *Id.* at 687–88. A prisoner demonstrates deficient performance by showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 699. Generally, the experience of counsel is not relevant to a *Strickland* claim; "a claim of ineffective assistance [can be established] only by pointing to specific errors made by trial counsel." *Cronic*, 466 U.S. at 666.

Additionally, a reviewing court should "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994). Rather, as *Strickland* holds, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Even when a prisoner establishes that counsel has performed deficiently, he must still show prejudice to be entitled to relief. *Strickland*, 466 U.S. at 691-92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). A court cannot presume prejudice. *Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000). Rather, the petitioner must affirmatively prove actual prejudice—the mere possibility that he suffered prejudice is insufficient to establish *Strickland*'s prejudice prong. *See Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' . . . This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors *actually* prejudiced him.") (quoting *Strickland*, 466 U.S. at 693) (emphasis in original).

To make this showing, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (prejudice prong concerned with whether "counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair . . . [u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right"). A "reasonable probability"

is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

**C.** ***The district court correctly concluded that Djerf's post-conviction counsel reasonably elected not to raise a meritless ineffective assistance of trial counsel claim.***

Djerf again engages in a sustained personal attack on his post-conviction counsel (who is now deceased)—including attempts to use her personal mental health records—to establish essentially a strict liability or "presumptive" standard for ineffective assistance of counsel. (Dkt. 75, at 98–104.) However, *Strickland* is an *objective* standard. 466 U.S. at 688; *see also Richter*, 562 U.S. at 104. The question is simply whether post-conviction counsel's decision to raise several issues (including IAC of trial counsel claims) in the post-conviction petition and amended post-conviction petition (*see* Dist. Ct. ECF 120, Exhs. A and B) and subsequent petition for review in the Arizona Supreme Court (SER 1434–53), but not other issues amounted to both deficient performance and prejudice sufficient to establish cause.[16] It does not.

_____

[16] Djerf alleges that post-conviction counsel "never obtained any pleadings or transcripts from Djerf's trial court proceedings." (Dkt. 75, at 104–08.) Djerf's exhibits reveal that current counsel (FPD) took possession of Djerf's trial file (including the transcripts) in 1998 to "keep" until post-conviction counsel was appointed by the Arizona Supreme Court. (PSER at 72–74.) Post-conviction counsel was appointed in 2000 and began the process of gathering Djerf's file from all previous counsel. (PSER at 69–71.) Even if this allegation were relevant to the objective assessment under *Strickland*, the FPD's attorneys made
(continued ...)

A post-conviction attorney, whose function is similar to that of an appellate attorney, *Martinez*, 566 U.S. at 11, should not be expected to file "kitchen-sink briefs," despite what the ABA guidelines may advise.[17] The "process of 'winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.'" *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). A post-conviction attorney's failure to raise meritless claims does not constitute ineffective assistance. *See Sexton*, 697 F.3d at 1157 ("[A] PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective."); *see generally, e.g., Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard."); *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise issues on direct appeal does not

_____

( ... continued)

themselves potential witnesses in any inquiry regarding transcript transfers by taking possession of Djerf's file long before their appointment for habeas proceedings in 2002. (Dist. Ct. ECF at 4.)

[17] Djerf again discusses the ABA Guidelines (Dkt. 75, at 96–97), however, s previously discussed, these Guidelines are only guides and confer no mandatory duties upon counsel. *See Van Hook*, 558 U.S. at 17.

constitute ineffective assistance when appeal would not have provided grounds for reversal.").  Moreover, *Strickland* requires this Court to presume that counsel acted competently, and made all decisions through the exercise of reasonable professional judgment.  *See Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").  Because *Martinez* requires this Court to evaluate post-conviction counsel's performance under *Strickland*'s standards, it also requires this Court to apply *Strickland*'s deferential presumptions to counsel's decision-making.

Djerf contends that the lack of communication from his trial counsel, as well as general dissatisfaction with their performance and with his relationship with them, led him to request to represent himself. (Dkt. 75, at 113.)  Djerf further claims that had he not been proceeding *pro se*, he would not have pled guilty.  (*Id.* at 108.)  Djerf also contends that his post-conviction counsel's failure to include this ineffective assistance claim in his post-conviction petition, while including other, related claims—such as a claim that the trial court failed to adequately inquire into the reasons for Djerf's request to remove his trial counsel—demonstrates her deficient performance.  (*Id.* at 101–02.)

To the contrary, post-conviction counsel's actions demonstrate precisely the sort of discretion expected of counsel to winnow issues.  The defaulted

86

ineffective assistance claim is no stronger than the issues post-conviction counsel presented and, presumably, she reasonably omitted it. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome") (quotations omitted). Further, as shown below, this claim fails on the merits and raising it would not have affected the post-conviction proceeding's outcome. Post-conviction counsel was therefore not ineffective for omitting it. *See, e.g. Sexton*, 679 F.3d at 1157.

The district court's 2008 analysis dismissing Djerf's claim that the trial court did not adequately inquire into his reasons for waiving counsel provides insight into why his underlying ineffective assistance of trial counsel claim is likewise meritless:

> Under the Sixth Amendment, the main purpose of providing assistance of counsel is to ensure that criminal defendants receive a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984). In evaluating Sixth Amendment claims, the appropriate inquiry is on the adversarial process, not on the defendant's relationship with his lawyer. *See United States v. Cronic*, 466 U.S. 648, 657 (1984). Thus, in *Morris v. Slappy*, 461 U.S. 1, 13–14 (1983), the Court held that the Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between the defendant and counsel.

> Petitioner has cited no Supreme Court case—and this Court is not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by two lawyers free of any actual conflicts of interest, but who the defendant maintains are not communicating with him on a regular

basis. *See Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc) (applying the AEDPA and denying habeas relief in the absence of controlling Supreme Court precedent regarding petitioner's motion to change counsel due to dislike and distrust of his lawyer). . . .

* * *

. . . Petitioner never attempted to allege how his counsel were performing ineffectively, other than to complain that they were not communicating with him on a consistent basis. Contrary to Petitioner's allegations of ineffective performance, the factual record and the comments from the trial judge demonstrated that Petitioner's counsel were diligently preparing for his trial (RT 2/17/95; RT 2/23/95.)

Moreover, a lack of communication between counsel and a criminal defendant, without more, is generally insufficient to constitute ineffective assistance of counsel. *See United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1992); *see also United States v. Ceballos*, 302 F.3d 679, 696 (7th Cir. 2002). The record in this case does not show that a total lack of communication or a complete breakdown of the attorney/client relationship occurred. *See Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (en banc). Even if such a breakdown had occurred, Petitioner does not attempt to demonstrate that how [sic] his case was prejudiced by any perceived lack of communication. *Id.* at 1028. …

(ER at 030–32.) For these same reasons Djerf's contention that his counsel were ineffective during the same pretrial period fails.

For example, as previously discussed, at the hearing on Djerf's request to self-represent, the trial court engaged in a lengthy discussion with Djerf, in which Djerf acknowledged that his counsel had been interviewing many witnesses and engaging in extensive work in preparation for a complicated DNA

hearing, among other things, and that, even if counsel had not visited as frequently as Djerf desired, they were actively working on his case. (SER 336–39, emphasis added.)

Djerf's underlying ineffective assistance of trial counsel claim for failing to communicate and/or visit to his satisfaction is not colorable. *Cf. West v. Ryan*, 608 F.3d 477, 487 (9th Cir. 2010) (no colorable claim of ineffective assistance of sentencing counsel); *Stokley v. Ryan*, 659 F.3d 802, 809-14 (9th Cir. 2011) (same). A non-colorable ineffective-assistance-of-trial-counsel claim cannot form the basis for cause to excuse procedural default under the self-defined narrow exception outlined by the United States Supreme Court in *Martinez*. 566 U.S. at 9, 17–18. *See also Sexton*, 679 F.3d at 1157. Nor can post-conviction counsel be ineffective for failing to raise a meritless ineffective assistance of counsel claim. *Id.* at 1157, 1159-61. Counsel is not required to argue a claim refuted by the record. *Cuffle v. Goldsmith*, 906 F.2d 385, 388 (9th Cir. 1990).

Moreover, as pointed out by the district court and discussed above, a lack of communication between counsel and a criminal defendant, without more, is generally insufficient to constitute ineffective assistance of counsel. *See Molina*, 934 F.2d at 1448; *United State v. Ceballos*, 302 F.3d 679, 696 (7th Cir. 2002). (ER 032.) The record in this case does not show that a total lack of communication or a complete breakdown of the attorney/client relationship

occurred.  *See Schell v. Witek*, 218 F.3d 1017, 1026 (9th Cir. 2000) (en banc).

(ER 032.)  On remand, the district court expanded its conclusions regarding trial

counsels' communication with Djerf:

> Petitioner argues that both trial counsel performed "so little work" on his case and "had such minimal communication" with him that they were deficient.  (*Id.* at 21).  Petitioner cites to various illnesses, vacations, and unrelated cases that allegedly monopolized both trial counsel's time in arguing that trial counsel deprived Petitioner of adequate pretrial representation.  (*See id. at 26*).  In support, Petitioner refers to the Supreme Court case *Powell v. Alabama*, 287 U.S. 45 (1932).  In *Powell*, on the first day of a capital murder trial, a trial court had appointed an out-of-state lawyer, who had no opportunity to prepare the case or familiarize himself with local procedure, to represent the criminal defendants.  *Id.* at 56.  The Supreme Court held that "such designation of counsel as was attempted was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard."  *Id.* at 53.  Instead of examining the actual performance of counsel at trial, the Court concluded that, under the circumstances, there was a remote likelihood that counsel could provide effective assistance so the trial was inherently unfair.  *Id.*

> Here, unlike the attorney in *Powell*, both trial counsel performed substantial work on Petitioner's case.  For example, trial counsel interviewed "more than 50 witnesses," and with some interviews occurring "over multiple days."  (Doc. 125 at 24.)  Trial counsel also attended a nearly daylong review of evidence filed multiple motions, and "tried to negotiate" on behalf of Petitioner.  (*Id.*)  Petitioner did not dispute the work trial counsel performed.  (*Id.* at 25.)  Further, the trial judge repeatedly recognized the significant amount of work trial counsel performed.  (*See, e.g., id.* at 20, 23–24.)  Thus, the performance of both trial counsel stands in stark contrast to the performance of counsel in *Powell*.

> Petitioner also cites to the Ninth Circuit case *Crandell v. Bunnell*, 25 F.3d 754 (9th Cir. 1994) (per curiam).  In *Crandell*, a public defender was appointed to represent the petitioner.  *Id.* at

754.   Despite numerous attempts to contact his attorney, the petitioner was moved to the "pro per" section of the jail because he was told he did not have an attorney.  *Id.* at 755.  After months of the attorney failing to performwork on his case, the petitioner sought to represent himself during his capital proceedings.  *Id.* at 754–55.  The Ninth Circuit held that the petitioner stated a viable claim of ineffective assistance of counsel.  *Id.* at 755.

Here, unlike the petitioner in *Crandell*, Petitioner stated that he both knew of and understood that his attorneys had done a considerable amount of work on his case.  (Doc. 125 at 20, 22.)  Yet, despite this understanding, Petitioner insisted upon representing himself because his counsel were not sufficiently communicating with him.   (*Id.* at 20.)   Further, Petitioner's contention that his trial counsel failed to consult with him "about *any* aspect of the case" is overstated and contradicted by the record.  (Doc. 124 at 29 (emphasis added)).  For example, Petitioner states that "[b]etween July 1994 and February 1995 . . . lead counsel [Mr.] Vaughn faile to . . . inform [Petitioner] of the progress of his case."  (*Id.* at 25).  Yet, in Petitioner's February 1995 letter to the trial court, he stated that, since July 1994, he had spoken with Mr. Vaughn multiple times "over the phone and at court."  (*See id.* at 21.)

Although Mr. Vaughn did not make frequent personal visits to Petitioner, Petitioner fails to cite any case law that would render a lack of face-to-face meetings to be constitutionally deficient.  *See, e.g., United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) (holding that, standing alone, an attorney's failure to meet with his client more than four short meetings did not constitute constitutionally deficient performance); *see also Morris v. Slappy*, 461 U.S. 1, 13–14 (1983) (holding that the Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between the defendant and counsel); *United States v. Cronic*, 466 U.S. 648, 657 (1984) (emphasizing that the appropriate inquiry is on the adversarial process, not on the defendant's relationship with his lawyer).  Furthermore, Petitioner has not shown that a total lack of communication or a complete breakdown of the attorney/client relationship occurred.  *See Schell v. Witek*, 218 F.3d 1017, 1026–27 (9th Cir. 2000) (en banc)

(recognizing that "a total lack of communication" may result in the "constructive denial of assistance of counsel" in violation of a petitioner's Sixth Amendment rights); *see also Crandell*, 25 F.3d 754–55.

(Dkt. 65, at 18–20.)

Even if such a breakdown had occurred, Djerf cannot demonstrate that how his case was prejudiced by any perceived lack of pre-trial communication. *See Slappy*, 461 U.S. at 13–14 (holding that the Sixth Amendment requires only competent representation and does not guarantee a meaningful relationship between a defendant and counsel). In fact, the record reveals that Djerf's reasons for pleading guilty did not relate to his dissatisfaction with trial counsel, but because he did not want to "inflame" a jury with the details of the crimes he inflicted on the Luna family. *Djerf*, 959 P.2d at 1285 n.6 (quoting Special Verdict, at 18.) Moreover, any claim that his trial counsel were constitutionally ineffective pre-trial would have been premature and speculative as there was not yet any result from any guilt or sentencing proceeding.

Additionally, as discussed previously, the record in this case demonstrates that trial counsel were not ineffective during their pretrial representation of Djerf. At a status conference regarding the presentence aggravation/mitigation hearing, the trial court (in the course of addressing Djerf's subsequent "change of counsel" motion) reiterated that his trial counsel (then serving as advisory counsel) were experienced and prepared. (ER 415–16.) The State additionally

92

made a record regarding the work defense counsel had performed on Djerf's behalf:

> [THE PROSECUTOR]: The Court knows well what degree of work advisory counsel have put into this case, but the appellate record does not reflect that, and what I want the record to reflect is the work that they have put it, including personally interviewing many, many witnesses. I can't tell you the exact number, but I am confident it's more than 50 witnesses that have been personally interviewed, and some of those interviews went over multiple days. For example, the interview of Dr. Ann Bucholtz may have taken three or four days to complete. Counsel did all the major interviews themselves. Counsel attended a review of evidence with me and the police officers at the Phoenix police property room. That review took the majority of one entire day, and we reviewed literally everything that was in evidence that the police seized connected with this case. They filed motions, and they have tried to negotiate on behalf of the defendant.

> So I want the appellate record to reflect that also, because we know the work that's gone on, but I think it's important that the review[ing] Court also be aware of the efforts that they have placed on this case.

(*Id.* at 420–21.) Indeed, Djerf affirmed to the court, as did Mr. Vaughn and Mr. Simpson, the State's recitation of the work trial counsel performed on his case prior to Djerf invoking his right to self-represent. (*Id.* at 421–22.) Djerf subsequently withdrew his waiver of counsel, waived his right to self-represent, and permitted Mr. Vaughn and Mr. Simpson to represent him in the sentencing proceedings. (*Id.* at 424–26.)

The record thus established that Djerf's trial attorneys were actively investigating and preparing his case during their pretrial representation of him,

and Djerf did not dispute this point at trial. Consequently, trial counsel cannot be said to have been constitutionally ineffective simply because Djerf was unsatisfied with their communication with him. Thus, Djerf has not shown that had post-conviction counsel raised the ineffective-assistance-of-trial-counsel-during-pretrial-months claim in state court, there is a reasonable likelihood that the state court would have granted relief. *See Clabourne*, 745 F.3d at 377–78. Any post-conviction challenge to counsel's pretrial performance would have failed, and post-conviction counsel cannot be ineffective for failing to raise a meritless claim. *See Sexton*, 679 F.3d at 1157 (citing *Knowles*, 556 U.S. at 127 (2009)). Djerf has thus failed to establish cause for purposes of *Martinez* because he can show neither deficient performance of post-conviction counsel, nor prejudice under *Strickland*. Djerf is not entitled to relief on this claim, and the district court correctly dismissed it. *See also Brecht*, 507 U.S. at 634–39.

. . . .

. . . .

. . . .

## CONCLUSION

For the foregoing reasons, Respondents-Appellees respectfully request that this Court reject Djerf's certified claims and affirm the district court's order and decision denying his habeas petition.

Respectfully submitted,

Mark Brnovich
Attorney General
Lacey Stover Gard
Chief Counsel

s/   Ginger Jarvis
Assistant Attorney General

Attorneys for Respondents-Appellees

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28–2.6 of the Rules of the United States Court of Appeals for the Ninth Circuit, Respondent-Appellees state that they are unaware of any related cases.


s/    Ginger Jarvis_____
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE

1. This brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 24,065 words, excluding the parts of the brief that Fed. R. App. P. 32(a)(7)(B)(iii) exempts. See Motion to Exceed.

2. This brief complies with the typeface requirements of Fed. R. App. P.32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman type style.

DATED this 5th day of February, 2018.


s/____Ginger Jarvis_____
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 5, 2018.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Barbara Lindsay
Legal Secretary
Criminal Appeals/
Capital Litigation Sections
2005 N. Central Avenue
Phoenix, Arizona  85004-1580
Telephone: (602) 542–4686

6648398